## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MIFFLINBURG TELEGRAPH, INC., | : | No. 4:14-CV-0612 |
| | : | |
| Plaintiff, | : | (Judge Brann) |
| | : | |
| v. | : | |
| | : | |
| HEIDI CRISWELL, | : | |
| DALE E. CRISWELL, | : | |
| WILDCAT PUBLICATIONS, LLC, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

### SEPTEMBER 7, 2017

The instant motion for default judgment presents the thorny task of determining the value of the surviving goodwill in a small business after employees surreptitiously absconded with proprietary customer information.

## I.     BACKGROUND

Plaintiff, Mifflinburg Telegraph, Inc. filed a complaint on March 31, 2014 against Defendants Heidi Criswell, Dale E. Criswell, and Wildcat Publications, LLC.[1]  Mifflinburg Telegraph is a small business located in Mifflinburg, Union County, Pennsylvania, that operated, previously, as both a print shop and a newspaper publisher, and as of 2014, only a print shop.  Heidi and Dale Criswell

---

[1]    And others, who have since been dismissed from the action.

are spouses who had been two of only five employees of Plaintiff Mifflinburg Telegraph until their February 3, 2014 resignation from the business.

Heidi Criswell had been a long term employee of Mifflinburg Telegraph when its owner, John Stamm, died in 2013. Heidi Criswell's title was 'primary designer and printer,' but it is widely acknowledged that in the years preceding Stamm's death, while he was ill, she ran the business in his stead.

After Stamm's death, she entered into negotiations with the Stamm Estate to purchase the business for $225,000. Negotiations eventually failed, and in the fall of 2013, unbeknownst to the estate or Mifflinburg Telegraph, Heidi Criswell started a competing business, Wildcat Publications, LLC. Prior to her February 2014 departure from Mifflinburg Telegraph, she began providing customers with re-order forms listing Wildcat Publications contact information where Mifflinburg Telegraph's information had previously appeared. She also misappropriated from Mifflinburg Telegraph its customer list, then subsequently and secretly deleted the customer list from Mifflinburg Telegraph's computers so the business would not be able to use its own customer list. Not only did she delete the customer lists, she also deleted any order history, so that if a customer returned to Mifflinburg Telegraph with a repeat order, Mifflinburg Telegraph could not simply reprint a prior order, but would have to start from scratch and recreate the customer's logo and any other information.

There are currently three motions pending in this action, one as to each of the three remaining defendants. Mifflinburg Telegraph filed a Motion for Default Judgment as to Wildcat Publications, LLC,[2] a Motion for Partial Summary Judgment against Heidi Criswell,[3] and a Motion for Partial Summary Judgment against Dale E. Criswell.[4] The instant Memorandum Opinion disposes of the Motion for Default Judgment against Defendant Wildcat Publications, LLC, hereinafter "Wildcat." The pending motions for partial summary judgment will be disposed of by separate Memoranda Opinions and Orders.

The complaint began as a fifty-four page, two-hundred twenty paragraph, eighteen count complaint against six defendants. Ten counts are alleged against Defendant Wildcat.[5] Jurisdiction is based on two federal causes of action, alleged violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and the Lanham Act 15 U.S.C. § 1125. The Court is exercising supplemental jurisdiction over the pendant state claims.

What makes resolution of this default judgment motion more complex than the typical default judgment motion is the fact that Wildcat initially retained counsel. Counsel filed an answer to the complaint on behalf of these three

---

[2]   November 6, 2015, ECF No. 87.

[3]   August 15, 2016, ECF No. 122.

[4]   August 15, 2016, ECF No. 123.

[5]   The counts are detailed in Section II. A of this Memorandum Opinion.

Defendants.[6]  Thus, the default here is unlike the typical default one sees in federal

court where the Defendant simply fails to answer and the default is entered shortly

after the date the answer had been due.  Here, the default on the part of Wildcat

slowly unfolded over time.  After a fashion, there was a breakdown of the

relationship between counsel and the collective Wildcat Defendants.   I eventually

granted counsels' motion to withdraw.[7]   In so Ordering, I provided these

Defendants with two months, until July 28, 2015, to find replacement counsel.

When no counsel entered an appearance, I entered a second Order extending the

time one additional month.  However, I warned in that Order that:

> if the Wildcat defendants do not find counsel by August 28, 2015,
> approximately ninety days after their original counsel withdrew, no
> further continuances will be granted to find new counsel. The
> individual Wildcat defendants, Dale E. Criswell, Heidi Criswell, and
> Darlene Sharp may proceed pro se, that is to say they will represent
> themselves. If Wildcat Publications, LLC. does not find counsel by
> August 28, 2015, entry of default will be made against it. *See, e.g.,*
> *Galtieri-Carlson v.Victoria M. Morton Enterprises, Inc*., No. 2:08-
> CV-01777, 2010 WL 3386473, at
> *1 (E.D. Cal. Aug. 26, 2010).[8]

Neither Wildcat, nor the Criswells, obtained counsel by August 28, 2015.  In

fact, nearly two years later, these defendants still have not retained counsel.  On

---

[6]   June 11, 2014, ECF No. 35.

[7]   May 29, 2015, ECF Nos. 78 and 79.

[8]   July 28, 2015, ECF No. 80.

September 3, 2015, Mifflinburg Telegraph duly moved for entry of default and the Clerk entered default the same date.[9]

On November 6, 2015, Mifflinburg Telegraph filed a motion for default judgment[10] against Wildcat, and an evidentiary hearing was held on December 17, 2015. The motion for default judgment is now granted, for the reasons that follow.

## II. ANALYSIS

Because default judgment is being entered as a sanction here, I look both to the rule governing defaults, Federal Rule of Civil Procedure 55, and also to the case law of the United States Court of Appeals for the Third Circuit. First, I turn to the Rules of Civil Procedure.

### A. Motion for Default Judgment Standard

Federal Rule of Civil Procedure 55 discusses default and default judgment, the Rule provides in pertinent part:

(a) Entering a Default.

When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default.

(b) Entering a Default Judgment.

(1) By the Clerk. If the plaintiff's claim is for a sum certain or a sum that can be made certain by computation, the clerk—on the plaintiff's request, with an affidavit showing the amount due—must enter

---

[9]   September 3, 2015, ECF Nos. 85 and 86.

[10]   November 6, 2015, ECF No. 87.

judgment for that amount and costs against a defendant who has been defaulted for not appearing and who is neither a minor nor an incompetent person.

(2) By the Court. In all other cases, the party must apply to the court for a default judgment. A default judgment may be entered against a minor or incompetent person only if represented by a general guardian, conservator, or other like fiduciary who has appeared. If the party against whom a default judgment is sought has appeared personally or by a representative, that party or its representative must be served with written notice of the application at least 7 days before the hearing. The court may conduct hearings or make referrals—preserving any federal statutory right to a jury trial—when, to enter or effectuate judgment, it needs to:

(A) conduct an accounting;
(B) determine the amount of damages;
(C) establish the truth of any allegation by evidence; or
(D) investigate any other matter

"Courts should look with disfavor upon allowance of judgments by default."[11]   That said, however, "grant or denial of motion for entry of default judgment is within discretion of trial court; in exercising that discretion the philosophy of these rules favors trial on the merits in contradistinction to judgments by default and court must look to that policy not only when petition to vacate a default judgment is presented but also when approving or denying entry of default."[12]   The Honorable Arlin M. Adams, writing for the Third Circuit, explained:

---

[11]   *Hughes v. Holland*, 320 F.2d 781 (DC. App. Ct. 1963).

[12]   *Kocenko v. Buskirk*, 56 F.R.D. 14. (E.D.Pa.1972).

It is well settled in this Circuit that the entry of a default judgment is left primarily to the discretion of the district court. As Justice Harlan explained in the parallel context of sanctions for failure to prosecute a claim, a trial court's discretion to dismiss a complaint is a power of "ancient origin" that "has generally been considered an 'inherent power,' governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."[13]

"Once a default has been entered and entry of judgment pursuant to default is sought, the function of the trial court is not to weigh conflicting evidence, but, rather, a court must make sole determination whether allegations of party in whose favor default has been entered are susceptible of proof."[14] Default was entered against Wildcat on September 3, 2015.[15] "Defaults are treated as admissions of the facts alleged, but a plaintiff may still be required to prove that he or she is entitled to the damages sought."[16] "A reasonable calculation should be made by looking at the evidence and the affidavits submitted by the moving party."[17]

---

[13] *Hritz v. Woma Corp.*, 732 F.2d 1178, 1180 (3d Cir. 1984) (*citing Tozer v. Charles A. Krause Milling Co.*, 189 F.2d 242, 244 (3d Cir.1951) and *quoting Link v. Wabash Railroad Co.*, 370 U.S. 626, 629–31 (1962)).

[14] *In re Consolidated Pretrial Proceeding in Air West Securities Litigation*, 436 F.Supp. 1281. (N.D.Cal.1977).

[15] ECF No. 86.

[16] *Rainey v. Diamond State Port Corp.*, 354 F. App'x 722, 724 (3d Cir. 2009).

[17] *E. Elec. Corp. of New Jersey v. Shoemaker Const. Co.*, 652 F. Supp. 2d 599, 605 (E.D. Pa. 2009).

"Before entering a default judgment, a court must consider a number of factors." [18] "The Third Circuit . . . has condensed these factors into three main issues: (i) whether the plaintiff will be prejudiced if the default is denied, (ii) whether the defendant has a meritorious defense; and (iii) whether the default was the product of defendant's culpable conduct."[19]

First, Mifflinburg Telegraph will be prejudiced if the default is denied. This action has been pending for more than three year. It is a straightforward matter and the time has come for resolution. To delay entry of default any longer is unnecessary and would "detrimentally affect[] their ability to vindicate their rights."[20]

Second, Wildcat does not have a meritorious defense. "A meritorious defense is presumptively established when the "allegations of defendant's answer, if established on trial would constitute a complete defense to the action."[21] Wildcat had counsel at the time it answered the complaint. Its answer was docketed on June 11, 2014.[22] Wildcat's answer consists of general, generic denials of the averments in the complaint. While certainly an appropriate answer, it does not rise

---

[18]   *E. Elec. Corp. of New Jersey v. Shoemaker Const. Co.,* 657 F. Supp. 2d 545, 551 (E.D. Pa. 2009).

[19]   *Id.*

[20]   *Jimenez v. Rosenbaum-Cunningham, Inc.,* 2010 WL 1303449, at *6 (E.D. Pa. Mar. 31, 2010)

[21]   *Hritz v. Woma Corp.*, 732 F.2d 1178, 1181 (3d Cir. 1984).

[22]   ECF No. 36.

to the level of allegations that would constitute a complete defense to the action if this matter were to proceed to trial.

Third, the default is the product of Wildcat's culpable conduct. "The standard for 'culpable conduct' in this Circuit is the 'willfulness' or 'bad faith' of a non-responding defendant."[23] Wildcat has now been without counsel for more than two years. "It has been the law for the better part of two centuries ... that a corporation may appear in the federal courts only through licensed counsel."[24] "The same applies to [limited liability companies], even those with only a single member, because even single-member LLCs have a legal identity separate from their members."[25] Moreover, "default judgment can be imposed for failure to comply with a court's orders to retain substitute counsel."[26]

In addition to evaluating these three factors, "before granting a default judgment, a court must first ascertain whether 'the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law.'" To accomplish this, the Court accepts "the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true."[27]

---

[23] *Hritz v. Woma Corp.*, 732 F.2d 1178, 1182 (3d Cir. 1984).

[24] *Rowland v. Cal. Men's Colony*, 506 U.S. 194, 201–02, (1993).

[25] *Dougherty v. Snyder*, 469 F. App'x 71, 72 (3d Cir. 2012) (unpublished).

[26] *Opta Sys., LLC v. Daewoo Elecs. Am.*, 483 F. Supp. 2d 400, 406 (D.N.J. 2007).

[27] *Coach, Inc. v. Ocean Point Gifts*, 2010 WL 2521444, at *2 (D.N.J. 2010).

I find that Mifflinburg Telegraph has stated a legitimate cause of action against

Wildcat as to seven of the ten counts against it, as follows:

1. Count V: Aiding and Abetting Thru Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et. seq.*

The Computer Fraud and Abuse Act (hereinafter "CFAA") prohibits seven

fraudulent activities related to computers.  The Third Circuit has observed that

employers "are increasingly taking advantage of the CFAA's civil remedies to sue

former employees and their new companies who seek a competitive edge through

wrongful use of information from the former employer's computer system."[28]

Mifflinburg Telegraph has sufficiently plead that Heidi Criswell violated

several provisions of the CFAA, specifically 18 U.S.C. § 1030(a) (2)(C).

"Whoever--  intentionally accesses a computer without authorization or exceeds

authorized access, and thereby obtains -- information from any protected

computer"  and (a)(5) "Whoever--  (A) knowingly causes the transmission of a

program, information, code, or command, and as a result of such conduct,

intentionally causes damage without authorization, to a protected computer; (B)

intentionally accesses a protected computer without authorization, and as a result

of such conduct, recklessly causes damage; or (C) intentionally accesses a

protected computer without authorization, and as a result of such conduct, causes

---

[28] *P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504, 510 (3d Cir.2005).

damage and loss." "To state a civil claim for violations of the CFAA, AFS must allege: (1) damage or loss "to 1 or more persons during any 1–year period ... aggregating at least $5,000 in value"; (2) caused by; (3) violation of one of the substantive provisions of §§ 1030(a) or (b)."[29]

However, "the CFAA does not create a cause of action for aiding and abetting."[30] Mifflinburg Telegraph has not, therefore, satisfied the factual predicate to state a cause of action against Wildcat Publications for aiding and abetting under the CFAA. Accordingly, this claim fails as a matter of law.

### 2. Count VII: Aiding and Abetting Conversion

Mifflinburg Telegraph has sufficiently plead that Wildcat, through its principal Heidi Criswell, is liable for conversion. The law relating to conversion is well established in the Commonwealth of Pennsylvania. "A conversion is the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful

---

[29] *Advanced Fluid Sys., Inc. v. Huber*, 28 F. Supp. 3d 306, 326 (M.D. Pa. 2014) (Conner, J.) citing 18 U.S.C. §§ 1030(c)(4)(A)(i)(I), 1030(g).

[30] *Id.* at 327; *see also Flynn v. Liner Grode Stein Yankelevitz Sunshine Regenstreif & Taylor LLP*, 2011 WL 2847712, at *2–4, 2011 U.S. Dist. LEXIS 77217, at *7–9 (D.Nev. July 15, 2011); *and see* 18 U.S.C. § 1030(b) (Holding that the statute creates a cause of action against "whoever conspires to commit or attempts to commit" an offense under § 1030(a), but makes no mention of aiding and abetting liability).

justification."[31]  "Conversion may be committed by [u]nreasonably withholding possession from one who has the right to it."[32]

"The civil tort of aiding and abetting has the following elements: For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person."[33]

'Aiding and abetting' a conversion, however, does not appear to be a tort in Pennsylvania;  I was unable to find even a single case in Pennsylvania with a cause of action of 'aiding and abetting' a conversion.  Moreover, Mifflinburg Telegraph also did not cite to any cases where 'aiding and abetting' a conversion is a cause of action.  Accordingly, because I am unconvinced that this is a cause of action, and there has been no legal argument advancing the issue, I find that Mifflinburg

---

[31]  *Stevenson v. Econ. Bank of Ambridge*, 413 Pa. 442, 451 (1964).

[32]  *Id*. at 451-2.

[33]  *Bochetto & Lentz, P.C. v. Datz*,  2013 WL 11256829, at *3 (Pa. Super. Ct. 2013) *see also Cummins v. Firestone Tire & Rubber Co*., 495 A.2d 963, 969 (Pa. Super. Ct. 1985) (*quoting* Restatement (Second) of Torts § 876).

Telegraph has not satisfied the factual predicate to state a cause of action against Wildcat for aiding and abetting conversion.

### 3. Count X: Aiding and Abetting Breach of Fiduciary Duty

"Under Pennsylvania law, the elements that must be proven in order to maintain a claim for aiding and abetting a breach of fiduciary duty are: (1) a breach of a fiduciary duty owed to another; (2) knowledge of the breach by the aider and abettor; and (3) substantial assistance or encouragement by the aider and abettor in effecting that breach."[34] "In other words, "[i]n order to be found liable for aiding and abetting a breach of a fiduciary duty, one must demonstrate that the party knew that the other's conduct constituted a breach of a fiduciary duty and gave substantial assistance or encouragement to the other in committing that breach."[35] "A fiduciary duty may arise from "a confidential relationship between two parties."[36]

---

[34] *Synthes, Inc. v. Emerge Med., Inc.*, 25 F. Supp. 3d 617, 674-75 (E.D. Pa. 2014) *citing Reis v. Barley, Snyder, Senft & Cohen*, 667 F.Supp.2d 471, 492 (E.D.Pa.2009).

[35] *Id. citing Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.,* 296 F.3d 164, 174 (3d Cir.2002) (claim for aiding and abetting breach of fiduciary duties under ERISA); *see also* RESTATEMENT (SECOND) TORTS § 876, cmt. to subsection (b) (1979) ("If the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act.").

[36] *PTSI, Inc. v. Haley*, 71 A.3d 304, 311 (Pa. Super. Ct. 2013) (internal citation omitted).

The Third Circuit has recently held that an employee can "breach[] her fiduciary duty by forwarding confidential e-mails before she quit."[37] Heidi Criswell owed a fiduciary duty to her former employer, and breached it by taking emails and customer lists from Mifflinburg Telegraph's computers.[38] In Pennsylvania, a business entity can aid and abet breach of fiduciary duty.[39]

Accordingly, Mifflinburg Telegraph has satisfied the factual predicate to state a cause of action against Wildcat for aiding and abetting breach of fiduciary duty.

### 4.  Count XI: Tortious Interference with Business Relations

The elements of a cause of action for intentional interference with a contractual relation, whether existing or prospective, are as follows:

> (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party;
> (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring;
> (3) the absence of privilege or justification on the part of the defendant; and

---

[37] *Parks Miller v. Shutt et al.*,  2017 WL 3278883, at *3 (3d Cir. Aug. 2, 2017).

[38] *See id.*

[39] *See Koken v. Steinberg,* 825 A.2d 723, 732 (Pa. Commw. Ct. 2003) (holding that Plaintiff there had stated a claim that Deloitte & Touch, LLP  "render[ed] substantial assistance to another to accomplish a tortious act" sufficient to survive preliminary objections to dismiss a claim of aiding and abetting breach of fiduciary duty.)

(4) the occasioning of actual legal damage as the result of the defendant's conduct.[40]

As to the first element,

A "prospective contractual relationship" is something less than a contractual right, something more than a mere hope. Under Pennsylvania law, [Plaintiffs] must present adequate proof of an objectively reasonable probability that a contract will come into existence. [Plaintiffs] need only demonstrate that it is reasonably probable that it would have obtained a contract, not that it was guaranteed to do so. Stated another way, [Plaintiffs] may recover if, but for [defendant's] wrongful acts, it is reasonably probable that a contract would have been entered. This reasonable probability may result from an unenforceable express agreement, an offer, or the parties' current dealings, but not merely from prior dealings or an existing business relationship between the parties. [41]

"It is not enough for a plaintiff to show merely that defendant's actions had the incidental consequence of affecting plaintiff's business relationships with third persons."[42] "A plaintiff must show that the defendant acted for the malevolent purpose of interfering with the plaintiff's existing ... business relationships."[43]

---

[40] *Blackwell v. Eskin*, 2007 PA Super 20, 916 A.2d 1123, 1127-28 (2007) *citing Reading Radio, Inc. v. Fink*, 833 A.2d 199, 211 (Pa.Super.2003), *appeal denied,* 577 Pa. 723, 847 A.2d 1287 (2004) (*quoting Strickland v. University of Scranton*, 700 A.2d 979, 985 (Pa.Super.1997)).

[41] *Baier v. Jersey Shore State Bank*, 2009 WL 2843325, at *17 (M.D. Pa. 2009) (McClure, J.) (internal citations and quotations omitted).

[42] *Devon Robotics v. DeViedma*, 2012 WL 3627419, at *16 (E.D. Pa. Aug. 23, 2012) (Joyner, J.).

[43] *Id. citing Valley Forge Convention & Visitors Bureau v. Visitor's Servs., Inc.*, 28 F.Supp.2d 947, 951 (E.D.Pa.1998).

"The second element requires proof that the defendant acted for the specific purpose of causing harm to the plaintiff."[44] "The wrong ordinarily requires conduct intended to interrupt negotiations or prevent the consummation of a contract."[45] "[T]he second prong is satisfied if defendant acts improperly and with the knowledge that such interference is substantially certain to occur."[46]

"The third element requires proof that the defendant's actions were improper under the circumstances presented."[47] "The presence of a privilege is not an affirmative defense, rather, the absence of such a privilege is an element of the cause of action which must be pleaded and proven by the plaintiff."[48] "Whether a defendant is privileged or justified in a particular course of conduct is defined by "the rules of the game," or the "area of socially acceptable conduct which the law regards as privileged."[49]

---

[44]  *Phillips v. Selig*, 2008 PA Super 244, 959 A.2d 420, 429 (2008) (internal citations omitted).

[45]  *Orange Stones Co. v. City of Reading*, 87 A.3d 1014, 1025 (Pa. Commw. Ct. 2014) (*citing Glenn v. Point Park College*, 441 Pa. 474, 481, 272 A.2d 895, 899 (1971)).

[46]  *Id. citing*  RESTATEMENT (SECOND) OF TORTS § 766 cmt. j; § 766B cmt. d (1979).

[47]  *Phillips*, 959 A.2d at 429.

[48]  *Synthes, Inc. v. Emerge Med., Inc.*, 2014 WL 2616824, at *19 (E.D. Pa. June 11, 2014) *citing Bahleda v. Hankison Corp.* 323 A.2d 121, 122-123 (Pa.Super.1974).

[49]  *Orange Stones Co.*, 87 A.3d at 1025, *citing  Glenn v. Point Park College*, 441 Pa. 474, 482, 272 A.2d 895, 899 (1971).

Pennsylvania has adopted the Restatement Second of Torts proposition that the interference must be improper, i.e., without privilege or justification.[50] To determine impropriety includes consideration of: "(a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the others with which the actor's conduct interferes; (d) the interests sought to be advanced by the actor; (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (f) the proximity or remoteness of the actor's conduct to the interference; and (g) the relations between the parties."[51]

In applying these factors, comment b to section 767 is also instructive:

> The issue in each case is whether the interference is improper or not under the circumstances; whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another. The decision therefore depends upon a judgment and choice of values in each situation. This Section states the important factors to be weighed against each other and balanced in arriving at a judgment; but it does not exhaust the list of possible factors.[52]

In making this choice of values in individual cases, the Pennsylvania Supreme Court has advised that when the purpose of the defendant's conduct is, in whole or in part, to protect a legitimate right or interest that conflicts with the

---

[50] *See Empire Trucking Co., Inc., v. Reading Anthracite Coal Co.*, 71 A.3d 923 (Pa. Super. 2013).

[51] RESTATEMENT (SECOND) OF TORTS § 767, *and see, Phillips, supra* ([The] third element...is determined in accordance with the factors listed in Restatement section 767).

[52] RESTATEMENT (SECOND) OF TORTS § 767 cmt. b (1979).

interests of the plaintiff, a line must be drawn and the interests evaluated.

Although this evaluation of interests is not always susceptible of precise definition,

it is clear that the central inquiry is whether the defendant's conduct is sanctioned

by the "rules of the game" which society has adopted.

Mifflinburg Telegraph has satisfied the factual predicate to state a cause of

action against Wildcat for tortious interference with contractual relations by

providing re-order forms to existing customers with re-order information being

redirected from Mifflinburg Telegraph to Wildcat.

     5.   Count XII: Misappropriation and Misuse of Trade Secrets and
Confidential Information in Violation of Pennsylvania Uniform Trade
Secrets Act 12 Pa.C.S. § 5301, *et. seq.* "PUTSA"

The policy behind trade secret law is "the maintenance of standards of

commercial ethics."[53]  "Under PUTSA, a person has misappropriated a trade secret

'when he acquires knowledge of another's trade secret in circumstances giving rise

to a duty to maintain   its confidentiality and then discloses or uses that trade secret

without the other's consent.'"[54]  "PUTSA defines a "trade secret" as: "Information,

including a formula, drawing, pattern, compilation including a customer list,

program, device, method, technique or process that: (1) derives independent

economic value, actual or potential, from not being generally known to, and not

---

[53]  *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470 (1974).

[54]  *Synthes, Inc. v. Emerge Med., Inc.,* 25 F. Supp. 3d 617, 704–05 (E.D. Pa. 2014) *citing Bimbo
Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 110 (3d Cir.2010) (*citing*  12 Pa. Cons.Stat. §
5302).

being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; or (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.'"[55]

Mifflinburg Telegraph has satisfied the factual predicate to state a cause of action against Wildcat Publications for misappropriation of trade secrets under PUTSA for taking Mifflinburg Telegraph's customer list.

6. Count XIII: Unfair Competition

Nearly one-hundred years ago, the Pennsylvania Supreme Court defined unfair competition as "anything done by a rival in the same business by imitation or otherwise designed or calculated to mislead the public in the belief that, in buying the product offered by him for sale, they were buying the product of another manufacturer."[56] The spirit of the law can be expressed as "the deception practiced in 'passing off' the goods of one for that of another."[57] "The law of unfair competition also requires that a company, entering a field already occupied by a rival of established reputation, 'must do nothing which will unnecessarily

---

[55] Synthes, Inc., 25 F. Supp. 3d at 705 *citing* 12 Pa. Cons.Stat. Ann. § 5302

[56] *B.V.D. Co. v. Kaufmann & Baer Co.*, 272 Pa. 240, 116 A. 508, 508-09 (Pa.1922).

[57] *Volunteer Firemen's Ins. Servs., Inc. v. Fuller*, No. 1:12-CV-2016, 2012 WL 6681802, at *11 (M.D. Pa. Dec. 21, 2012) (citing *Pa. State Univ. v. Univ. Orthopedics, Ltd.*, 706 A.2d 863, 870 (Pa.Super.Ct.1998)).

create or increase confusion between his goods or business and the goods or business of the rival.'"[58]

Mifflinburg Telegraph has satisfied the factual predicate to state a cause of action against Wildcat for unfair competition.

### 7. Count XIV: Procuring Information by Improper Means

Pennsylvania has adopted RESTATEMENT OF TORTS § 759, Procuring Information by Improper Means, which provides "one who, for the purpose of advancing a rival business interest, procures by improper means information about another's business is liable to the other for the harm caused by his possession, disclosure or use of the information." "Moreover, the comments to § 759 clearly indicate information that is procured under this section need not rise to the level of a trade secret." [59] "It only need be confidential business information."[60]

Mifflinburg Telegraph has satisfied the factual predicate to state a cause of action against Wildcat for procuring information by improper means.

### 8. Count XVI: Civil Conspiracy

"In Pennsylvania, 'to state a cause of action for civil conspiracy, the following elements are required: (1) a combination of two or more persons acting

---

[58] *Pennsylvania State Univ. v. Univ. Orthopedics, Ltd.*, 706 A.2d 863, 870–71 (Pa. Super. Ct. 1998) (internal citations omitted).

[59] *Pestco, Inc. v. Associated Prod., Inc.*, 880 A.2d 700, 709 (Pa. Super. Ct. 2005) *citing* RESTATEMENT OF TORTS § 759 cmt. b.

[60] *Id.*

with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage.'"[61] To prove a civil conspiracy, it must be shown that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means.[62]

Additionally, the Pennsylvania Supreme Court stated that proof of malice, an intent to injure, is essential in proof of a conspiracy.[63] This unlawful intent must be absent justification. The test was set forth by that court as follows.

> Assume that what is done is intentional, and that it is calculated to do harm to others. Then comes the question, Was it done with or without "just cause or excuse"? If it was bona fide done in the use of a man's own property such legal justification would exist not the less because what was done might seem to others to be selfish or unreasonable. But such legal justification would not exist when the act was merely done with the intention of causing temporal harm, without reference to one's own lawful gain, or the lawful enjoyment of one's own rights.[64]

---

[61] *Gen. Refractories Co. v. Fireman's Fund Ins. Co.,* 337 F.3d 297, 313 (3d Cir. 2003*), citing Strickland v. Univ. of Scranton*, 700 A.2d 979, 987-8 (1997) (citation and internal quotations marks omitted) (*cited in Allegheny General Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 446 (3d Cir.2000)).

[62] *See Landau v. Western Pennsylvania National Bank*, 445 Pa. 217, 282 A.2d 335 (1971); *Fife v. Great Atlantic and Pacific Tea Co*., 356 Pa. 265, 52 A.2d 24 (1947); *Bausbach v. Reiff*, 244 Pa. 559, 91 A. 224 (1914); Baker v. Rangos, 229 Pa.Super. 333, 324 A.2d 498 (1974).

[63] *See Miller v. Post Publishing Co*., 266 Pa. 533, 110 A. 265 (1920); *Miller v. Harvey,* 215 Pa. 103, 64 A.2d 330 (1906); *Irvine v. Elliott*, 206 Pa. 152, 55 A.2d 859 (1903).

[64] *Rosenblum v. Rosenblum,* 320 Pa. 103, 108-09 (1935).

Mifflinburg Telegraph has satisfied the factual predicate to state a cause of action against Wildcat for civil conspiracy.

 9.  Count XVII: Unjust Enrichment

Pennsylvania law supports two species of unjust enrichment claims: "(1) a quasi-contract theory of liability, in which case the unjust enrichment claim is brought as an alternative to a breach of contract claim; or (2) a theory based on unlawful or improper conduct established by an underlying claim, such as fraud, in which case the unjust enrichment claim is a companion to the underlying claim."[65] The case at bar appears to be a claim of the latter, hinging upon other claims in the Plaintiff's complaint.

"Unjust enrichment is essentially an equitable doctrine."[66] "The elements necessary to prove unjust enrichment are: (1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value."[67] "The application of the doctrine depends on the particular factual circumstances of the case at issue."[68] "In determining if the doctrine applies, our focus is not on the intention of the

---

[65]   *Whitaker v. Herr Foods, Inc.*, 198 F. Supp. 3d 476, 492 (E.D. Pa. 2016).

[66]   *Mitchell v. Moore*, 729 A.2d 1200, 1203 (Pa. Super. Ct. 1999).

[67]   *Id.*

[68]   *Id.* at 1203-4.

parties, but rather on whether the defendant has been unjustly enriched."[69]   In

other words, "benefits conferred on defendant by plaintiff, appreciation of such

benefits by defendant, and acceptance and retention of such benefits under such

circumstances that it would be inequitable for defendant to retain the benefit

without payment of value."[70]  Employing circular reasoning, the Superior Court of

Pennsylvania has stated that "the most important factor to be considered in

applying the doctrine is whether the enrichment of the defendant is unjust."[71]

More helpfully, Pennsylvania has adopted the Restatement of Restitution for

determining whether there is unjust enrichment.[72] The Restatement provides

guidance that unjust enrichment can occur through conversion (§40), interference

with a trade secret (§42), or through a fiduciary or confidential relation (§43).[73]

Further, "an unjust enrichment claim may be pled as a companion… to a claim of

unlawful or improper conduct as defined by law—e.g., a tort claim."[74] When based

on an underlying claim, an unjust enrichment claim shall fall where the underlying

claims are dismissed.[75]

---

[69]  *Id.* at 1204.

[70]  *Schenck v. K.E. David, Ltd.*, 666 A.2d 327, 328 (1995) (internal citations omitted).

[71]  *Id.*

[72]  *D.A. Hill Co. v. Clevetrust Realty Inv'rs*, 524 Pa. 425, 432, 573 A.2d 1005, 1009 (1990).

[73]  RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 40, 42-43 (2011).

[74]  *Whitaker v. Herr Foods, Inc.*, 198 F. Supp. 3d 476, 493 (E.D. Pa. 2016).

[75]  *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 937 (3d Cir. 1999).

Because there is a factual predicate to support a finding of unjust enrichment, Mifflinburg Telegraph has stated a cause of action for unjust enrichment against Wildcat.

      10. Count XVIII: Violation of Section 43(A) of the Lanham Act, 15 U.S.C. § 1125

The Lanham Act is the federal law of unfair competition. The Act provides that a civil action exists when:

> any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> > (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.[76]

The Third Circuit has stated, "to prevail on its claim of unfair competition under Section 43(a), we have said a plaintiff must prove by a preponderance of the evidence: 1) that the defendant has made false or misleading statements as to his

---

[76] 15 U.S.C. § 1125(a).

own product [or another's]; 2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) that the deception is material in that it is likely to influence purchasing decisions; 4) that the advertised goods travelled in interstate commerce; and 5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc."[77]

Mifflinburg Telegraph has not satisfied the factual predicate to state a cause of action against Wildcat for a violation of the Lanham Act because there are no facts to support a finding that this matter involves interstate commerce. Accordingly, this claim fails as a matter of law.

### B.    The *Poulis* Factors

Having found that default judgment should be entered based on the facts presented, the Third Circuit has also enumerated a set of factors for district courts to consider when imposing judgment for failure to prosecute or answer in a variety of circumstances. Those factors, which the Third Circuit has referenced in the default and default judgment contexts, are commonly referred to as the *Poulis* factors from the seminal case *Poulis v. State Farm Fire & Cas. Co.*; they tally six in number. The Third Circuit explained that "dismissal is a drastic sanction and

---

[77] *Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm., Inc.*, 19 F.3d 125, 129 (3d Cir. 1994) *citing U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 922–23 (3d Cir.1990), *cert. denied*, 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990) (*quoting Max Daetwyler Corp. v. Input Graphics, Inc.*, 545 F.Supp. 165, 171 (E.D.Pa.1982)).

should be reserved for those cases where there is a clear record of delay or contumacious conduct."[78]  *Poulis* sets forth certain factors to consider before sanctioning Plaintiffs with dismissal.  The six factors are:

> (1) the extent of the party's personal responsibility;
> (2) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery;
> (3) a history of dilatoriness;
> (4) whether the conduct of the party or the attorney was willful or in bad faith;
> (5) the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and
> (6) the merit of the claim or defense.[79]

"Considerable delays, especially those that might "stretch on indefinitely, are sufficient to show prejudice to the plaintiff."[80] Moreover, " the defendant's failure or refusal to engage[ ] in the litigation process and [to] offer[ ] no reason for this failure or refusal may qualif[y] as culpable conduct with respect to the entry of a default judgment—indeed, for the Court to conclude otherwise would be to reward the recalcitrant or the oppositional and uncooperative."[81]

---

[78]  *Poulis v. State Farm Fire & Cas. Co.*, 747 F.2d 863, 866 (3d Cir. 1984) *citing Donnelly v. Johns-Manville Sales Corp.*, 677 F.2d 339, 342 (3d Cir.1982).

[79]  *Id.* at 868.

[80]  *Joe Hand Promotions, Inc. v. Yakubets*, 3 F. Supp. 3d 261, 271 (E.D. Pa. 2014) (Pratter, J.) (*citing Grove v. Rizzi 1857 S.P.A.*, No. 04–2053, 2013 WL 943283, at *2 (E.D.Pa. Mar. 12, 2013)).

[81]  *Yakubets*, F. Supp. 3d at 272 (*citing E. Elec. Corp. of N.J. v. Shoemaker Constr. Co.*, 657 F.Supp.2d 545, 554 (E.D.Pa.2009)).

The *Poulis* factors all weigh in favor of Mifflinburg Telegraph. Wildcat is responsible for failing to obtain substitute counsel to defend it, despite now having two years within which to do so. Additionally, Wildcat "has exhibited a history of willful dilatory behavior in this matter, and there is no effective alternative sanctions available other than the entry of a default judgment."[82] Although "not all of the factors need to weigh in favor of entering default judgment against a defendant,"[83] here all factors favor entry. Wildcat, as a limited liability company, simply cannot proceed *pro se*. Despite ample opportunity to retain counsel, Wildcat has not done so. I have no alternative other than to enter default judgment against it.

### C.      Damages Award

Although a hearing is never required under Rule 55(b)(2), as Wright and Miller explain, that rule grants the court "discretion to decide whether to enter a judgment by default" and "empowers the district judge to hold hearings . . . as it deems necessary and proper."[84] The most important consideration historically has been the preservation of a right to a jury trial where that right is statutorily guaranteed. Relatedly, Wright and Miller explain that courts often find it beneficial to hold a narrow, trial-like hearing in the event that the Defendant

---

[82]   *Opta Sys., LLC v. Daewoo Elecs. Am.*, 483 F. Supp. 2d 400, 406 (D.N.J. 2007)

[83]   *Plumbers Union Local No. 690 v. F.P.S. Plumbing, Inc.*, 2009 WL 2591153, at *2 (E.D. Pa. Aug. 20, 2009)

[84]   10 C. Wright, A. Miller, & M. Kane, <u>Federal Practice and Procedure</u>, § 2688.

contests the amount of damages.  Here, a hearing was conducted on Mifflinburg Telegraph's motion for the Court to determine the appropriate amount of damages.

As noted, determining the damages in this matter is more difficult than in other cases.  The reasons for this are multi-fold.  First, Plaintiff, both in its papers and at the hearing, did not fully justify the amount claimed.  Second, there is no opposing counsel to aid in deconstructing Plaintiff's demand.  Third, there is little in the way of concrete damage to the business, as the damage is principally an intangible damage to its goodwill.  Fourth, any decrease in the value of the business could be attributed to its loss of employees - both the death of the owner, John Stamm, and also of Heidi Criswell's departure.  While her resignation was clandestine, it was not prohibited by a non-compete agreement.  Finally, the market may have had a negative impact on the business value, as well.  Attempting to value a printing company during the explosion of internet services is daunting, to say the least.[85]

However, although formidable, the task is not impossible.  I have the aid of the testimony and exhibits presented, both at the hearing and from pre- and post-hearing briefing.

---

[85]  I liken it to a judge a century ago, being tasked with valuation of a horse and buggy business while Henry Ford was debuting his Model T.

The current president of Mifflinburg Telegraph, John Helwig, who entered into that position on January 13, 2014, testified at the hearing. The salient portions of his testimony are noted herein.

> The morning of February 3rd, I believe it was Monday morning about two weeks after I had started, I went to work and there were three resignation letters on my desk.

> I wasn't sure exactly what to do. I panicked a bit. But I started Heidi's computer, which was used for the design of all of the products for our clients. I discovered that the data files had been wiped out. The e-mails had been deleted. Basically there was nothing there except for the programs.

> In our business we, for a project, we create a file for a customer that would consist of their logos, their letterhead, the information that would be used to create their project would then be saved to recreate it later. Most of our business is return business. So for instance, if you come in and want to buy a business card or an invoice, we don't have to recreate it again every time. It's just reprinted from the past data files.

When asked about invoices for two different computer companies for the recovery of the data on the computers, Mr. Helwig explained that initially the forensic data recover company retained could not recover any files, and while some of the computer files were eventually recovered, those files were not useful. He continued, in relevant part,

> Well, they were -- he may have recovered 10,000 files but instead of them being labeled as the client files would have been, they were labeled -- or they were renamed one through 10,000. So going through each file individually we could pick, you know, some aspects might have part of a project that was number three and part of a project that

was number, you know, 5,003. But for the most part the data files were gone, the images were gone.

We spoke to several customers that were -- that had told us that they were told that the business was closing or that the business was moving and there were a number of people that quite simply were told that we wouldn't be there anymore. That the business was no longer in existence. They said some things that led us to believe that they were told that there were untoward things going on in the business.

I was able to get into the program, the website rather, that allowed me to forward the e-mails from the prior employees so the emails were still coming through and -- for instance Heidi and Darlene but they were coming to my email address.

[Exhibit 3] is a recovered e-mail from Darlene's computer to what I found later was an email address for Heidi.

The attachment is a mailer list which is our mailing list for the Telegraph.

[The mailing list is] the names, addresses, known numbers, all of the contact information for the business that we had done as the Telegraph. I can't tell you how far back it went but I'm sure it was years.

When asked about a printer that Wildcat had taken from Mifflinburg

Telegraph, Mr. Helwig explained,

It [the printer] was picked up by Ricoh [the company supplying the printers]. Several weeks later I received a bill for moving it to Wildcat to Heritage [another name for Wildcat], it was -- the 720 [type of printer] is actually owned by the Telegraph. We have a lease for the 651 [another type of printer] and bundled into that lease is the buyout for the 720. So what it was taken it was moved to Heritage and then the bill was sent to me for the move and when I confronted our representative at Ricoh about this I was told that that's what -

that's what they had arranged for.  For us to be paying for it and not having it.

The entire lease payment is about $2,000 a month.  I'm not exactly sure what the breakdown is between the lease for the 651 and the buyout of the 720.  I actually requested the information from Ricoh and I still haven't gotten a firm answer on that.  But I believe it's about 25 percent of the remaining payments that I'm making.  The payments that I'm making go towards the buyout.

The printer is now in our possession.  We were paying for the printer when it was not in our possession as well.  The lease we had for both the leased printer and the 720 which was a purchased printer were rolled into one number and then the 720 left our possession, I should say.

When asked about the damage to the business, Mr. Helwig testified that

Mifflinburg Telegraph was not turning a profit.  He continued, in salient part,

I would like to think that we have been able to gain some organic growth.  But the overall decline, the overall dip from comparing 2013 to 2014 to 2015 is still going to be better than 50 percent.  I don't -- like I said I would like to think it was better that we've been able to gain some business.  But the majority -- the vast majority of the existing business that we did come again is return business, returning customers left the Telegraph.

[They went] to Heritage, to Wildcat.

The majority of the losses come from the loss of business from the historic customers of the Mifflinburg Telegraph.  Whereas before a customer list included many of the local businesses, when those businesses were told, were directed rather that the Telegraph was closing it took the business to Heritage under Wildcat.  So the business that -- the business that we were continuing to do is either business owners that did not care to do business with Ms. Criswell or newer businesses or business that we have gotten organically out of the area.

Angelo Mark Papalia, the executor for the (still open) John Stamm estate also testified. Mr. Papalia also attempted to explain how the Plaintiff had arrived at a damages amount of $264,662.47. His testimony, in relevant part, is as follows:

> There was an agreement to go forward [with a sale of the business to Heidi Criswell] with a value of $225,000.
>
> I had actually -- my assessment of the value was slightly higher than that. It was an agreed upon value in agreed upon negotiations back and forth.
>
> I had come up with a number closer to $300,000. I had used -- I had looked at an even number as an average an adjusted EBDIT that for the previous five years of the business and came up with approximately $75,000 as to the yearly adjusted EBDIT files of the business.
>
> [EBDIT is] the earnings before depreciation, interest, and taxes. So it's in purchasing or selling businesses it's a very common method of valuing a company EBDIT.
>
> I used the four times multiple of EBDIT which from talking to other business experts that sell the printing type businesses or other types of businesses, they felt a multiple of somewhere between four and five times was a reasonable number to sell the business that being it's value.
>
> Most of the assets of the business were really the clients and the earnings capacity of the business that they had generated from those previous customers over the years and that ongoing relationship with those customers.
>
> [Mifflinburg Telegraph] had a very significant [tax] loss [in 2014]. It was $211,000.
>
> [The internal loss for 2014 was] $184,415. [For 2015 it was] $88,454.

I think the business has a negative value today.  During -- during this time since the beginning of last year when Heidi Criswell and the other employees left the business, there needed to be significant loans from the trust to the business to continue the operation of the business and as well as pay for inventory and a lot of things that the business was no longer able to do because of relationships that had been disrupted through their leaving.  But that loan over the last two years is as of today $425,000, which were loans given from the trust created from John Stamm's estate to the Mifflinburg Telegraph.  None of those loans existed at the time of Heidi Criswell and the other employees left.

At the time, also based on the asset purchase agreement, the business was worth $225,000.  And my statement today is the business would actually -- if you sold the assets of the business you would end up with a negative value and be unable to repay the debt.  That's where I got to the $250,000 was taking out the legal fees related to the loan because those fees were paid by the Telegraph and taking the value of the business as well as some of the miscellaneous expenses that we've been forced to pay to get the $250,000.  Because I would come up with a negative value today.

A much smaller amount of customers than it had two years ago with 75 percent of those customers leaving, 50 to 75 percent and still had some of the other assets being, you know, some older equipment, some printing materials and things of that nature.

…the business was to be purchased for 225,000 it now has a negative value.

Even the reorder cards that were described earlier, those were put out in all of the packages for printing that were done at the Telegraph for several months prior to them leaving so that when the customer reordered the card would go back to Wildcat Publications to do all of the business that our existing business was moving just by work that we were doing at the Telegraph.  It created an unfair environment.  I have no way to tell you what it would look like had they established a fair competing business because they didn't.

When I was trying to determine what to sell it for, I looked at five years of tax returns at that time and I believe they were all returned by Larson Kellett and that would be at least six years ago.

It was profitable. There was also internal -- in a small business when you own the real estate separately there's some internal flow of money. So there were rents being paid for the Telegraph building which no longer are being paid because of cash flow of the business. So they are just using it now with no rent. John Stamm was taking you know salaries and income from the business. When you added those things up I was getting an average number of five years of 75,000 a year. If you look at 2013 alone I believe -- and I don't have this in front of me, so I may be a little bit off, I believe it had approximately a $30,000 loss in 2013, the year of his death. Part of that was the rents that had been paid over to the -- they paid 2,000 a month to the rental property. So you ended up relatively break even in 2013 give or take a little bit. Prior to that they were profitable. And John Stamm just in the assessment of whether his death created the issue, he had been sick for several years prior to that with cancer. And was unable to really do much in the business. So he wasn't really as actively involved as he was say five years ago in the business. So the business was being operated for at least the two years prior to his death really by Heidi. So I don't know that his death alone created any significant difference. I can't define that. It's impossible you know to know for sure what would happen but that's all I know from just being involved.

Mifflinburg Telegraph also provided exhibits and affidavits supporting its damages request. It asks for three categories of damages: the cost of the rental for the pilfered printer; the cost of the forensic data recovery service; and the loss of goodwill to the business. The first two types of damages Mifflinburg Telegraph requested are sum certain, and therefore, require only simple calculation before making an award. "A claim for damages is a sum certain when there is no doubt as

to the amount to which a plaintiff is entitled as a result of the defendant's default."[86]

Plaintiff's Exhibit One is a series of three bills from Kinn Computers for the forensic recovery services it provided.  These three bills total $9,304.57. [87]  This amount will be awarded to Plaintiff.

Mr. Helwig's affidavit in support of the motion for default judgment attests that the payments Mifflinburg Telegraph made for the printer rental while it was in Wildcat's possession was $5,358.00.  This amount will also be awarded to Plaintiff.

The remainder of the damage calculation is based on the loss of goodwill to the business.  This is not a sum certain calculation.

In 2013, the value of the business is best estimated at $225,000.  Despite Mr. Papalia's testimony that he believed it to be $300,000, the amount was undoubtedly closer to $225,000; that is what a ready, willing, and able buyer was prepared to pay for it.

Mifflinburg Telegraph attached to its post-hearing brief, the sworn affidavit from Bob McCormack the Managing Partner of Murphy McCormack Capital Advisors LLC.   Mr. McCormack valued the business as of 2013 at somewhere

---

[86]  *Lincoln Harbor Enterprises, LLC v. M.Y. Diplomat*, 2008 WL 5046787, at *6 (D.N.J. Nov. 21, 2008) (internal citation omitted).

[87]  The bills are for $553.32; $2,950; and $5,801.25.

between $91,000 and $292,000, using multiple methods.  Using the capitalization

of earnings method, he found an enterprise value of $194,000 with an equity value

of $128,000.  Using the Business Reference Guide he valued the enterprise at

between $91,000 to $292,000 with an equity value of $25,000 to $226,000.   For

the year 2015, Mr. McCormack attested that the business has negative values at

both the enterprise and equity levels.

Although Mr. McCormack attested that the business has no current value, I

cannot, in good conscience, award Mifflinburg Telegraph an amount equal to the

sales price, had the sale gone through.   The goodwill here is clearly diminished

due to the duplicitous actions of Wildcat and the Criswells, but the assets and

accounts receivable remain; the business survived and is operating.  So there must

be some value remaining, despite the protestations of Mifflinburg Telegraph. The

Criswells acted wholly inappropriately and in an underhanded manner, but their

actions did not destroy the business to the point of zero value.   The Criswells were

under no employment agreement that required them to stay as employees. Nor

were they under contract to buy Mifflinburg Telegraph.  Nor did they have a

covenant not to compete.  What they did was unfair, surreptitious, and frankly

wrong, but the damages award should represent the damage they caused to

Mifflinburg Telegraph in the form of lost profits -- not, as Mifflinburg Telegraph

desires -- the entire sales price of the failed sale.  Therefore, I discount the values

Mr. McCormack attributed to the business. To provide a business that is still operating the entire sales contract price would make Mifflinburg Telegraph more than whole.

Finally, Mifflinburg Telegraph provided several years of tax returns. I find these returns to be more instructive to the task at hand. In 2008, Mifflinburg Telegraph's Form IRS Form 8879-S reported a gross profit of $352,390. My calculations show that gross profit decreased in 2009 by 20% to $281,562. In 2010, gross profits remained relatively flat at $272,000. In 2011, gross profits decreased by 7% from the prior year to $252,241. In 2012, gross profits again decreased by 24% from the prior year to $192,492. In 2013, gross profits decreased slightly less, by almost 10% to $165,498. Tellingly, from 2013 to 2014, the final tax return provided to the Court, the 2014 gross profits of the business plummeted by almost 70% to $52,900.

I find a 70% drop in the value of the business to more closely represent the harm done here than the 100% loss that Mifflinburg Telegraph suggests. While still an imperfect calculation, as the 70% drop in business value also may comprise loss representing both the steady decline in the profitability of the business over the prior few years and also the death of the owner. However, Mr. Papilia also testified that Mifflinburg Telegraph had lost somewhere between 50 and 75 percent of its customers due to the actions of Wildcat and the Criswells. So this loss of

most of the customers in the business comports with a finding that the actions of Wildcat through the Criswells diminished the value of Mifflinburg Telegraph by 70%.  Accordingly, I value the damages to the business to be $157,500, representing 70% of the 2013 value of $225,000.  This amount will be awarded to Plaintiff.

"Fed.R.Civ.P. 54(c) provides that a default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings."[88] "The rationale for this provision is that the 'defending party should be able to decide on the basis of the relief requested in the original pleading whether to expend the time, effort, and money necessary to defend in the action.'"[89]  I find here that an award totaling $172,162.57, comprising of $157,500.00 in damages to goodwill, $5,358.00 for the printer, and $9,304.57 for the forensic computer recovery services, in compensatory damages is rationally related to the amount demanded in the complaint.

### D.    Attorney's Fees award

"The "American Rule" [is] that each party in a lawsuit ordinarily shall bear its own attorney's fees unless there is express statutory authorization to the

---

[88]  *Lincoln Harbor Enterprises, LLC v. M.Y. Diplomat*, 2008 WL 5046787, at *6 (D.N.J. Nov. 21, 2008) *citing* 10A Wright, et al., FEDERAL PRACTICE & PROCEDURE: Civil § 2663 (3d ed.1999).

[89]  *Id. citing* 10A Wright, et al., FEDERAL PRACTICE & PROCEDURE: CIVIL § 2663 (3d ed.1999).

contrary."[90] Attorney's fees and expenses may be awarded to a prevailing party in a federal litigation where authorized by statute, court rule, or contract.[91] Mifflinburg Telegraph seeks an award of attorney's fees pursuant to both the Pennsylvania Uniform Trade Secrets Act and the Lanham Act. As stated above, I am not entering default judgment based on the alleged violation of the Lanham Act; I am, in part, entering default judgment for a violation of the Pennsylvania Uniform Trade Secrets Act. Under that act "a court may award reasonable attorney fees, expenses and costs to the prevailing party if… willful and malicious misappropriation exists."[92]

Plaintiff argues "willful and malicious misappropriation" on the part of Wildcat.[93] 'Willful and malicious' is defined as such intentional acts or gross neglect of duty as to evince a reckless indifference of the rights of others on the part of the wrongdoer and an entire want of care so as to raise the presumption that the person at fault is conscious of the consequences of his carelessness."[94]

---

[90]   *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983).

[91]   *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 257, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).

[92]   12 Pa. C.S. § 5305.

[93]   ECF No. 106 at 12.

[94]   18A SUMM. PA. JUR. 2D COMMERCIAL LAW § 19:45 (2d ed.).

I find here that the actions of Defendant were 'willful and malicious.'[95]  In a similar case, arising out of our sister court in the Western District of Pennsylvania, the Honorable Donetta W. Ambrose found that "where the employee spent months letting the employer believe that he was working in its best interest; used the employer's name, reputation, contacts, and resources to develop an automated system; and then resigned, taking with him the system knowing full well that not only was he misappropriating a trade secret but that he would also simultaneously be depriving the employer of the ability to use that trade secret."[96]

The factual scenario here is similar to that in Judge Ambrose's case.  Heidi Criswell spent months negotiating a buyout of Mifflinburg Telegraph while simultaneously, and surreptitiously, organizing the Wildcat business.  She stole the customer list.  She misappropriated re-order forms.  Finally, she intentionally deleted Mifflinburg Telegraph's computer files, hindering Mifflinburg Telegraph's ability to operate.

In its post-hearing brief, Mifflinburg Telegraph requests $178,679.29 in legal fees and costs.  "A district court in a statutory fee case may not reduce the number of hours claimed by an attorney if the adverse party has declined to "raise a material fact issue as to the accuracy of representations as to hours spent, or the

---

[95]  However, I award only attorney's fees, as Plaintiff did not request exemplary damages.

[96]  *Id. see also B & B Microscopes v. Armogida,* 532 F. Supp. 2d 744 (W.D. Pa. 2007).

necessity for their expenditure."[97]  The reason for this is two-fold.  "First that *sua*

*sponte* reduction of a fee request deprives the fee applicant of her entitlement to 'to

offer evidence in support of the reasonableness of her request.'"[98]  "And second,

because statutory fee litigation is adversarial litigation, there is no need to allow

the district court to reduce a fee award on its own initiative."[99]  That said, however,

> the District Court has a positive and affirmative function in the fee
> fixing process, not merely a passive role. It should reduce the hours
> claimed by the number of hours spent litigating claims on which the
> party did not succeed, that were distinct from the claims on which the
> party did succeed, and for which the fee petition inadequately
> documents the hours claimed. The party opposing the fee award has
> the burden to challenge by affidavit or brief with sufficient specificity
> to give fee applicants notice, the reasonableness of the requested fee.

---

[97]  *Bell v. United Princeton Properties, Inc.*, 884 F.2d 713, 719 (3d Cir. 1989) *quoting Cunningham v. City of McKeesport*, 753 F.2d 262, 267 (3d Cir. 1985), *see e.g. Ward v. Philadelphia Parking Auth.*, 2015 WL 263733, at *8 (E.D. Pa.  21, 2015), *aff'd*, 634 F. App'x 901 (3d Cir. 2015); *and see Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)) ("The district court retains a great deal of discretion in deciding what a reasonable fee award is, so long as any reduction is based on objections actually raised by the adverse party.");  *and see ACLF of Delaware v. Dep't of Correction of Delaware,* 2014 WL 4755520, at *5 (D. Del 2014*), report and recommendation adopted sub nom. ACLF of Delaware v. Dep't of Correction, Delaware,* 2014 WL 6657242 (D. Del. Nov. 24, 2014)

 The exception to this general rule is those matters within the judge's personal knowledge, for example, a hearing in court.  *See A minor v. Harrison Twp. Bd. of Educ.,*  2016 WL 4430929, at *3 (D.N.J. Aug. 19, 2016).

[98]  *Id.*

[99]  *Id.*   Moreover, this reasoning applies across contexts.   "The reasoning articulated in Cunningham I with respect to this principle is not unique to the area of civil rights, and we can see no reason to create a different jurisprudence of fee awards in ERISA cases." *Bell v. United Princeton Properties, Inc.*, 884 F.2d 713, 719 (3d Cir. 1989) *Cf. Delaware Valley Citizens' Council for Clean Air v. Pennsylvania,* 762 F.2d 272, 275 (3d Cir.1985) (holding that the same standards apply for setting "reasonable" attorney's fees under the Clean Air Act's fee shifting provision as under 42 U.S.C. § 1988), modified on other grounds, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986), rev'd on other grounds, 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987); *see also Independent Federation of Flight Attendants v. Zipes*, 491 U.S. 754, 109 S.Ct. 2732, 2735 n. 2, 105 L.Ed.2d 639 (1989).

However, the district court cannot 'decrease a fee award based on factors not raised at all by the adverse party.[100]

Although I cannot *sua sponte* reduce the fee award based on hours expended, I may eliminate any 'unreasonable' hours.[101] "A reasonable fee is one which is adequate to attract competent counsel, but which does not produce windfalls to attorneys."[102] "To the extent the affidavit leaves any doubt as to the amount of fees to be awarded, these doubts shall be resolved against an award of fees."[103]

Here, Mifflinburg Telegraph provided printouts from its billing system to support its fee request. However, the printouts are vague and unhelpful to determining what portion of the fees are attributable to the claims specifically against Wildcat. "[T]he party seeking to recover attorney's fees bears the burden of establishing its right to them."[104] "Even in a default judgment case, therefore,

---

[100] *Loughner v. Univ. of Pittsburgh*, 260 F.3d 173, 178 (3d Cir. 2001).

[101] *See Bell, supra.*

[102] *Pub. Interest Research Grp. of New Jersey, Inc. v. Windall*, 51 F.3d 1179, 1185 (3d Cir. 1995) (internal citation omitted).

[103] *Spectrum Produce Distrib., Inc. v. Fresh Mktg., Inc.*, 2012 WL 2369367, at *3 (D.N.J. June 20, 2012)

[104] *Veneziano v. Long Island Pipe Fabrication & Supply Corp.*, 238 F.Supp.2d 683, 695 (D.N.J.2002)

Plaintiff must establish the threshold reasonable lodestar to the Court's satisfaction."[105]

As an initial matter I find that the hourly rate requested is squarely within the rate I have previously set for this vicinage, and is therefore reasonable.[106] However, Mifflinburg Telegraph has not met its burden of establishing reasonableness with regard to hours spent on the three counts I delineated above which could not state a claim and the six counts which are common law based, with no fee shifting authority. "A plaintiff requesting attorney's fees must provide evidence supporting the time claimed to meet its burden of establishing the reasonableness of the hours worked."[107] The late Justice Antonin Scalia has explained, "under th[e] 'American Rule,' we follow 'a general practice of not awarding fees to a prevailing party absent explicit statutory authority.'"[108]

Mifflinburg Telegraph has not outlined its fee request by claim; it has not met its burden of establishing the reasonableness of the hours worked on the one successful claim that is subject to fee shifting, as opposed to the unsuccessful claims and the successful claims that are not subject to fee shifting. "It is the role

[105] *Spectrum Produce Distrib., Inc.*, at *3.

[106] *See Beattie v. Line Mountain Sch. Dist*. 2014 WL 3400975, at *1 (M.D. Pa. 2014); *Nittany Outdoor Advert., LLC v. Coll. Twp.*, 2015 WL 1537616, at *1 (M.D. Pa. 2015); *Joe Hand Promotions, Inc. v. Tickle*, 2016 WL 393797, at *1 (M.D. Pa. 2016); *Keister v. PPL Corp.*, 2016 WL 688031 (M.D. Pa. 2016), aff'd, 677 F. App'x 63 (3d Cir. 2017).

[107] *Spectrum Produce Distrib., Inc.*, at *5.

[108] *Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health & Human Res.*, 532 U.S. 598, 602, (2001) *citing Key Tronic Corp. v. U.S.*, 511 U.S. 809, 819, (1994).

of the Court to review the hours billed and decide which are appropriately billed and which are excessive, redundant, or otherwise unnecessary."[109]  "Work on an unsuccessful claim cannot be compensated because it was not expended in pursuit of the ultimate result achieved."[110]  "If []a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount."[111] "This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith."[112]

In similar situations, Pennsylvania courts have limited fees to those claims based on a statute with fee shifting, and eliminated hours based on common law claims.[113]  For example, the Superior Court of Pennsylvania has observed that: "A court in awarding attorney fees under the [statute][114] must link the attorney fee award to the amount of damages a plaintiff sustained under that Act, and eliminate from the award of attorney fees the efforts of counsel to recover on non-[statutory]

---

[109] *Id.*

[110] *Hensley v. Eckherhart*, 461 U.S. 424 (1983) (Powell, J).

[111] *Id.*

[112] *Id.*

[113] *See Klipper Const. Assocs., Inc. v. Warwick Twp. Water & Sewer Auth.* 2014 WL 10316918 at * 12 (Pa. Commw. Ct. 2014) (unreported).

[114] This case are evaluating fees under the Pennsylvania Unfair Trade Practices and Consumer Protection Law.  I found no basis for finding an evaluation of the reach of fee-shifting under PUTSA to be considered differently.

theories."[115]  Additionally, "[a]n effort should be made to apportion the time spent by counsel on the distinct causes of action."[116]

Consequently, I will reduce the fees requested by 90%.[117]  Because the fee-shifting applies to only one of ten claims against Wildcat, I find that a fee request based on the entirety of the hours expended on all claims brought is unreasonable. I am only awarding fees based on the claim brought pursuant to PUTSA, as addressed above.  Because Mifflinburg Telegraph did not break down their hourly rate by claim, I cannot trim line item hours.  Accordingly, I will reduce the requested $178,679.29 in attorney's fees and costs to 10%, resulting in an award of $17,867.92, an amount that most accurately represents the time expended on the claim subject to fee shifting.[118]  "Such a calculation 'produces an award that roughly approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a

---

[115] *Neal v. Bavarian Motors, Inc.*, 882 A.2d 1022, 1031–32 (Pa. Super. Ct. 2005).

[116] *Croft v. P & W Foreign Car Serv., Inc.*, 557 A.2d 18, 20 (Pa. Super. Ct. 1989).

[117] *See, e.g., Prunty v. Vivendi*, 195 F. sup. 3d 107 (D.D.C. 2016) ( reducing a fee award by 40%, an amount representing the two of five common law claims to which no fee-shifting provision would apply.)

[118] Liability as to the attorney's fees will also be joint and several liability with any fees awarded against the Criswells.

comparable case.'"" [119] "The essential goal in shifting fees ... is to do rough justice, not to achieve auditing perfection."[120]

### E.    Joint and Several Liability

Wildcat will be jointly and severally liable with any liability subsequently directed against Heidi and/or Dale Criswell.  "A liability is joint and several when 'the creditor may sue one or more of the parties to such liability separately, or all of them together, at his [or her] option.'"[121] "Accordingly, 'an assertion of joint and several liability is an assertion that each defendant is liable for the entire amount, although the plaintiff only recovers the entire amount once.'"[122]

## III.   CONCLUSION

For the forgoing reasons Plaintiff's Motion for Default Judgment against Wildcat Publications, LLC is granted.  Damages, attorney's fees, and post judgment interest will be Ordered in accordance with this Memorandum Opinion.

This amount is comprised of:

Computer forensic recovery:          $9,304.57

Rental payments on 720 printer:       $5,358.00

---

[119] *Texas v. United States*, 49 F. Supp. 3d 27, 35 (D.D.C. 2014), aff'd, 798 F.3d 1108 (D.C. Cir. 2015) (Collyer, J.) *citing Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551 (2010).

[120] *Fox v. Vice*, 563 U.S. 826, 838 (2011).

[121] *S.E.C. v. J.W. Barclay & Co.*, 442 F.3d 834, 843 (3d Cir. 2006) *citing United States v. Gregg*, 226 F.3d 253, 260 (3d Cir.2000).

[122] *S.E.C. v. J.W. Barclay & Co., Inc.* 442 F.3d 834, 843 (3dCir. 2006) *citing Golden v. Golden*, 382 F.3d 348, 355 n. 5 (3d Cir. 2004).

Damages to the business value:          $157,500.00

Attorney's Fees:          $17,867.92

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge