## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MIFFLINBURG TELEGRAPH, INC., | : | No. 4:14-CV-0612 |
| | : | |
| Plaintiff, | : | (Judge Brann) |
| | : | |
| v. | : | |
| | : | |
| HEIDI CRISWELL, | : | |
| DALE E. CRISWELL, | : | |
| WILDCAT PUBLICATIONS, LLC, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

### SEPTEMBER 28, 2017

"In all literature, there is perhaps no more vivid example of a man wrestling

with the knowledge of his own guilt than that of Raskolnikov in [Fyodor]

Dostoyevsky's <u>Crime and Punishment</u>."[1]  "Throughout <u>Crime and Punishment</u>,

Dostoyevsky provides examples of physical actions and reactions that demonstrate

Raskolnikov's consciousness of his guilt…such as Raskolnikov's psychosomatic

illness and his internal monologue."[2]   After murdering a pawnbroker for her

money, Raskolnikov convinces himself that he could perform good deeds to offset

the crime.   When questioned by the police about an unrelated matter,

---

[1]    Dan E. Stigall, PROSECUTING RASKOLNIKOV: A LITERARY AND LEGAL LOOK AT "CONSCIOUSNESS OF GUILT" EVIDENCE, Army Law., December 2005, at 54, 54

[2]    *Id.* at 56.

Rasknolnikov finds himself forced to fabricate an alibi, "attempting to convince law enforcement that he was somewhere else, doing something other than murdering and stealing."[3]

Here, there is no murder. But there was stealing. Although the matter turns on the undisputed facts of this case, Defendant Heidi Criswell's *pro se* representations, written in the third person as if to distance herself from her own actions,[4] are an admixture of consciousness of guilt and an attempt to convince the Court of her unbelievable naivety, leading me to the ineluctable conclusion based on the record of this matter that, despite her vociferous protestations to the contrary, there is a distinct absence of mistake here.

## I.    BACKGROUND

The procedural history and a brief background of this action are as follows. Plaintiff Mifflinburg Telegraph, Inc. filed a complaint on March 31, 2014, against Defendants Heidi Criswell, Dale E. Criswell, and Wildcat Publications, LLC.[5] Hereinafter "Mifflinburg Telegraph," "Heidi Criswell," "Dale Criswell," and "Wildcat" respectively. The complaint began as a fifty-four page, two-hundred twenty paragraph, eighteen count complaint against six defendants. Jurisdiction is based on two federal causes of action: alleged violations of the Computer Fraud

---

[3]    *Id.*

[4]    Def. Opp. Br., September 16, 2016, ECF No. 138.

[5]    And others, who have since been dismissed from the action.

and Abuse Act, 18 U.S.C. § 1030, and the Lanham Act 15 U.S.C. § 1125. The Court is exercising supplemental jurisdiction over the pendant state claims.

Mifflinburg Telegraph is a small business located in Mifflinburg, Union County, Pennsylvania, that operated, previously, as both a print shop and a newspaper publisher, and as of 2014, only a print shop. Heidi and Dale Criswell are spouses who had been two of only five employees of Mifflinburg Telegraph until their February 3, 2014 resignation from the business.

Heidi Criswell had been a long time employee of Mifflinburg Telegraph when its owner, John Stamm, died in 2013. Hereinafter "Stamm." Heidi Criswell's title was 'primary designer and printer,' but it is widely acknowledged that in the years preceding Stamm's death, while he was ill, she ran the business in his stead. Dale Criswell worked for Mifflinburg Telegraph intermittently as a "delivery guy."

After Stamm's death, Heidi Criswell entered into negotiations with the Stamm Estate to purchase the business for $225,000. Negotiations ultimately failed, and in the autumn of 2013, unbeknownst to the estate or Mifflinburg Telegraph, Heidi Criswell started a competing business, Wildcat Publications, LLC.

Prior to her February 2014 departure from Mifflinburg Telegraph, she began providing customers with re-order forms listing Wildcat's contact information

where Mifflinburg Telegraph's information had previously appeared.   She also misappropriated from Mifflinburg Telegraph's customer lists and data files, and then subsequently and secretly deleted her computer identity from Mifflinburg Telegraph's computers.  This deletion included any order history, so that if a customer returned to Mifflinburg Telegraph with a repeat order, the company could not simply reprint a prior order, but would have to start from scratch and recreate the customer's logo and any other information.  Additionally, Heidi Criswell misappropriated a Ricoh commercial printer from Mifflinburg Telegraph for Wildcat's use.

The day after filing the complaint, Plaintiff filed for injunctive relief, and on April 17, 2014, I entered an order enjoining Defendants

> 1.     From directly or indirectly processing reorders procured from placing re-order forms in Mifflinburg Telegraph's customers' orders;
>
> 2.     From directly or indirectly processing orders placed with the Mifflinburg Telegraph;
>
> 3.     From directly or indirectly processing orders with confidential and proprietary information taken, procured, or received from the Mifflinburg Telegraph;
>
> 4.     From directly or indirectly processing orders with information, files, or images taken, procured or received from the Mifflinburg Telegraph, a Mifflinburg Telegraph computer or email, or received from clients while employed at the Mifflinburg Telegraph;

5. From directly or indirectly using Mifflinburg Telegraph templates, distribution lists, confidential or proprietary information or machinery in order to publish the Mifflinburg Free Press;

6. From directly or indirectly accessing or attempting to access Mifflinburg Telegraph computers or email;

7. From directly or indirectly using the RICOH C720S printer, serial number C40026787; and

8. From purposefully misleading customers and vendors into believing the Mifflinburg Telegraph is now Wildcat Publications, LLC, Heritage Printers or any other division or fictitious name of Wildcat Publications, LLC. [6]

On September 7, 2017, default judgment was entered as to Wildcat.[7]

Heidi and Dale Criswell initially were represented by counsel, including at the time of their depositions. Counsel filed an answer to the complaint on behalf of these Defendants.[8] After a fashion, however, there was a breakdown in the relationship between counsel and Defendants. I eventually granted counsels' motion to withdraw.[9] In so Ordering, I provided these Defendants with two months, until July 28, 2015, to find replacement counsel. When no counsel entered an appearance, I entered a second Order extending the time one additional month. However, I warned in that Order that:

---

[6] ECF No. 26.

[7] ECF Nos. 146 and 147. The parties also refer to Wildcat as Heritage Printers, the fictitious name of the business, and use the two names interchangeably. ECF No. 124-2 at 7.

[8] June 11, 2014, ECF No. 35.

[9] May 29, 2015, ECF Nos. 78 and 79.

if the Wildcat defendants do not find counsel by August 28, 2015, approximately ninety days after their original counsel withdrew, no further continuances will be granted to find new counsel. The individual Wildcat defendants, Dale E. Criswell, Heidi Criswell, and Darlene Sharp may proceed pro se, that is to say they will represent themselves. If Wildcat Publications, LLC. does not find counsel by August 28, 2015, entry of default will be made against it. *See, e.g., Galtieri-Carlson v.Victoria M. Morton Enterprises, Inc.*, No. 2:08-CV-01777, 2010 WL 3386473, at *1 (E.D. Cal. Aug. 26, 2010).[10]

Nearly two years later, these defendants still have not retained counsel and are currently proceeding *pro se*.

Presently pending before the Court are Motions for Partial Summary Judgment against Heidi Criswell[11] and against Dale E. Criswell.[12]  The motion for summary judgment as to Dale Criswell will be denied, but final judgment is deferred for thirty days for additional response if the parties choose to file a response, but only as to those counts directed in this memorandum opinion.  The motion for summary judgment as to Heidi Criswell is granted in part, denied in part, and final judgment deferred for thirty days if the parties choose to file an additional response, but only as to those counts directed in this opinion. I will enter final judgment in accordance with this opinion by October 31, 2017, barring any further responsive filings.

---

[10]   July 28, 2015, ECF No. 80.

[11]   August 15, 2016, ECF No. 122.

[12]   August 15, 2016, ECF No. 123.

## II. DISCUSSION

### A. Motion for Summary Judgment Standard

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose."[13]  Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[14]"Facts that could alter the outcome are 'material facts,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[15]

"A defendant meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[16]  "A plaintiff, on the other hand, must point to admissible evidence that would be sufficient to show all elements of a *prima facie* case under applicable substantive law."[17]

"[T]he inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of

---

[13]  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

[14]  Fed. R. Civ. P. 56(a).

[15]  *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993) (Hutchinson, J.) (*citing Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986) and *Celotex*, 477 U.S. at 322).

[16]  *Clark*, 9 F.3d at 326.

[17]  *Id*.

proof that would apply at the trial on the merits."[18]  Thus, "[i]f the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."[19]  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."[20]  "The judge's inquiry, therefore, unavoidably asks . . . 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'"[21]  Summary judgment therefore is "where the rubber meets the road" for a plaintiff, as the evidentiary record at trial, by rule, will typically never surpass that which was compiled during the course of discovery. "In this respect, summary judgment is essentially 'put up or shut up' time for the non-moving party."[22]

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions

---

[18]  *Liberty Lobby, Inc*., 477 U.S. at 252.

[19]  *Id.*

[20]  *Id.*

[21]  *Id. (quoting Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 447 (1871)).

[22]  *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (Fisher, J.).

on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."[23]  "[R]egardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."[24]

Where the movant properly supports his motion, the nonmoving party, to avoid summary judgment, must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[25]  For movants and nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed" must be supported by: (i) "citing to particular parts of materials in the record" that go beyond "mere allegations"; (ii) "showing that the materials cited do not establish the absence or presence of a genuine dispute"; or (iii) "showing . . . that an adverse party cannot produce admissible evidence to support the fact."[26]

"When opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would

---

[23]  *Celotex*, 477 U.S. at 323 (internal quotations omitted).

[24]  *Id.*

[25]  *Liberty Lobby*, 477 U.S. at 250.

[26]  Fed. R. Civ. P. 56(c)(1).

contradict the facts identified by the movant.'"[27]   Moreover, "[i]f a party fails to

properly support an assertion of fact or fails to properly address another party's

assertion of fact as required by Rule 56(c), the court may . . . consider the fact

undisputed for purposes of the motion."[28]  On motion for summary judgment,

"[t]he court need consider only the cited materials, but it may consider other

materials in the record."[29]

"[A]t the summary judgment stage the judge's function is not himself to

weigh the evidence and determine the truth of the matter but to determine whether

there is a genuine issue for trial."[30]   "[T]here is no issue for trial unless there is

sufficient evidence favoring the nonmoving party for a jury to return a verdict for

that party."[31]  "If the evidence is merely colorable . . . or is not significantly

probative, summary judgment may be granted."[32]

### B.    Undisputed Facts

The Court is reminded of the old adage, if you tell the truth, you never have

anything to remember.  Discussed above, as an introductory matter, was a brief

distillation of the procedural history of this matter.  I have attempted to discern the

---

[27]  *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2003) (Weis, J.).

[28]  Fed. R. Civ. P. 56(e)(2).

[29]  Fed. R. Civ. P. 56(c)(3).

[30]  *Liberty Lobby*, 477 U.S. at 249.

[31]  *Id.*

[32]  *Id.* at 249–50 (internal citations omitted).

undisputed facts, as I must do on a Federal Rule of Civil Procedure 56 motion, to the best of my ability. However, the Criswells' *pro se* responses are, as evidenced below, full of rambling explanations that, while detailed, do not dispute the actual facts at issue. When they have attempted to create a dispute, for the most part it has **not** been supported by the record.

The 'sham affidavit' doctrine has a long history in this Circuit. "The trial judge's role in [summary judgment is] sorting the genuine from the fallacious."[33] "It is this determination that permits trial judges to disregard contradictory affidavits."[34] "A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment."[35] "A sham affidavit cannot raise a genuine issue of fact because it is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the nonmovant."[36] "Therefore, if it is clear that an affidavit is offered solely for the purpose of defeating summary judgment, it is proper for the trial judge to conclude

---

[33] *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007), *see Anderson v. Liberty Lobby* 477 U.S. 242 (1986).

[34] *Jiminez,* at 253.

[35] *Id.*

[36] *Id.*

that no reasonable jury could accord that affidavit evidentiary weight and that summary judgment is appropriate."[37]

Additionally, as I will explain later in this opinion, Rule 56(h) states, "(h) Affidavit or Declaration Submitted in Bad Faith. If satisfied that an affidavit or declaration under this rule is submitted in bad faith or solely for delay, the court--after notice and a reasonable time to respond--may order the submitting party to pay the other party the reasonable expenses, including attorney's fees, it incurred as a result. An offending party or attorney may also be held in contempt or subjected to other appropriate sanctions."[38]

Heidi Criswell's statement of facts is not in accordance with her own written letter of resignation, her deposition testimony, and other evidence of record. Middle District Local Rule 56.1 requires parties to cite to the record, and, "all material facts set forth in the statement required to be served by the moving part will be deemed to be admitted unless controverted by the statement required to be served by the opposing party." Therefore, as to paragraphs where she has attempted to create a dispute, I have not relied on her unsupported and uncited assertions, but instead on the record, as required by Federal Rule of Civil Procedure 56, which states "a party asserting that a fact…is genuinely disputed

---

[37] *Id.*

[38] I intended to address this further in the "Attorney's Fees" section below.

must support the assertion by citing to particular parts of materials in the record, including depositions, documents, electronically store information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials."[39] The undisputed facts are as follows, with attempts at dispute by the Criswells noted.[40]

As noted, Mifflinburg Telegraph is an incorporated print shop located in Mifflinburg, Union County, Pennsylvania.[41] It operates as a print shop printing brochures, booklets, letterhead, business cards, invitations and announcements.[42] Mifflinburg Telegraph has been in business since 1992, when its sole shareholder, John R. Stamm, began the business.[43] Stamm died on January 9, 2013.[44] When Stamm died, the shares of Mifflinburg Telegraph passed to his estate.[45] The executor of the still open Stamm estate is Angelo Mark Papalia.[46] Hereinafter "Papalia."

---

[39] Fed. R. Civ. P. 56(c)(1)(A).

[40] Pl. Statement of Undisputed Facts, August 15, 2016, ECF No. 124. Def. Resp. to Undisputed Facts, September 16, 2016, ECF No. 138. Hereinafter, the facts will be cited to collectively only by paragraph number.

[41] ¶ 1.

[42] ¶ 2.

[43] ¶ 5.

[44] ¶ 5.

[45] ¶ 6.

[46] ¶ 6.

Heidi Criswell and Dale E. Criswell are former employees of Mifflinburg Telegraph.[47] Heidi Criswell had been a twelve-year employee of Mifflinburg Telegraph and was its primary designer.[48] During her tenure with Mifflinburg Telegraph, Heidi Criswell earned between $10.75 and $11.75 per hour.[49] She was never an officer of Mifflinburg Telegraph.[50] She was not on the Board of Directors of Mifflinburg Telegraph.[51] According to his wife's affidavit, Dale Criswell was employed by Mifflinburg Telegraph doing "odd jobs such as making deliveries and taking out the trash, for $9/hour."[52]

Soon after Stamm's death, his estate, through Papalia, entered into negotiations with Heidi Criswell for the purchase and sale of Mifflinburg Telegraph.[53] The negotiations resulted in an initial agreement, one that was ultimately never consummated, for Heidi Criswell to purchase the Mifflinburg Telegraph for a total of $225,000.[54] The offer was comprised of $80,000 for accounts receivable, $61,000 for assets (excluding real property), and $84,000 for the goodwill of the business, including the business name, "Mifflinburg

---

[47] ¶ 3.

[48] ¶ 15 and ECF no. 124-2 at 12.

[49] ECF No. 124-2 at 12.

[50] ECF No. 124-2 at 15.

[51] ECF No. 124-2 at 16.

[52] ECF No. 124-2 at 214.

[53] ¶ 7.

[54] ¶ 8 and ECF No. 124-2 at 55 and ECF No. 124-2 at 273-.

Telegraph."[55]   At the time of Stamm's January 2013 death she did not know that the business had a $46,000 loss in tax year 2012.[56] However, by December 9, 2013, she was aware of the this loss.[57]

By October 2013, negotiations between the parties broke down and no agreement reached.[58]  On October 7, 2013, the attorney for Heidi Criswell notified her that their written offer was not accepted[59] as Papalia made a counteroffer.  On October 25, 2013, unbeknownst to Papalia or the Stamm estate, Heidi Criswell formed a competing business, Wildcat Publications, LLC.[60]  She was free to do so, as she was not subject to non-competition, non-solicitation, or non-disparagement agreements.[61]

Her husband, Dale Criswell, testified at his deposition that he was not involved in the negotiations to purchase Mifflinburg Telegraph nor in the decision to start Wildcat.[62]  However, he did testify that the purchase agreement ultimately

---

[55]   ¶ 8.

[56]   ECF No. 124-2 AT 32.

[57]   ECF No. 124-2 at 359.

[58]   ¶ 9.  There is a typo in the Plaintiff's statement of undisputed facts.  It lists the date as October 2014, I believe all parties would agree that was a typo and the year was actually 2013.

[59]   ECF No. 124-2 at 60.

[60]   ¶ 4 and ECF No. 124-2 at 62-63, and 96.

[61]   ECF No. 124-2 at 15.

[62]   ECF No. 124-2 at 18-21.

"wasn't signed because my wife and I didn't agree with it."[63] 'It' being the counteroffer from Papalia.[64]

Dale Criswell continued, "It was all - - it all boiled own to the stock sale. We didn't want the stock. I mean, that was a sticking point in the sale."[65] He further testified that the Criswell's decision not to purchase Mifflinburg Telegraph was made "before Halloween."[66]

As late as November 6, 2013, Heidi Criswell sent an email to Papalia temporizing the situation. The email lead him to believe that she was still planning to proceed with the purchase and was merely awaiting financing, as she wrote in the email, "Holding on to bank information until after veteran's day, banks are closed Monday and won't hear until Tuesday."[67] Yet, that very same date, November 6, 2013, is the date of her Wildcat Publications Business Plan,[68] copied in full herein:

---

[63]   ECF No. 124-2 at 24.
[64]   ECF No. 124-3 at 25.
[65]   ECF No. 124-3 at 25.
[66]   ECF No. 124-3 at 26.
[67]   ECF No. 124-2 at 301.
[68]   ECF No. 124-2 at 303.

# Wildcat Publications, LLC

229 East Chestnut Street • Mifflinburg, PA 17844 • 570-412-3570 • bluebari89@mac.com • Heidi Criswell, President

## — Business Plan - November 6, 2013 —

### Business Statement:
Wildcat Publications LLC will do business as Heritage Printers and the Union County Telegraph.

### Mission Statement:
**Heritage Printers** will specialize in all types of printing, from personal to business and industrial. We will offer our customers honest, competitive pricing and prompt, courteous service every day. No job is too big or too small! **The Union County Telegraph** will give our subscribers the best in local news, sports and community events, focusing on what is happening in Mifflinburg and surrounding communities. We also plan to use it as a resource to help drive local commerce in tandem with the Mifflinburg Heritage & Revitalization Association and Max Media Productions.

### Targeting Consumers:
**Heritage Printers** will provide our customers with all types of printed materials including but not limited to: business cards, posters, flyers, newsletters, rack cards, brochures, postcards, invitations, calendars, programs, books, stationery, EDDM & bulk mailing, envelopes, catalog envelopes, business forms, multi-part forms, labels, perforating, numbered raffle tickets, die-cutting, door hangers, rubber stamps, color copies, and menus. We will offer a wide range of design services including design for print, web and social media.

### Confirmed Clients:
**Heritage Printers** confirmed clients include: Country Farm & Home, Mifflinburg Heritage & Revitalization Association, Artist Valerie Moyer, Martin & Lobos Attorneys, Tournament of Bands/National Judges Association, BandVideos.com, Milton Band Boosters & Theatre Department, Hoffman Advertising, Mifflinburg Christkindl Inc., Max Media, Mifflinburg Theatre & Arts Department, Raspberry Creative Design, Hoffman Advertising, Hometown Eatery.

Clients in negotiation include: Con-Agra, Boy Scouts, Country Cupboard, Central Susquehanna Builders Association, Landmark Tours, Mifflinburg School District, Lewisburg School District to name a few.

### Financial Capital:
Startup costs are projected at $125,000 including remodeling/repurposing place of business, equipment & supplies, starting salaries, insurance, promotion, permits, fees, etc... *(See Excel Document on Projected Costs)*

The place of operation, 229 East Chestnut Street, would be offered as collateral to secure the loan. The building is owned by Dale Edward Criswell and Heidi Anne Criswell. Realtor Ann Hilliard estimates the value of the property between $175-200,000 based on comparable buildings that have either been on the market or are currently for sale. The building is zoned Commercial.

### Plan of Production:
All printing and finishing will take place at 229 East Chestnut Street, Mifflinburg. Marketing will include mass mailings to prospective clients, radio and social media. The Union County Telegraph will be mailed weekly to subscribers, hand delivered and/or available for sale at local retailers.

### Personnel:
Wildcat Publications LLC will employ four full-time employees.
Heidi Criswell, President
> Graphic Designer, Production Manager, Editor of UC Telegraph

Dale Criswell
> Sales & Marketing Director, Publisher of UC Telegraph

Darlene Sharp
> Secretary & Accounting

Jane Boop
> Post-Production & Finishing



EXHIBIT
Criswell
11

The November 6, 2013, Wildcat business plan lists as employees all the employees of Mifflinburg Telegraph at the time: Heidi Criswell, Dale Criswell, Darlene Sharp, hereinafter "Sharp," and Jane Boop.[69]  Thus, it is clear that the very same day Heidi Criswell emailed Papalia leading him to believe that she is still attempting to obtain financing to purchase Mifflinburg Telegraph, she was doing no such thing; she had instead already formed a competing business using all Mifflinburg Telegraph employees and a large part of its customer base.

On January 13, 2014, Papalia appointed a new president of Mifflinburg Telegraph, John Helwig.[70]  Three weeks later, during the weekend of January 31, 2014 through February 2, 2014, all employees ceased employment with Mifflinburg Telegraph, Heidi Criswell through a written letter of resignation, Dale E. Criswell, without notice.[71]  Helwig was surprised with the *en masse* resignation of all employees, but him.[72]

Heidi Criswell is currently the president of Wildcat, a competing print shop and newspaper she formed as a limited liability company and also based in Mifflinburg, Pennsylvania.[73]  She is the only member of the LLC.[74]  Heidi Criswell

---

[69]  ECF No. 124-2 at 303.

[70]  ¶ 10.

[71]  ¶ 11.

[72]  ¶ 14.

[73]  ECF No. 124-2 at 8-9.

[74]  ECF No. 124-2 at 9.

earned her Bachelor of Arts degree with a concentration in graphic design from the

Pennsylvania State University in 1990.[75]

Dale Criswell is currently the publisher of Wildcat.[76]  He testified at his

deposition:

> Really I'm the guy that delivers stuff and takes the garbage out, just like I was at the Telegraph you know.  Pretty much my duties as publisher just include writing a letter to the public, you know.  I don't -- I give full creative control to my people, because that's why they're there.  I don't -- I honestly -- it's just the name I drew out of the hat, you know.  I never really picked it; it picked me.  As far as -- Like I said, it was a job somebody needed to fill.[77]

Dale Criswell appears to have only an opaque understanding about

Wildcat's ownership.  When asked at his deposition, "Do you own Wildcat

publications," he responded equivocally, "I guess I do.  Do I? Yeah, with my

wife."[78]  He continued,

> I'm not sure how -- honestly, I was just -- I mean, as far as all that goes, I don't know a lot of the innerworking of how things are set up. I don't.  I just - - I was just the guy who said, Here, you know, I'll give you my credit.[79]

---

[75]  ECF No. 124-2 at 8.

[76]  ECF No. 124-3 at 9.

[77]  ECF No. 124-3 at 9.

[78]  ECF No. 124-3 at 9-10.

[79]  ECF No. 124-3 at 10.

Dale Criswell is also unsure about Wildcat's financing. When questioned during his deposition about whether or not Wildcat had a business loan he responded:

A: Yeah, I did [sign the loan]; but I'm not sure if it's an actual business loan, you know, come to think of it.

Q: Okay. So then please explain to me. What do you recall signing, what type of loan?

A: It was a remortgage on my wife's grandmother's house.

Q: Okay. And you cosigned that or signed it?

A: Yes. Yes.

Q: Do you remember what you used as collateral?

A: The house itself.

\*\*\*\*\*

A: Yeah, we borrowed on the house to start the business.

Q: Okay.

A: I mean, whatever that is, that's what we did.

Q: Okay. Do you own the building where Wildcat Publications is located?

A: Personally, no. Or wait. I'm not sure. I'm honestly not sure who owns the building. [80]

---

[80] ECF No. 124-3 at 10-12

Darlene Sharp, was deposed as well. She had been the office manager of Mifflinburg Telegraph for thirty-four years before she left with the Criswells to take a position with Wildcat.[81]  As office manager for Mifflinburg Telegraph she "paid the bills; [] took care of cash receipts and all receipts; took care of the subscriptions; waited on customers; answered the phone" and prepared invoices.[82]

**Heidi Criswell's resignation letter**

Because her resignation letter is instructive as to the issues at hand, I copy Heidi Criswell's resignation letter in its entirety.

February 1, 2014

Dear John[83] [Helwig]:

> Thirteen months ago my life was forever changed when John [Stamm] called me here at the shop on a Monday morning and told me that he had decided to sell the Telegraph. He had talked to Dennis at Printed Page but he wasn't interested in spending that much money on another business at the time. He told me that he did not want Jake [Stamm's son] to have it and that Jake's time as a pressman was over, it wasn't his calling whether he realized it yet or not. He then asked me to please consider buying it from him. John told me that he was worried about the future of the business- he told me that no one but me would give a shit about the newspaper and that I was the only logical candidate to buy it.

> John knew I wasn't loaded, he knew what I  made (or didn't make), but he knew he could trust me.  He told me that day that if I

---

[81]   ECF No. 124-7 at 8.

[82]   ECF no. 124-7 at 9.

[83]   The irony has not been lost on me that Heidi Criswell wrote what is literally, and figuratively, a "Dear John" letter prior to ending her professional relationship with Mifflinburg Telegraph and starting a competing business.

wanted it, it was mine.  That he would sit down with me later that week and show me the books, and we'd work out a number suitable and that I  could pay him (or the estate after he passed) for as long as I wanted to.  He told me that he'd make sure that Wanda would also hold on to it, until we could make arrangements.

That Thursday meeting never happened, he died two days later. And a few days after that, we found out that Wanda didn't even own it, that it was in another's hands.

We also didn't know until a few weeks later, just how much financial trouble the Telegraph was in.

Mark [Papalia] came in and told us to run business as usual, that he needed to sell it and that he would like to honor John's request but he immediately started talking ridiculous numbers that made no sense when you looked at the books and the building.  I did what everyone told me to do- I sought council [sic] and tried to do everything by the book. I researched machinery, combed the books, talked to my accountant and we valued the business at barely $150,000 but I was still willing to go much higher because I knew Mark would never agree. Well - he did agree that there was about $150,000 in the business but then started tossing out ridiculous principles like EBIDTA and again valued the business at some ridiculous amount.

I offered a fair and reasonable price, I was told it was summarily accepted. We drafted agreements based on what was affordable based on what this business brought in a month. I was laughed at, I was made a fool of, I was told that I'd run the place into the ground. I was told I'd have to pay much more a month, I'd have to secure ridiculous amounts of collateral (which should tell you that even Mark knew this business wasn't worth squat), I was told they'd prefer to sell me worthless stock than assets, I was told if I got those assets- they were also tied as collateral.  I'd have no cash flow, no way of making building improvements, no way of promote the business. I should have known the real game was to prevent me from even attempting to buy it anymore.

I went back to my attorney and to my accountant and to my bank and the solution was clear- start over. Start new- turn my collateral into something that worked for me, not Mark Papalia. So we did- the bank happily financed us and off we went on our new adventure.

Now, that day has come- we are ready for business and myself and Darlene, Dale and Jane are leaving the Telegraph with heavy hearts but also with great excitement for the future. OUR future ...

We bear no ill will against you John, -you've made the past few weeks really hard because we all really like you but we simply can't stay. Mark will never sell this to me, he never intended to. He couldn't even thank me for what I've done, he had to toss it in my face that he needed to make sure we didn't go under. Well, if he was so damn worried about that, where was he the past 13 months. He never stopped by, never called, never asked how it was going, if we needed anything, if the building was falling down, if it was bee infested, etc .... His sudden concern is a bit odd, don't you think?

I didn't lie to you about the equipment- it's all good. The Ricoh is the best machine out there for the money. The presses all function in some capacity but haven't been used since Jake left. You honestly, have all the tools to continue to operate- you'll just need to find new people to helm the ship. And you'll have us to contend with, because we will be out there securing our customers and getting those jobs that I was told that I didn't know how to get or how to properly market.

Remember this too, the Telegraph has no contracts with clients- there is not one client under any kind of obligation for any extended period of time to print with the company.

This isn't easy for me -losing the newspaper is killing me. It means so much to me and I hope one day to buy it back from the estate. Hopefully, someone will come to their senses and allow me to buy it for a reasonable price- if not, we will be publishing  our own newspaper  soon enough.

I have given 300% to this business the past year- I have worked 60 hours weeks, I have been out there talking to people and securing

our old clients and not one word of thank you from anyone in the family or the estate. That's fine- I'm finally getting my reward - something that can't be taken away from me.

Again, I wish you well and will not bad mouth you to anyone - you are a good man. can see that. Under different circumstances, we could have been a good team.

Darlene has left passwords and the safe combination. I have done the same.

Things to know:

1. Call Peggy Shields about online newspaper updating information.
2. Paper ordered through Lindenmyer-Monroe- Jason Butler contact.
3. Daily Item prints Telegraph- Bob Kutz is your contact.
4. I switched you as the official contact with Ricoh- Margaret Wolfe is your contact, whom you've already met. She can set up training for you. They are changing the online supply order as well - once they get it updated and contact you, password is-[redacted].
5. My computer is set to log in as Mifflinburg Telegraph - log in is-[redacted].
6. Time capsule has my current backups and the CO's to the right are older files.
7. Xante envelope printer is not under Ricoh. The files should have contact information if you have problems.
8. D&L is our contact for the big machinery.

I think that's it.

Heidi Criswell[84]

Tellingly, the copy of the resignation letter that the Criswells attached as an

exhibit to their opposing brief is slightly different than the copy Mifflinburg

---

[84] ECF No. 124-1 at 14-16.

Telegraph attached.[85]  The phrase "Remember this too" has been cut from the

eleventh paragraph.[86]  The first six line items under "things to know" are identical,

but then they continue:

> 7.  Risograph contact is Pat from GE Richards
>
> 8.  Xante envelope printer is not under Ricoh.  The files should have contact information if you have problems.  Also - we ordered needed supplies last week, the ordering information for that is also in file.
>
> 9.  D&L is our contact for the big machinery - I think service number is in rolodex - Bonnie is secretary, Terry is the service man you [sic] usually comes up here.

The most damnning difference, one of several indicators of 'consciousness

of guilt,' is that the letter the Criswells' attached as an exhibit contain a different

sign off.  As opposed to "I think that's it.  Heidi." in the copy Mifflinburg

Telegraph attached, the Criswell's purported letter includes an additional, phrase:

I think that's it.  Good luck and game on!!

Heidi [87]

---

[85]   ECF No. 138-1 at 13-14.

[86]   ECF No. 138-1 at 13.

[87]   ECF No. 138-1 at 14.

**Misleading Mifflinburg Telegraph's clients**

<u>Reorder forms</u>

Prior to resigning, Heidi Criswell provided reorder forms to Mifflinburg Telegraph clients. She testified the reorder forms contained the phone number, fax number, email address, and mailing address, not of Mifflinburg Telegraph, but of her new business, Wildcat.[88] The front and back of a reorder form given to a client on January 30, 2014, immediately prior to her resignation, is copied herein:[89]

---

[88] ECF No. 124-2 at 105-106 and ECF No. 124-2 at 308-309.

[89] ECF No. 124-2 at 308-309.

# NEED TO REORDER? IT'S EASY!

Call 570.966.1120 • Fax: 570.966.1130 • bluebari89@mac.com
or mail this card directly!

To re-order a duplicate of this job, just check below

☐ PLEASE MAKE A DUPLICATE OF THE JOB NUMBER __93439__

JOB NAME __Cards__

AMOUNT __250__ DATE __1-30-15__

FIRM _____

ADDRESS _____

AUTHORIZED SIGNATURE _____

*If you desire prices or would like information on any other printing job,
please call (570) 966-1120 or email bluebari89@mac.com.*

Wildcat Publications, LLC
229 East Chestnut Street
Mifflinburg, PA 17844

In her counseled deposition testimony, when asked when this reorder form was used, she responsively testified that

> We had two schools of thought here: One, what was happening to the Mifflinburg Telegraph before January 9th when Mark walked in the business, and one that happened after that. We seriously, stupidly, thought that the customers were our responsibility, that if we walked out the door and the shop closed down on February 3rd or whatever day we were thinking we were going to be able to get out of there, that the customers were going to be left hanging.

> It was a stupid attempt to try to reach out to them to find us, to find anybody to print. When -- I think I printed maybe 20 of these, I don't know, just a couple of sheets. And I was under the impression that-- the day that John walked into the building or Mark Papalia walked into the building and said that things -- he was going to -- there was no danger of the Telegraph closing, I was under the impression that all these cards were pitched.

> I honestly do not know how this card got out on January 30th. It was, honestly, the last job that was done before we walked out of the building for the last time as printers -- the last time that she walked out of the building, on January 30th. She, meaning Jane [Boop another employee], who would have filled this out.[90]

Mifflinburg Telegraph's counsel continued the line of questioning asking

Q: "And who instructed Jane to fill this out?"[91]

A: "I did."[92]

Q: "When did you instruct Jane to first start putting them in the jobs?"[93]

---

[90]  ECF No. 124-2 at 110-111.

[91]  ECF No. 124-2 at 111.

[92]  ECF No. 124-2 at 111.

[93]  ECF No. 124-2 at 112.

A: "Oh, gosh, probably the very end of December. I'm not honestly sure. It would have been somewhere around Christmas, somewhere in that period of time. As I said, I don't think I printed more than 20 of them, 20 or 25 of them; and I did think they were gone."[94]

Q: "So you printed them, the 20, 25 of them, for the specific pursue of taking care of Mifflinburg Telegraph customers?"[95]

A: "Yes."[96]

Darlene Sharp testified at her deposition that she had seen the reorder card prior to the litigation "back in the finishing department of Mifflinburg Telegraph.[97] She affirmed that Wildcat Publications' reorder cards were put in Mifflinburg Telegraph jobs when completed.[98] She was aware of this practice since sometime in early January 2014, but never told John Helwig.[99]

Helwig discovered the reorder form shortly after the collective resignation. He attested in an affidavit: "On February 6, 2014, I noticed a customer order that was ready for pick up by the customer. When I opened the order to make sure it was correct, I found a reorder form for Wildcat Publications, LLC."[100]

---

[94]   ECF No. 124-2 at 112.

[95]   ECF No. 124-2 at 112.

[96]   ECF No. 124-2 at 112.

[97]   ECF No. 124-7 at 21.

[98]   ECF No. 124-7 at 21.

[99]   ECF No. 124-7 at 21.

[100]   ECF No. 124-4 at 2.

<u>Accessing Mifflinburg Telegraph Emails after resigning and responding
with a sign off containing the Mifflinburg Telegraph name</u>

In addition to providing customers misleading reorder forms directing them to Wildcat, Heidi Criswell also accessed, after she resigned and without authority, her former Mifflinburg Telegraph email account from her personal iPad.[101]  She did not delete her Mifflinburg Telegraph email account until the weekend of February 6 and 7, 2014, a week after her voluntary resignation.[102]  She continued to send emails from that account during the week after she handed in her formal resignation letter, leading customers to believe that she was both still with the Mifflinburg Telegraph and now running it.  On February 4th and 5th 2014, Heidi Criswell engaged in an email exchange with Christina Lee regarding a print job for Mifflinburg Midget football and cheerleading.  She did so from her Mifflinburg Telegraph email address, Heidi@mifflinburgtelegraph.com with the following picture attached to the bottom of her email:[103]

---

[101]  ¶ 30.

[102]  ¶ 31.

[103]  ECF No. 124-2 at 319.



The picture was also attached to her January 31, 2014-February 3, 2014 email exchange with Andrew Klose from her Mifflinburg Telegraph email address, Heidi@mifflinburgtelegraph.com.[104]

When questioned at her counseled deposition, Heidi Criswell testified that "new management" referred to "Darlene and I started managing the place with Mark's blessing."[105] She continued by saying "Competitive pricing meant exactly what it says. It was very important. There was a lot of concern after John passed away that the place was closing, and we got phone calls every day; so we wanted to make it very clear that the place was not closing."[106]

---

[104] ECF No. 124-2 at 316-318.

[105] ECF No. 124-2 at 84.

[106] ECF No. 124-2 at 85.

<u>Fulfilling Mifflinburg Telegraph orders though Wildcat</u>

In addition to sending these emails after she had resigned, Heidi Criswell conceded at her deposition that she had fulfilled a Mifflinburg Telegraph order through Wildcat.[107]   The weekend she resigned, she took Andrew Klose's business card order from Mifflinburg Telegraph.  She testified that,

> A: So on Sunday when I went in and had my last walk through the building, I grabbed them [the business cards] quick and took them with me.  And I contacted him immediately to tell him, as that e-mail says, that I had his cards and where they were located, and I knew he was in a hurry for them, so to come get them.[108]

> Q: When did he pick them up?

> A: First thing Monday morning.

> Q: So he could have picked them up from the Telegraph?

> A: Yes, he could have.  We never did any - I mean, I never heard from him again, you know.  There was a mention of receipt books here. We never printed them or did anything for him after that, so --[109]

The email exchange between Andrew Klose and Heidi Criswell confirms that she took the business cards from Mifflinburg Telegraph and told Klose to pick

---

[107]   ECF No. 124-2 at 130.

[108]  ECF No. 124-2 at 126.

[109]   ECF No. 124-2 at 127.

them up from her at Wildcat.[110]  The salient portion of this email exchange is

copied herein:

From: Andrew Klose <aklose20@gmail.com>
Subject: Re: I HAVE YOUR BUSINESS CARDS! - NOT AT TELEGRAPH
Date: February 3, 2014 at 9:06:41 AM EST
To: Heidi Criswell <heidi@mifflinburgtelegraph.com>

Ok awsome. Do you want me to bring cash or can I use a card? If you eant cash what is my total.

On Feb 3, 2014 7:01 AM, "Heidi Criswell" <heidi@mifflinburgtelegraph.com> wrote:
So - you are the lucky person to get stuck in the middle of a move.  The employees of the Telegraph had their last day Friday and are now at 229 East Chestnut.  LONG STORY....  Anyway - I have your cards because I was afraid you might not be able to get them today.  We are located across from Sheetz. Call 570-966-1120.  You can get them anytime today.

Thanks,
Heidi

For his part, Dale Criswell testified that although he did recall taking a

package to UPS on January 23, 2014, he did not recall the intended recipient.[111]

Additionally, John Helwig professed that at least one "Mifflinburg Telegraph

customer entered the Mifflinburg Telegraph to pick up his order.  He then

indicated that he had ordered it from Heidi Criswell and was at the wrong

place."[112]

---

[110]  ECF no. 124-2 at 316.

[111]  ECF No. 124-3 at 46.

[112]  ECF No. 124-4 at 4.

However, one Mifflinburg Telegraph customer was not misled -- Conagra.

Credit for honesty should be given to Darlene Sharp, however, not Heidi Criswell.

This email is copied herein:[113]



From: **Stacey Reich (ConAgra Foods)** Stacey.Reich@conagrafoods.com
Subject: Mifflinburg Telegraph
Date: January 10, 2014 at 2:00 PM
To: bluebari89@mac.com

Here is the rough draft, please review and advise if you would like anything changed.


I received a phone call from Darlene at Mifflinburg Telegraph today concerning the state of the business since John Stamm passed away. It is being taken over by someone from John's estate and Heidi has decided to start a new business and Darlene and a few of them will be leaving Mifflinburg Telegraph. They would love for us to continue to do business with them. Pricing, equipment etc. would all be the same but they are changing name and location.

They will be called

Wildcat Publishers LLC
229 E Chestnut St.
Mifflinburg, PA


Thanks
Stacey


## Absconding with Mifflinburg Telegraph's customer list

Prior to their official departure from Mifflinburg Telegraph, Sharp  sent an

email to Heidi Criswell's personal email address, bluebari89@mac.com, attached

was an excel spreadsheet, containing the Mifflinburg Telegraph "mailing list."[114]

---

[113]  ECF No. 138-1 at 5.

[114]  ECF no. 124-4 at 236.

Sharp testified at her deposition that she maintained an electronic mailing list on her computer listing subscribers.[115]  She further testified that her January 24, 2014 email reflected sending the Mifflinburg Telegraph customer list/mailing list to Heidi Criswell.  She stated as a deponent:

Q: I'm going to hand you what we're marking as Sharp 7.  Do you recognize this e-mail?

A: I have seen it before, yes.

Q: And where have you seen it before?

A: On documents.

Q: Okay.  Did you send an e-mail from your computer to bluebari89@mac.com?

A: I tried to, yes.

Q: Okay.  And what were you sending?

A: A mailing list.

Q: And whose mailing list was it?

A: From the Telegraph.

Q: And where did you get this mailing list?

A: From my computer.

Q: Is a copy of this mailing list still on your computer?

A: Yes.

[115]  ECF No. 124-7 at 25.

Q: Okay.  And what would it be called?

A: I don't remember.  Customer list.

Q: You said you tried to send this mailing list.  And who is bluebari89@mac.com?

A: That is Heidi's address.

Q: Okay.  Did you delete this e-mail after you tried to send it?

A: I probably did, yes.

Q: And why were you sending this to Heidi?

A: Because she asked me to.

Q: And what did you think it was going to be used for?

A: A postcard mailing.

Q: For?

A: Wildcat Publications.

Q: Okay.  And where did you get the mailing list?

A: Off my computer.

Q:  So it was a Mifflinburg Telegraph mailing list?

A: Yes.[116]

There are two separate lists attached as sealed exhibits.  Approximately 300 customers are noted on the mailing list.[117]  There are approximately 200 customers named on the November 26, 2013 'customer and job list.'[118]

_____

[116]  ECF No. 124-7 at 28.

In preparing her business plan for the new Wildcat business, Heidi Criswell included a "laundry list" of confirmed clients.[119] Heidi Criswell had spoked to "all but two or three" of those listed prior to writing her business plan. [120]  Heidi Criswell testified that "a lot of them were friends that had been with me since January and saw me struggling to buy the business and saw my choices and felt that -- and wanted to assure me that if I would decide to branch out on my own that they would definitely consider -- strongly consider or definitely stay with me."[121] She had been speaking to these clients "for a long time."[122]

Heidi Criswell further testified that she "went around with the business agreement as to the people that said they would definitely continue to use my services.  I did not contact people that I did not know, didn't have personal encounters with, which was probably 95 percent of customers."[123]  She continued, "Darlene talked to ConAgra sometime in November…I know the only one we

[117]  ECF No. 128 at 2-11.
[118]  ECF No. 128 at 15-49
[119]  ECF No. 124-2 at 82.
[120]  ECF no. 124-2 at 82.
[121]  ECF No. 124-2 at 83.
[122]  ECF No. 124-2 at 83.
[123]  ECF No. 124-2 at 90.

made a formal -- any kind of formal letter to was ConAgra."[124]  "Lewisburg

School District, we did not call until February 3rd."[125]

Although Heidi Criswell only admitted to two clients, her business plan, dated November 6, 2013, lists the following clients.  "Confirmed Clients: Heritage Printers confirmed clients Include: Country Farm & Home, Mifflinburg Heritage & Revitalization Association, Artist Valerie Moyer, Martin & Lobes Attorneys, Tournament of Bands/National Judges Association, BandVideos.com, Milton Band Boosters & Theatre Department, Hoffman Advertising, Mifflinburg Christkindl lnc., Max Media, Mifflinburg Theatre & Arts Department, Raspberry Creative Design, Hoffman Advertising, Hometown Eatery."[126] "Clients in negotiation include: Con-Agra, Boy Scouts, Country Cupboard, Central Susquehanna Builders Association, Landmark Tours, Mifflinburg  School  District,  Lewisburg  School District to  name  a few."[127]

An email chain between Heidi Criswell and Stacey Reich at ConAgra Foods dated January 10, 2014 through January 13, 2014 confirmed Con-Agra as a client of Wildcat. [128]  This particular email was not misleading. Heidi Criswell made it clear that "The new name is Wildcat Publications LLC" and that "all of the

---

[124]  ECF No. 124-2 at 90-91.

[125]  ECF No. 124-2 at 91.

[126]  ECF No. 124-2 at 303.

[127]  ECF No. 124-2 at 303.

[128]  ECF no. 124-2 at 304-5s.

employees are moving."[129]  Of the above listed clients Heidi Criswell included in her business plan, one-third were existing Mifflinburg Telegraph customers.[130]

In deleting files, it appears that Heidi Criswell may have also deleted the customer list from the Mifflinburg Telegraph computers.  John Helwig attested that "I am unable to locate the Mifflinburg Telegraph newspaper distribution list which indicates the subscription end dates."[131]

**Closing Mifflinburg Telegrpah's account with its paper supplier**

On December 20, 2013, Heidi Criswell and Sharp received an email from Lindenmeyr Munroe, Mifflinburg Telegraph's paper supplier, that indicated that based on a verbal representation from Heidi Criwell, Lindenmeyr Munroe would close the Mifflinburg Telegraph account at the end of January 2014.  This email exhibit appears to be an exhibit that, tellingly, Mifflinburg Telegraph apparently wasn't aware of, because Mifflinburg Telegraph didn't attach the exhibit to its papers; the Criswells, however, did.  The Criswells attached this email despite it clearly inculpating Heidi Criswell as the individual who closed Mifflinburg Telegraph's account with its paper supplier.  That email is copied herein,[132]

---

[129]  ECF No. 124-2 at 305.

[130]  ECF No. 128 at 15-49.

[131]  ECF No. 124-4 at 4.

[132]  ECF No. 138-1 at 16.

From: alambdin@lindenmeyr.com  📎
Subject: 180601 MIFFLINBURG TELEGRAPH
Date: December 20, 2013 at 4:26 PM
To: heidi@mifflinburgtelegraph.com, darlene @mifflinburgtelegraph.com
Cc: jbutler@lindenmeyr.com
Bcc:

Hi Heidi and Darlene!

Per my phone conversation with you, Heidi, earlier this AM, I have noted the subject account that operations will cease by the end of January due to the passing of John Stamm last year and your current management's lack of success in working out an agreeable buy out of the subject from the estate.

I have noted that October invoices are being paid via payment on the way this Monday the 23rd in the amount of $2,445.98.

We are fine through the end of January working with a $10,000 credit limit and 60 day max on the invoices outstanding.  With October being paid next week, this should accommodate your needs satisfactorily.

Attached is a blank credit application for the new entity you will be opening up at the end of January.  Please fill it out completely making sure to sign and date where indicated.  Please return the completed application to me along with your PA tax exemption certificate as soon as possible so that I can get your new account setup.

If you would be so kind as to supply me with the current management makeup of Mifflinburg since John's passing, that would be helpful in our addressing what credit terms we will be able to extend.  We are certainly aware of how well this has been handled since John's passing and that will weigh in on what new account credit decision we can make.

We did discuss credit card terms as well this morning which, if necessary, would be an option for the 1st say 6 months until financials could be created for the new entity.

This can all be discussed once we have your credit application and the current Mifflinburg management makeup available to us.

I look forward to working with you going forward in the same successful manner that we have in the past.

Let me know if you have any questions please and thank you!

**Andy Lambdin** | Credit Analyst-Ext 201
**Lindenmeyr Munroe**| 3300 Horizon Drive | King of Prussia, PA 19406
610.239.9100| f.610.239.9334| alambdin@lindenmeyr.com | www.lindenmeyr.com

Paper is one of the most recyclable, renewable and natural mediums for communication.

    Heidi Criswell could have advised Mark Papalia in the interim that

Mifflinburg Telegraph's account with its paper supplier would be closed.   Instead,

on January 3, 2014, Heidi Criswell sent a responsive letter to Lindenmeyer Munroe

stating, in relevant part,

> You have requested some information from me about the current situation at the Mifflinburg Telegraph…and how it pertains to my new business - Wildcat Publications, LLC.
> *****

> We already have verbal confirmations from about 85% of our major clients that they have no intention of leaving us regardless of where we are located or what we call ourselves.[133]

Lindenmeyer Munroe then closed Mifflinburg Telegraph's account "as a result of being told that the Mifflinbug Telegraph would be out of business at the end of January."[134] As a result, Helwig had to subsequently reapply for credit with this vendor.[135]

**Work performed by Mifflinburg Telegraph and invoiced for payment by Wildcat**

Heidi Criswell testified at her deposition that a client, Brett Hosterman, emailed her on January 21, 2014 to place an order for 150 posters for Mount Carmel Area High School. [136] She processed the order on January 23, 2014 while still working at Mifflinburg Telegraph using Mifflinburg Telegraph machines and supplies, but later billed the order from Wildcat.[137] The bill is copied herein:[138]

---

[133] ECF No. 124-2 at 356.

[134] ECF No. 124-4 at ¶ 14.

[135] ECF No. 124-4 at ¶ 14.

[136] ECF No. 124-2 at 166.

[137] ECF No. 124-2 at 167 and 362 and ECF No. 138 at ¶69.

[138] ECF no. 124-2 at 365.

# Wildcat Publications, LLC

229 East Chestnut Street • Mifflinburg, PA 17844 • 570-412-3570 • Heidi Criswell, President

## INVOICE

INVOICE#  0301
DATE:  01/08/14

SOLD TO:
TOURNAMENT OF BANDS
ATTN: JEFF DENT

REMIT TO:
WILDCAT PUBLICATIONS, LLC
229 EAST CHESTNUT STREET
MIFFLINBURG, PA 17844

TERMS:
NET 30

| QUANTITY | ITEM DESCRIPTION | UNIT PRICE | AMOUNT |
|---|---|---|---|
| 250 | Judges Badges | 2.75 | $687.50 |
|  | Shipping and Handling |  | 27.36 |
| 1500 | Brochures |  | $540.00 |
|  |  | TOTAL AMOUNT DUE | $1,254.86 |

She did not forward to her employer the money received by Wildcat from the Tournament of Bands work performed by Mifflinburg Telegraph.[139] At her deposition, Heidi Criswell conceded that yet another bill for work that was completed by Mifflinburg Telegraph was ultimately billed from Wildcat.[140]

---

[139] ECF No. 124-2 at 167.

[140] ECF No. 124-2 at 166.

The uninformed or inobservant Dale Criswell testified that he was not aware of any "Wildcat Publications orders [] processed through the Telegraph."[141]

**Deleted data files from Mifflinburg Telegraph's computer**

After the clandestine resignation of all employees, Helwig attempted to access Heidi Criswell's computer and discovered that in addition to her resignation, she had also deleted all Mifflinburg Telegraph work product and customer files from the Mifflinburg Telegraph owned computer.[142] Mifflinburg Telegraph was forced to retain a computer recovery service to attempt to recover the files.[143] The first computer technical support personnel retained was unable to recover the files.[144] Mifflinburg Telegraph later hired a forensic computer expert who did recover some deleted emails, but most of what was found were 'corrupt,' unusable files.[145] In total, Mifflinburg Telegraph paid $9,204.57 for the computer recovery services.[146]

In her counterstatement of facts, Heidi Criswell asserts "emphatically [that] all job files were on her computer on February 2, 2014."[147] Yet an email she sent to

---

[141]  ECF no. 124-3 at 47 and ECF No. 124-4 at 2.

[142]  ¶ 16-19.  She testified that the computer was only "two or three years old maybe." ECF No. 124-2 at 104.

[143]  ¶ 18, 20-24.

[144]  ¶ 24.

[145]  ¶ 25-27.

[146]  ¶ 28 and ECF No. 124-1 at 9-12..

[147]  ¶ 18.

Cheri Ross of the Main Street program part of the Mifflinburg Heritage &

Revitalization Association ("MHRA"), shows that as early as January 22, 2014,

Heidi Criswell was aware that she had deleted all MHRA files.[148]  This email is

copied herein.[149]

From: Heidi Criswell <bluebari89@mac.com>
Subject: **Re: request**
Date: January 22, 2014 1:33:05 PM EST
To: Cherie Ross <mhra@dejazzd.com>

Will do later if okay... I deleted all mhra files except news and views from this work computer!!

OOPS

On Jan 22, 2014, at 1:28 PM, Cherie Ross <mhra@dejazzd.com> wrote:

> Can you email me a copy of last year's MayFest brochure?  Trying to make some decisions around here, you know!
>
> *Cherie Ross*
> *Main Street Manager*
> *300 Chestnut Street*
> *Mifflinburg, PA 17844*
> *570-966-1666*
> *mhra@dejazzd.com*
> *mainstreet@mifflinburgpa.com*
> *www.mifflinburgpa.com*

Heidi Criswell
bluebari89@mac.com

---

[148]  ECF No. 124-2 at 310.

[149]  ECF No. 124-2 at 310.

Moreover, in her statement of facts Heidi Criswell admitted that she deleted her entire computer identity on January 31, 2014.[150] She testified at her deposition that she understood 'identities' on Macs.[151] She further testified that she removed her identity from the computer, explaining "I removed myself from the computer: my name, my personal identity; and that's what I did. I removed my identity from the computer."[152]

Darlene Sharp testified at her deposition that the job files were all stored on Heidi Criswell's computer. If a customer asked for a reorder, no one else could go on Heidi Criswell's computer; Heidi "would have to send it directly to the [printing] press from her computer."[153]

Heidi Criswell does not dispute that Mifflinburg Telegraph spent almost ten-thousand dollars attempting to recover files.[154] What she appears to dispute is the timeline of events, as she poses the question in her counterstatement of facts "Criswell asks what date Kinn Computers was called to investigate it?"[155] Heidi Criswell asserts that Mifflinburg Telegraph should have been able to access all

---

[150] ¶ 19.

[151] ECF No. 124-2 at 117.

[152] ECF No. 124-1 at 121.

[153] ECF No. 124-7 at 10-12.

[154] ¶ 28.

[155] ¶ 18.

files on her computer.[156]  However, the inability of the forensic computer recovery service to recover the files belies her contention.   Her narration of undisputed facts is as follows:

¶ 17 Criswell states that Mifflinburg's customer job files were saved on her computer.  In addition back-ups were on her Apple Time Capsule and on CD's as stated in her resignation letter.

¶ 18   Criswell would have no first hand knowledge of this but assumes it to be true that David Kinn was hired to examine the computer.   Criswell states emphatically all job files were on her computer on February 2, 2014.  Helwig made no inquires directly to Criswell about the computer when he asked for a voicemail password - it seems that missing files would have ben the larger priority.  Criswell asks what date Kinn Computers was called to investigate it?  It seems as if it was working immediately after Criswell leaving as at least two repeat jobs were printed b the Telegraph.

¶ 19   As stated, Criswell admits to removing her identity from her work computer on Friday, January 31, 2014.   As stated in her directions to Helwig in her resignation letter, the computer was set to log in as "Mifflinburg Telegraph" not "Mifflinburg" as she provided the password to access it.

¶ 20  Mr. Kinn is correct, identities allow the use with the access to the files the administrator allows.  However, "Mifflinburg Telegraph" was also set as the administrator, which allowed it to access and edit ALL files on the computer.

¶ 21 The sole identity on the computer was not "Telegraph."  It was "Mifflinburg Telegraph."  It was also the sole administrator.  Again, Criswell asks if the computer was ever attempted to be logged in as she instructed.

---

[156] ¶ 20.

¶ 22 Criswell strong disputes that the files were not accessible. While Criswell does not dispute what Mr. Kinn found, she disputes how the computer arrived to him in that condition.

¶ 23 Again, while Criswell's identity was deleted from her computer, the "Mifflinburg Telegraph" identity as well as the assignment of administer allowed access to all files on the computer. Criswell assigned it as such and disputed Mr. Kinn's claims.

However, the Criswells' 2016 recitation of facts is not in entirely in accord with what the Heidi Criswell's February 2014 resignation letter actually says.[157] In her letter, her only references to the computers were to say "Darlene has left passwords and the safe combination;" "I have done the same;" "My computer is set to log in as Mifflinburg Telegraph - log in is [redacted]; and "Time capsule has my current backups"[158] Her contrary statements in paragraphs nineteen and twenty noted above are examples of multiple discrepancies in the Criswells written work that cause me to question their forthrightness. Heidi Criswell admits that she deleted her files and identity from the computer, but in the same breath attempts to shift the blame back to Plaintiff for its inability to access those deleted files through its administrator identity.

The undisputed fact is, that despite Heidi Criswell's purported hope that the files would remain after she deleted them, they somehow did not. The owner, president, lead computer technician, computer consultant, technical advisor, tech

---

[157] ECF No. 124-1 at 14-16.

[158] *Id.*

support, and the on-side field technician of Kinn Computers, David Kinn, was unable to recover her files.[159] Kinn is far from a novice, as he has more than 25 years of experience.[160] The computer at issue is a MAC[161], an Apple, Inc. brand. Kinn attested as follows in his declaration:

> 4.     On or about February 3, 2016, I was contacted by Mark Papalia to go to the Mifflinburg Telegraph to assist in locating files on a MAC computer which was formerly used by Heidi Criswell while she was employed by Mifflinburg Telegraph.

> 5.     Mifflinburg Telegraph computers were set such that a person logged into the computer under an identity. The person then had access to all files created under that identity and no other identity. Therefore, if one were to log in under the identity of Mifflinburg Telegraph, they would not have access to the customer files created under Heidi Criswell's identity.

> 6.     The only identity that existed on February 3, 2016 was the identity of Mifflinburg Telegraph. Logging in as Heidi Criswell as an identity was not an option.

> 7.     When we logged in as Mifflinburg Telegraph, none of Mifflinburg Telegraph's customer files were accessible.

> 8.     When an identity is deleted on a computer, this action deletes all files associated with that identity and login. Therefore, when Heidi Criswell deleted her identity, she deleted all Mifflinburg Telegraph files that were created under her identity, in essence all Mifflinburg Telegraph files.

> 9.     I was unable to restore Ms. Criswell's identity and unable to recover the deleted files.

---

[159] ECF No. 124-5 at 2-5.

[160] *Id.* at ¶ 2.

[161] ¶ 3.

10.     As I was unable to recover the deleted files, I recommended to Mark Papalia that he hire a forensic computer expert to work with me, which he did.

11.     The forensic computer expert recovered deleted emails.

12.     The forensic computer expert also did recover a minimum amount of customer files; however, those files were not able to be used as they were corrupt.

13.     At that time it was determined that the customer files were not able to be recovered in a usable manner, so we stopped attempting to recover them.[162]

## Continued unauthorized use of Mifflinburg Telegraph's data files

Lest one believe Heidi Criswell's vacillating responses are confined solely to her written statements, I note her deposition was laden with equivocal responses, as well.  When asked "Are you using Mifflinburg Telegraph designs at Wildcat Publications?"[163]  She responded "I am doing my best not to, if I feel it's something that's in conflict.  At this point, yes -- I mean, no, I am not using anything."[164]  When pressed, she continued, "I mean, I'm not saying I have not accidentally used one.  If it was done, it was not done with intent."[165]

She admitted in her statement of facts that she was using designs that were on the Mifflinburg Telegraph computers, but argues that the customer 'owns' the

---

[162]  *Id.* at p. 3-4 (emphasis added).

[163]  ECF No. 124-2 at p. 185 ¶ 15-16.

[164]  ECF no. 124-2 at p. 185 ¶ 17-19.

[165]  ECF No. 124-2 at p. 185 ¶ 7-9.

design.[166] Specifically, she admitted she re-produced the menu for Carriage Corner restaurant.[167] Interestingly, Sharp testified that she believed that if a customer wanted to purchase something through Wildcat that is duplicative of work from Mifflinburg Telegraph that "Heidi had to start from scratch and redo it."[168]

**Use of Mifflinburg Telegraph's pricing list**

Until just before his death, John Stamm was responsible for determining pricing for the products and services Mifflinburg Telegraph provided.[169] Mifflinburg Telegraph asserts that Heidi Criswell used this pricing book to solicit Mifflinburg Telegraph customers to Wildcat, telling customers that she would charge less than John Stamm.[170] Heidi Criswell disputes this, but again, her emphatic statement of facts contradicts her own prior testimony. She wrote:

> ¶ 33 Stamm had a pricing book that he kept with him at all times. The book was turned over to Sharp and Criswell approximately one week before his death and was used to price orders. UNDISPUTED.

> ¶ 34 Criswell used pricing information obtained from Stamm's book to solicit Telegraph customers for the Telegraph NOT Wildcat. UNDISPUTED.

---

[166] ECF no. 138 at ¶ 71.

[167] ECF no. 124-2 at 186-187.

[168] ECF No. 124-7 at 68.

[169] ¶ 33.

[170] ¶ 34-35.

In her 2014 deposition, however, Heidi Criswell testified that Stamm gave the pricing book to his wife Wanda, not to her.[171]  Additionally, prior to leaving Mifflinburg Telegraph, she attempted to undercut Mifflinburg Telegraph by telling a client that she would charge them less at Wildcat.  She wrote in a January 28, 2014 email to Carol Pierson

> Worked on the pricing for the bridal book - With the reduced page count, I can do you more programs - do you want to do about 300-350 and put the rest toward the nascar book and get more there?  I'm not getting anything near what John was charging you.[172]

**Unauthorized transfer of Mifflinburg Telegraph's printer to Wildcat**

Sometime between October 7, 2013, when she was notified that the negotiations to purchase Mifflinburg Telegraph had failed, and October 25, 2013, when she formed the Wildcat business, Heidi Criswell contacted Ricoh, USA, Inc., hereinafter "Ricoh," to ask them "if equipment that I [Heidi Criswell] thought was mine that I had signed for, could be switched -- the contracts could be switched; and they said yes."[173]  Curiously, on September 22, 2013, without Papalia's knowledge, Heidi Criswell signed a lease with Ricoh for a '651' printer for Mifflinburg Telegraph for a cost of $1,704 per month.[174]  She signed a revised lease, dated November 14, 2013, to 'buy out' Mifflinburg Telegraphs' existing

---

[171]  ECF No. 124-2 at 24.

[172]  ECF No. 124-6 at 17.

[173]  ECF No. 124-2 at 63.

[174]  ECF No. 124-2 at 132-137 and ECF No. 124-2 at 320-322.

'720' printer to bring the lease up to $1,986 per month.[175] The change in lease price was "what it would cost to add the 720 on to the 651 lease."[176] She never discussed the lease, nor the subsequent revision, with Papalia prior to signing.[177] The lease itself, including the price change from $1,704 to $1,986, is billed to Mifflinburg Telegraph.[178]

Although Heidi Criswell asserts in her statement of facts that Wildcat signed a service contract for the increased payment to be removed from Mifflinburg Telegraph's account and placed on Wildcat's, her only evidentiary support for this is to cite, *ipsie dixit*, to her resignation letter.[179] The price change and billing information on the lease have been copied herein:

---

[175] ECF No. 124-2 at 132-137 and ECF No. 124 at ¶ 42..

[176] ECF No. 124-2 at 134.

[177] ECF No. 124-2 at 132.

[178] ECF no. 124-2 at 320-322.

[179] ECF No. 138 at ¶ 50 and Exhibit F.

**RICOH**

Ricoh USA, Inc.
70 Valley Stream Parkway
Malvern, PA 19355

**Lease Agreement**

Number: 3072408

This Lease Agreement (this "Lease") has been written in clear, easy to understand language. Please take time to review the terms. When we use "Customer," "you" or "your," we are referring to you, our Customer. When we use "we," "us" or "our," we are referring to Ricoh USA, Inc. ("Ricoh") or, if we assign this Lease pursuant to Section 3 below, the Assignee (as defined below). Our corporate office is located at 70 Valley Stream Parkway, Malvern, PA 19355.

**CUSTOMER INFORMATION**

| | |
|---|---|
| MIFFLINBURG TELEGRAPH INC | HEIDI Criswell |
| Full Legal Name | Billing Contact Name |
| 358 WALNUT ST | 358 WALNUT ST |
| Equipment Location Address | Billing Address (if different from location address) |
| MIFFLINBURG | PA 17844-1153 | MIFFLINBURG | PA 17844-115 |
| City | County | State | Zip | City | County | State | Zip |

| Federal Tax ID No. | Billing Contact Telephone No. | Billing Contact Facsimile No. | Billing Contact E-Mail Address |
|---|---|---|---|
| 23-3102732 | (570)966-2255 | | heidi@mifflinburgtelegraph.com |

**EQUIPMENT DESCRIPTION**

| Qty | Equipment Description: Make & Model | Qty | Equipment Description: Make & Model |
|---|---|---|---|
| 1 | RICOH PRO C65IEX | | |

**PAYMENT SCHEDULE**

| Minimum Term (months) | Minimum Payment (Without Tax) | Minimum Payment Billing Frequency | Advance Payment |
|---|---|---|---|
| 60 | $1986.00 ~~$1,704.00~~ | ☑ Monthly ☐ Quarterly ☐ Other: | ☐ 1st Payment ☐ 1st & Last Payment ☑ Other: NONE |

**ADDITIONAL PROVISIONS** (if any) are:

---

Heidi Criswell asserts she believed she was personally responsible for the machines.[180] The lease does contain a 'personal guaranty' section, but it is unexecuted by anyone:[181]

---

[180] ECF No. 124-2 at 135.

[181] ECF No. 124-2 at 320.



PERSONAL GUARANTY In consideration of Ricoh USA, Inc. entering into the above Lease, I unconditionally guarantee that the Customer will make all payments and pay all other charges required under such Lease when they are due, and that the Customer will perform all other obligations under the Lease fully and promptly. I also agree that Ricoh USA, Inc. or its Assignee may modify the Lease or make other arrangements with the Customer, and I will still be responsible for these payments and other obligations under the Lease. I agree that Ricoh USA, Inc. or its Assignee need not notify me of any default under the Lease and may proceed directly against me without first proceeding against the Customer or the Equipment, in which event, I will pay all amounts due under the terms of the Lease. In addition, I will reimburse Ricoh USA, Inc. or its Assignee, as applicable, for any costs or reasonable attorneys' fees incurred in enforcing its rights. This continuing guaranty is a guaranty of payment and not of collection. I CONSENT TO THE VENUE AND NON-EXCLUSIVE JURISDICTION OF ANY COURT LOCATED IN EACH OF THE COMMONWEALTH OF PENNSYLVANIA AND THE STATE WHERE MY PRINCIPAL PLACE OF BUSINESS OR RESIDENCE IS LOCATED TO RESOLVE ANY CONFLICT UNDER THIS GUARANTY.

X_____     Home Address_____

Guarantor Signature

(Printed Name of Guarantor • Do Not Include Title)     City_____ State_____ Zip_____

[_____
Home Phone

08/29/2013 14:31 PM          12667743
LSHADD C-L6 07.13     Ricoh* and the Ricoh Logo are registered trademarks of Ricoh Company, Ltd.

EXHIBIT
CRISWELL
20

In a December 2, 2013 email exchange with Margaret Wolfe, a Senior

Account Executive with Ricoh USA, hereinafter "Wolfe," Heidi Criswell wrote:

> So to re-iterate -please make sure all billing goes to the Miflfinburg [sic] Telegraph Inc... not me.  Something going down (not bad) and Iwant [sic] to make sure that the present trustee pays for all that the business is responsible for.  So for now, let's just forget that we talked about moving them until this is all settled.

In a January 3, 2014 email to Wolfe, Heidi Criswell wrote,

As I said, if there is ANYTHING I can do to help, please let me know.

> Things seems to be progressing according to plan but the silence on the part of the Stamm estate is deafening and I'm worried we may hear from them soon. I gotta get these machines moved  out of  here soon.[182]

In a January 6, 2014 email exchange between Wolfe and Heidi Criswell,

Criswell wrote:

---

[182]  ECF No. 124-2 at 348.

It is in the mail...

As far as the world is concerned the Telegraph is now Wildcat Publications, LLC.  It is closing Feb. 3, and unless the executor would like to find a buyer at sometime and try to reopen it - which is 99% doubtful, it will stay shuttered.  He doesn't know equipment was ever here, we have contracts, we are continuing to pay our commitment to Ricoh.

Can we   simply tell them that yes, we are the Telegraph and yes, we are rebrandlng and starting over simply because of the "bad karma" associated with the Telegraph name.  We have to move because the current location is about to be condemned by the county (this is the truth).

Are we just trying to be too damn  honest about this?  Can you just be "misinformed" or just didn't quite understand  what  I wanted  done.

We are under the exact same corporate structure.

It is interesting to note that Lindenmyer- Munroe is cancelling the credit line with the current Telegraph on Jan. 30 because John is dead and we are gone.  If someone else opens this, they must re-apply and will have to prove credit worthiness even though the business itself has been here since 1862.  They have no  problem with allowing  us to take our credit to the new location.

I need a beer!

Heidi Criswell[183]

Wolfe responded to Heidi Criswell:

I'm down with the beer!

OK…, lets do this…I will process paperwork as Telegraph, moving to "telegraph" at new location.   The invoice will be created as 'telegraph'.   Then once the assumption is done…provided its done,

---

[183]  ECF No. 124-2 at 355.

we can issue a new invoice as wildcat and credit it. Or you can just pay the 'telegraph' invoice. We don't care where the check comes from.[184]

On January 8, 2014, Heidi Criswell wrote in an email to Wolfe: "do

whatever you need to do to get these machines out of here asap!!"[185] In a January

9, 2014 email exchange between Wolfe and Heidi Criswell, Wolfe wrote:

Heidi,

Our coordinator got wind of the conversation I had with the big boss (Ramzi). She was trying to get the Mifflinburg Telegraph lease straightened out so the you [sic] could start making the payments.

NOW there is a total barrage of questions. They want to know who the contact will be if not you,

I am afraid they are not going to be OK with this. After all it is rather apparent that you are more or less sticking the Executor (what's his name?) with this lease. If he doesn't want to pay it, we are going to have to re-posess [sic] the unit and take a loss.

Now maybe they will let you just assume the lease with the marketplace funding it.

I'm not sure what to tell them. You're thoughts?

Margaret Wolfe[186]


Heidi Criswell replied,

---

[184]  ECF no. 124-2 at 354.

[185]  ECF no. 124-6 at 12.

[186]  ECF No. 124-2 at 374.

If the skew can be fixed a little better btw, which I can just say "hey it's fixed!" He will keep the machine with no problem. I told him about the skewing issue and that it still wasn't great and he asked if they planned on fixing it - I couldn't say - yeah, when it moves. So - if a tech comes in and "fixes" it- or tries to make it better again, I will say "this is great!!" and he will say yeah!! and pay all the money Ricoh wants, cause he is all about spending the cash!![187]

In a January 9-10 email exchange between Heidi Criswell and Wolfe,

Criswell wrote:

how do we get these out of here post haste?

He wants to bring in a manager to help us make more money and he's willing to look at new printers (I told him one of these was on trial and the other broken) and they were scheduled for removal soon.[188]

Wolfe replied "I've asked to have them scheduled ASAP. I will check with the warehouse and get back to you."[189] Heidi Criswell replied, "Any idea when the 720 is physically leaving the building.[190] In a January 10, 2014 email from Wolfe to Heidi Criswell, Wolfe wrote:

Heidi,

The payment for the 720 has to be in it. We bought it out with the 651 lease. You are correct that it doesn't appear on the lease document, so he won't know that. All he will know is that the C651 costs $1986 a month.

---

[187] ECF No. 124-2 at 374.

[188] ECF No. 124-6 at 26.

[189] ECF No. 124-6 at 26.

[190] ECF No. 124-6 at 26.

We can move it because according to our records it is "owned by the Telegraph now. And he told you to get it out of there.

Margaret Wolfe.[191]

In a January 15, 2014 email exchange to Wolfe, Heidi Criswell wrote:

Someone from ricoh is calling HERE to find out about the new machine - something about delivery Darlene thinks. I have no idea who it is because I am never here. It's so important that no one calls the Telegraph about the new machinery. Have no idea who is using the number.[192]

In a January 28, 2014 email exchange with Erika Brent, Lead Specialist, Customer Billing at Ricoh USA, Inc., Heidi Criswell wrote:

I wasn't aware that we'd be receiving invoices until the new 651 was installed -it's at least two weeks from what Margaret told me. The two machines are on the same contract?

The Telegraph would be responsible for all invoices dating to January 14. We don't have supporting electricity to run any printers yet, prob. not for another two weeks.

Darlene caught up Invoices at the Telegraph relating to the both the 720 and the 651 that is here last week I believe. (I hope)

Thanks ,
Heidi[193]

Heidi Criswell made the first lease payment with her "own personal money;"[194] she signed an assumption agreement on January 6, 2014.[195] The

---

[191] ECF No. 124-2 at 352.

[192] ECF No. 124-2 at 350.

[193] ECF No. 124-2 at 326.

assumption agreement stated that the Transferor, Mifflinburg Telegraph, and Transferee, Wildcat Publication, are jointly and severally liable for all rental and lease payments.[196]  There was a $250 fee assessed by Lessor, Ricoh, in connection with the assumption.[197]

In a January 30, 2014 email to Donald Reichenbach, another Ricoh employee, with the subject line, 'Installation of Machines at Wildcat Publications,' Heidi Criswell wrote,

> Howdy ho Don!!
>
> I am not sure who to contact about this because Margaret is away and I don't have the serial numbers of the machines to open an account to file a service request.
>
> The contractors at our new place of business say that we will have power up and running for both the 720 that was moved from the Telegraph and the new 651 that I'm hoping we will see tomorrow.  It was in town yesterday and the lift gate froze, hoped we'd get it today but never heard anything from the driver.
>
> SO…that being said - we can scheduled [sic] installation of the machines anytime after Mon., Feb. 3.
>
> Thanks so much!!
> Heidi Criswell.[198]

---

[194]  ECF No. 124-2 at 136 and ECF No. 138-1 at 2.

[195]  ECF No. 124-2 at 137.

[196]  ECF No. 124-2 at 333.

[197]  ECF No. 124-2 at 333.

[198]  ECF NO. 124-6 at 27.

On February 6, 2014, Heidi Criswell had the printers at Wildcat "up and running."[199]

On March 3, 2014, Ricoh billed Mifflinburg Telegraph $500 for "equipment relocation."[200]

When questioned at his deposition about the printers at Wildcat, Dale Criswell explained:

A: We have a digital printer, a paper cutter, a folder, an envelope press, and, of course, the disputed 720.

Q: Okay. So when you mentioned digital printer, you're not talking about the 720?

A: No.

Q: That's the second one. Okay. Do you know where the 720 came from?

A: It came from the Telegraph.

Q: Okay. Do you know how Wildcat got the 720?

A: To the -- the way it was explained to me was that this was a machine that was going to be junked because it was broken and the lease was up on it. And when Mr. Papalia said throw it out, we thought, well, this is going to end up on the ship somewhere; so my wife asked Margaret if we could buy it or whatever or we could assume -- or take over the lease on it or whatever, you know. We weren't trying to steal it or anything. We were under the assumption that this was all set up with Ricoh, and, you know, -- and I asked them

---

[199] ECF No. 124-2 at 180.

[200] ECF No. 124-2 at 357.

for reassurances, you know, over and over against, Is this okay?  Not because we were trying to steal anything.  We were just trying to buy an old broken press.[201]

John Helwig attested that he was unaware of Heidi Criswell's plan for the 720 printer.

¶ 8.  Prior to [Heidi] Criswell and Sharp quitting, according to the Mifflinburg Telegraph's financial records payments were made to RICOH in the amount of $1,986.  I did not sign the check making the payments.

¶ 9.  I was unaware that the lease payment of $1,986 included a payment for the 720 Printer until I read the emails recovered by the computer forensic consultant.

¶ 10.  On March 20, 2014, a bill from RICOH was dropped off at the Mifflinburg Telegraph for moving the 720 Printer to Wildcat Publications, LLC's address.

¶ 11.  I was under the impression that the 720 Printer was returned to RICOH. [202]

Mifflinburg Telegraph asserts that the total payments it made for the 720 printer while in Wildcat's possession was $5,358.00

## Defamation

Heidi Criswell also testified that she "told a few people that I was concerned something illegal was going on, yes."[203]   She also emailed a contact at Costas Foods:

---

201  ECF No. 124-3 at 2-3.

202  ECF No. 124-3 at 2-3.

From: Heidi Criswell <bluebari89@mac.com>
Subject: **Moving Question**
Date: January 15, 2014 9:07:07 AM EST
To: Ryan Stahl <ryan@Costasfoodsinc.com>

Good morning Ryan,

Just overheard your question and YES, we are moving but we are all leaving the Telegraph behind because the estate has refused to sell - they have put it in charge of a baby sitter and are dumping a mysterious amount of cash into it. Our attorney and accountant and heck, the authorities are all on alert that something illegal is going down here and ALL of the employees are getting out of here fast.

204

For his part, Dale Criswell testified as follows:

Q:  Did you ever tell anyone that Mark Papalia was engaged in illegal operations?

A:  Not -- I -- well, no.  I said to people that we might -- we have apprehension.

*****

Q: Okay.  Do you know if anyone else told -- or said that Mifflinburg Telegraph was engaged in illegal operations or doing something illegal?

A: No.

*****

Q: Did you ever tell anyone that Mifflinburg Telegraph had financial troubles and could not pay its bills?

A: No, not that it couldn't bay [sic] its bills.  But it's no secret that the Telegraph was floundering for a while.

---

[203]  ECF No. 124-2 at 103.

[204]  ECF No. 124-2 at 373.

Q: And so who would you have told that --

A: Nobody.  I don't -- I wouldn't tell them.  It's common knowledge.

*****

Q: Did you ever tell anyone that the Mifflinburg Telegraph was closing?

A: No.

Q:  Did you ever tell anyone that the Mifflinburg Telegraph was not going to be in business after January?

A: No. [205]

Additionally, Helwig attested that:

The Mifflinburg Telegraph uses Lindenmeyr Munroe to purchase paper.  Upon attempting to order more paper, I was informed by Andy Lamden at Lindenmeyr Munroe that our account was blocked as a result of being told that the Mifflinburg Telegraph would be out of business at the end of January.   Although I have reassured Mr. Lamden that we were not closed, we still had to reapply for credit.[206]

**Unauthorized Transfer of Trusteeship of Mifflinburg Telegraph's 401K plan**

On August 1, 2013, Heidi Criswell changed the trustee of the Mifflinburg Telegraph's 401K plan held by First Savings Bank from Stamm and Papalia to herself and Darlene Sharp.[207]  She did so by signing her name as the employer, knowing that she was not, and also knowing full well that she did not have a

---

[205]  ECF No 124-3 at 38, 42, 44-45

[206]  ECF No. 124-4 ¶ 14.

[207]  ECF No. 124-2 at 16 and ECF No. 124-2 at 228-272.

written agreement to purchase the business.[208]  Heidi Criswell did not notify Paplia that she had transferred the trusteeship of the 401K plan.[209]  Subsequently, on February 2, 2014, immediately after her stealthy resignation from Mifflinburg Telegraph, she signed documents transferring the 401K plan from Mifflinburg Telegraph to Wildcat.[210]

The documents Sharp and Criswell submitted to the plan administrator at Continental Benefits Group are copied herein:

---

[208]  ECF No. 124-2 at 16-18 and ECF No. 124-2 at 229.

[209]  ECF No. 124-2 at 18.

[210]  ECF No. 124-2 at 20 and ECF No. 124-2 at 231-272.

# FOURTH AMENDMENT TO THE
## JANUARY 1, 2010 RESTATEMENT
## OF THE
## 401(K) PROFIT SHARING PLAN AND TRUST AGREEMENT
## OF
## MIFFLINBURG TELEGRAPH, INC.

Effective the first day of August, 2013, the Adoption Agreement of the 401(k) Profit Sharing Plan and Trust Agreement of Mifflinburg Telegraph, Inc. shall be amended as follows:

Heidi Criswell and Darlene Sharp shall be added as Trustees, and by their signatures below accept the responsibility of such appointment and John Stamm and Angelo Mark Papalia are removed as Trustees.

IN WITNESS WHEREOF, the undersigned has executed this Amendment to the Plan on this the 1st day of August, 2013.

**Employer:**
Mifflinburg Telegraph, Inc.

_Heidi Criswell_ (signature)

Heidi Criswell

**Trustees:**

_Heidi Criswell_ (signature)

Heidi Criswell

_Darlene Sharp_ (signature)

Darlene Sharp

211

---

[211]  ECF No. 124-7 at 138.

### Appointment and Acceptance of Trustees

Pursuant to a resolution of the Board of Directors of Mifflinburg Telegraph, Inc., Heidi Criswell and Darlene Sharp are hereby appointed as Trustees of the Mifflinburg Telegraph, Inc. 401(k) Profit Sharing Plan, effective August 1, 2013.

_Heidi Criswell_
Heidi Criswell

August 1, 2013
Date

_Darlene Sharp_
Darlene Sharp

August 1, 2013
Date

### Acceptance

I, Heidi Criswell, hereby accept the appointment to act as a trustee of the Mifflinburg Telegraph, Inc. 401(k) Profit Sharing Plan, effective August 1, 2013 and agree to be bound by the terms of the Mifflinburg Telegraph, Inc. 401(k) Profit Sharing Plan dated August 1, 2013.

_Heidi Criswell_
Heidi Criswell

August 1, 2013
Date

I, Darlene Sharp, hereby accept the appointment to act as a trustee of the Mifflinburg Telegraph, Inc. 401(k) Profit Sharing Plan, effective August 1, 2013 and agree to be bound by the terms of the Mifflinburg Telegraph, Inc. 401(k) Profit Sharing Plan dated August 1, 2013.

_Darlene Sharp_
Darlene Sharp

August 1, 2013
Date

212

---

212 ECF No. 124-7 at 140.

RESOLUTION
OF THE
BOARD OF DIRECTORS
OF
MIFFLINBURG TELEGRAPH, INC.

On August 1, 2013, the following resolution was duly adopted by unanimous consent of the Board of Directors of Mifflinburg Telegraph, Inc. and such resolution has not been modified or rescinded as of the date hereof:

RESOLVED, effective August 1, 2013, John Stamm and Angelo Mark Papalia are removed as Trustees and Heidi Criswell and Darlene Sharp shall be appointed as Trustees of the Mifflinburg Telegraph, Inc. 401(k) Profit Sharing Plan and Trust, further, that the proper Officers of the Employer shall act to notify Heidi Criswell and Darlene Sharp of this appointment.

RESOLVED, that the proper Officers of the Employer shall act as soon as possible to notify employees of the Employer of the adoption of this amendment.

RESOLVED, that the proper Officers of the Employer be, and they hereby are, authorized and directed to execute any and all such documents and to perform any and all such acts as may be necessary and proper to effect the foregoing; and

THE UNDERSIGNED does hereby certify that the foregoing is a full, true and correct copy of the resolutions duly and regularly adopted by the Board of Directors of said Employer.

Mifflinburg Telegraph, Inc.

_Darlene Sharp_
Darlene Sharp

213

Darlene Sharp admitted that she was never an officer of the Mifflinburg Telegraph.[214]  She also testified that there was no board meeting and that she was

---

[213]  ECF No. 124-7 at 136.

[214]  ECF No. 124-7 at 37.

not a member of board on August 1, 2013. She further testified that Mifflinburg Telegraph did not have a board.[215]

In a feeble attempt to mitigate her liability as to the change of 401K trusteeship, Heidi Criswell attempts to shift blame to Continental Benefits Group by asserting that they initiated contact with her. In her statement of facts, she wrote:

> Any movement of the 401 K was initiated by First Savings and their agent Marianne Mundy (Mundy) of Continental benefits Group. It was never implied or understood that Criswell was under any "authority." The Plaintiff seeks to establish such authority in hindsight. The 401 K was never an issue until First Savings and Mundy made it one. Interestingly enough, Mundy would not divulge to Attorney Jason Benion who directed her to initiate contact with Sharp and it is also interesting that Helwig was still employed by First Savings at this time. Mundy was to be depositioned [sic] by Sharp's attorneys but that deposition was cancelled when the Telegraph decided to settle with Sharp and the answer to this question will not be known until this goes to trial.[216]

Whether or not Continental Benefits Group reached out to her initially is really irrelevant. Sharp testified that Mifflinburg Telegraph does not have a board of directors; Heidi Criswell admitted that she was never an officer of Mifflinburg Telegraph;[217] nor was she on the board of directors of Mifflinburg Telegraph.[218] It is abundantly clear that Heidi Criswell unscrupulously signed a document stating

---

[215] ECF No. 124-7 at 39.

[216] ECF No. 128 at ¶ 58.

[217] ECF No. 124-2 at 15.

[218] ECF No. 124-2 at 16.

that she was appointed trustee of the 401K plan pursuant to a resolution of the

Mifflinburg Telegraph board of directors.  She acknowledged at her deposition that

she signed the documents as the 'employer' knowing that she was not the

employer.

      With the facts as I understand them stated, I now move to the legal causes of

action against Heidi and Dale Criswell.

### C.    The Counts

    **1.    Count I: Violation of the Computer Fraud and Abuse Act ("CFAA")18 U.S.C. § 1030(a)(2)(C) against Heidi Criswell**

           **Count II: Violation of the Computer Fraud and Abuse Act ("CFAA")18 U.S.C. § 1030(a)(5) against Heidi Criswell**

           **Count V: Aiding and Abetting Thru Violation of the computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et. seq.*, ("CFAA") against Heidi Criswell and Dale E. Criswell**

      The Computer Fraud and Abuse Act "CFAA" is part of the federal crimes

code.  "The [CFAA] was an anti-hacking law that has grown well beyond its

original role."[219]  "Now, it can serve as the basis of litigation by creative plaintiffs'

class action attorneys, as well as companies attempting to protect their trade

secrets."[220]  The United States Court of Appeals for the Third Circuit has observed

that employers "are increasingly taking advantage of the CFAA's civil remedies to

---

[219] Christine D. Galbraith, ACCESS DENIED: IMPROPER USE OF THE COMPUTER FRAUD AND ABUSE ACT TO CONTROL INFORMATION ON PUBLICALLY ACCESSIBLE INTERNET WEBSITES, 63 Md. L.Rev. 320, 324 (2004)

[220] *Id.*

sue former employees and their new companies who seek a competitive edge through wrongful use of information from the former employer's computer system."[221]

The CFAA has been amended several times. Although the CFAA is part of the crimes code, "the 1994 Act added civil remedies."[222] " One of the 1996 amendments deleted the phrase "through means of a computer used in interstate commerce or communications" found in the 1994 Act's version."[223] "Today, a claimant may establish a civil cause of action under the CFAA by demonstrating that a person has (i) knowingly and with intent to defraud, (ii) accessed a protected computer, (iii) without authorization, and as a result (iv) has furthered the intended fraudulent conduct and obtained anything of value."[224]

The Computer Fraud and Abuse Act prohibits seven fraudulent activities related to computers.[225] Count I alleges that Heidi Criswell violated 18 U.S.C. § 1030(a) (2)(C), which states "Whoever-- intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains --

---

[221] *P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504, 510 (3d Cir.2005).

[222] *Pac. Aerospace & Elecs., Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1195 (E.D. Wash. 2003*)* (superseded by statute on other grounds, e.g. the definition of the term "loss.") *see e.g.* 18 U.S.C. § 1030(g).

[223] *Pac. Aerospace & Elecs., Inc.* at 1195.

[224] *Id.*

[225] *See* 18 U.S.C. § 1030(a)(1)-(7).

information from any protected computer." Count II alleges that Heidi Criswell violated Section 1030 (a)(5) "Whoever-- (A) knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer; (B) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or (C) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss." "To state a civil claim for violations of the CFAA, [Plaintiff] must allege: (1) damage or loss "to 1 or more persons during any 1–year period ... aggregating at least $5,000 in value"; (2) caused by; (3) violation of one of the substantive provisions of §§ 1030(a) or (b)."[226]

"Caselaw supports an employer's use of the CFAA's civil remedies to sue former employees and their new companies who seek a competitive edge through wrongful use of information from the former employer's computer system."[227] "Such former employees may attempt to gain an edge for their new venture by making use of proprietary information, such as customer lists or trade secrets, obtained with ease of access from their former employer's computer database or

---

[226] *Advanced Fluid Sys., Inc. v. Huber*, 28 F. Supp. 3d 306, 326 (M.D. Pa. 2014) (Conner, J.) citing 18 U.S.C. §§ 1030(c)(4)(A)(i)(I), 1030(g).

[227] *Id.*

workstations that are linked together in a network."[228]  "While passwords and other electronic means can limit the unauthorized dissemination of some confidential information, an employee who has not yet announced his departure is still able to access confidential information and store it on a CD or floppy disk before he or she leaves."[229]  "Computers also make it easy for employees to quickly transmit information out of the company via e-mail."[230]

### "Protected computer"

"The definition of 'protected computer" includes [the computers] at issue here, because the definition embraces any computing device that may be used in interstate commerce.[231]

### "Without authorization" [232]

---

[228] *Id.*

[229] *Id.*

[230] *Id.*

[231] *Penn--Air & Hydraulics Corp. v. Lutz,* 2015 WL 4508922, at *3 (M.D. Pa. July 24, 2015) (Kane, J.) *see also* 18 U.S.C. § 1030(e).

[232] The issue here turns on whether Heidi Criswell was **authorized** to access Mifflinburg Telegraph's computer system after resignation.    The circuits are divided as to this issue. The United States Court of Appeals for the Ninth Circuit has explained:

> A Seventh Circuit decision, I*nternational Airport Centers, LLC v. Citrin*, 440 F.3d 418 (7th Cir.2006). According to LVRC, Citrin supports its argument that the CFAA incorporates an additional limitation in the word "authorization,  such that an employee can lose authorization to use a company computer when the employee resolves to act contrary to the employer's interest. In Citrin, the court held that an employee's authorization to access a computer ended for purposes of § 1030(a)(5)6 when the employee violated his duty of loyalty to his employer. The employee had decided to start a competing business in violation of his employment contract and erased all data from his work laptop computer before quitting his job. *Id*. at 419. The

erased data included both valuable information belonging to his employer and evidence that the employee had engaged in misconduct. Id. The Seventh Circuit held that, under common law agency principles, the employee breached his duty of loyalty to his employer "when, having already engaged in misconduct and decided to quit [the company] in violation of his employment contract, he resolved to destroy files that incriminated himself and other files that were also the property of his employer, in violation of the duty of loyalty that agency law imposes on an employee." *Id*. at 420. The court held that this breach of the duty of loyalty to his employer terminated the employee's agency relationship "and with it his authority to access the laptop, because the only basis of his authority had been that relationship." Id. at 420–21. Accordingly, the Seventh Circuit held that the employee's actions were "without authorization" for purposes of § 1030(a)(5). *Id*. at 421.

If we applied the reasoning in Citrin to this case, Brekka would have breached his duty of loyalty to LVRC when he allegedly resolved to transfer key LVRC documents and information to his personal computer to further his own competing business, and at that point his authorization to access the computer would have ended. Applying this reasoning, Brekka would have acted "without authorization" for purposes of §§ 1030(a)(2) and (4) once his mental state changed from loyal employee to disloyal competitor.

We are unpersuaded by this interpretation. First, and most important, § 1030 is primarily a criminal statute, and §§ 1030(a)(2) and (4) create criminal liability for violators of the statute. Although this case arises in a civil context, our interpretation of §§ 1030(a)(2) and (4) is equally applicable in the criminal context. *See Leocal v. Ashcroft*, 543 U.S. 1, 11 n. 8, 125 S.Ct. 377, 160 L.Ed.2d 271 (2004) (holding that where a statute "has both criminal and noncriminal applications," courts should interpret the statute consistently in both criminal and noncriminal contexts). It is well established that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *United States v. Carr*, 513 F.3d 1164, 1168 (9th Cir.2008) (quoting *Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971)). The Supreme Court has long warned against interpreting criminal statutes in surprising and novel ways that impose unexpected burdens on defendants. *See United States v. Santos*, 553 U.S. 507, 128 S.Ct. 2020, 2025, 170 L.Ed.2d 912 (2008) (J. Scalia) (plurality opinion) (*citing United States v. Bass,* 404 U.S. 336, 347–49, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971); *McBoyle v. United States*, 283 U.S. 25, 27, 51 S.Ct. 340, 75 L.Ed. 816 (1931); *United States v. Gradwell*, 243 U.S. 476, 485, 37 S.Ct. 407, 61 L.Ed. 857 (1917)). "This venerable rule ... vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are

Both Sections a(5) and "Section 1030(a)(2)(C), [] requires [Defendant] to have accessed [Plaintiff's] computer system 'without authorization.'"[233]

"'Authorization is not defined by the CFAA, and the Third Circuit has not yet

---

uncertain, or subjected to punishment that is not clearly prescribed." Id. Therefore, "[t]he rule of lenity, which is rooted in considerations of notice, requires courts to limit the reach of criminal statutes to the clear import of their text and construe any ambiguity against the government." *United States v. Romm,* 455 F.3d 990, 1001 (9th Cir.2006).

In this case, as noted above, "authorization" means "permission or power granted by an authority." Random House Unabridged Dictionary, 139. The definition of the term "exceeds authorized access" from § 1030(e)(6) implies that an employee can violate employer-placed limits on accessing information stored on the computer and still have authorization to access that computer. The plain language of the statute therefore indicates that "authorization" depends on actions taken by the employer. Nothing in the CFAA suggests that a defendant's liability for accessing a computer without authorization turns on whether the defendant breached a state law duty of loyalty to an employer. If the employer has not rescinded the defendant's right to use the computer, the defendant would have no reason to know that making personal use of the company computer in breach of a state law fiduciary duty to an employer would constitute a criminal violation of the CFAA. It would be improper to interpret a criminal statute in such an unexpected manner. *See Carr*, 513 F.3d at 1168.

Because LVRC's proposed interpretation based on Citrin does not comport with the plain language of the CFAA, and given the care with which we must interpret criminal statutes to ensure that defendants are on notice as to which acts are criminal, we decline to adopt the interpretation of "without authorization" suggested by Citrin. Rather, we hold that a person uses a computer "without authorization" under §§ 1030(a)(2) and (4) when the person has not received permission to use the computer for any purpose (such as when a hacker accesses someone's computer without any permission), or when the employer has rescinded permission to access the computer and the defendant uses the computer anyway.

*LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1133–34 (9th Cir. 2009)

[233]  *QVC, Inc. v. Resultly, LLC*, 159 F. Supp. 3d 576, 595 (E.D. Pa. 2016) (Beetlestone, J.).

addressed the meaning of 'authorization' in the context of the statute."[234] "[T]hose who have permission to access a computer for any purpose, such as employees, cannot act "without authorization" unless and until their authorization to access the computer is specifically rescinded or revoked."[235] "No language in the CFAA supports [the] argument that authorization to use a computer ceases when an employee resolves to use the computer contrary to the employer's interest."[236] "[A] person who uses a computer 'without authorization' has no rights, limited or otherwise, to access the computer in question."[237] Accordingly, "[w]hile disloyal employee conduct might have a remedy in state law, the reach of the CFAA does not extend to instances where the employee was authorized to access the information he later utilized to the possible detriment of his former employer."[238] Chief Judge Christoper C. Conner of this Court has held that "the CFAA prohibits unauthorized *access* to information rather than unauthorized *use* of such information."[239] Chief Judge Conner further noted that unauthorized access

---

[234] *Id.*

[235] *Id.*

[236] *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1133 (9th Cir. 2009)

[237] *Id.*

[238] *Brett Senior & Assoc., P.C. v. Fitzgerald*, 2007 WL 2043377, at *3, 2007 U.S. Dist. LEXIS 50833, at *9–10 (E.D.Pa. July 13, 2007)

[239] *Advanced Fluid Sys., Inc. v. Huber*, 28 F. Supp. 3d 306, 329 (M.D. Pa. 2014) (Conner, J.) (emphasis in original).

includes an employee continuing to access an employer's computers after leaving employment.[240]

### "Damage or Loss"

"Under the Act, the term 'damage' means any impairment to the integrity or availability of data, a program, a system, or information."[241] "Meanwhile, the term 'loss' means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."[242] "A violation of (a)(5)(A) is not determined by unauthorized access, rather, it is predicated on unauthorized damage."[243] There must be a minimum of $5,000 in loss for the statute to apply.[244]

### Summary Judgment is denied as to Counts I and II

In the case *sub judice*, Heidi Criswell admitted that she accessed her Mifflinburg Telegraph email after she resigned. Because it has not yet been decided in this Circuit if confiscating information before resigning is a violation, I

---

[240] *Id.*

[241] *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125, 148 (3d Cir. 2015), *cert. denied sub nom. Gourley v. Google, Inc.*, 137 S. Ct. 36, 196 L. Ed. 2d 26 (2016) (internal citations omitted).

[242] *Id.*

[243] *Advanced Fluid Sys., Inc*, at 330 (M.D. Pa. 2014) (Conner, J.) (internal citation omitted).

[244] 18 U.S.C. § 1030(a).

base today's decision only on the clearly established laws that she did access Mifflinburg Telegraph computers without authorization, i.e. after she resigned. However, Mifflinburg Telegraph has not provided evidentiary support that the damages based on her accessing her Mifflinburg Telegraph emails after she resigned were more than the statutory threshold $5,000. The approximately $9,000 damages for computer recovery will be recoverable for her torts, but not under the CFAA because it is undisputed that she deleted the files prior to her official resignation, when she was still 'authorized' to use her computer. Judgment will be entered in favor of Heidi Criswell as to these counts.

Summary Judgment is also denied as to Count V as it fails as a matter of law

Moreover, the motion for summary judgment is also denied and judgment will be entered as to both Heidi and Dale Criswell as to Count V as "the CFAA does not create a cause of action for aiding and abetting."[245]

---

[245] *Advanced Fluid Sys., Inc*, at 327 *citing* 18 U.S.C. §§ 1030(c)(4)(A)(i)(I), 1030(g).; *see also Flynn v. Liner Grode Stein Yankelevitz Sunshine Regenstreif & Taylor LLP*, 2011 WL 2847712, at *2–4, 2011 U.S. Dist. LEXIS 77217, at *7–9 (D.Nev. July 15, 2011); *and see* 18 U.S.C. § 1030(b) (Holding that the statute creates a cause of action against "whoever conspires to commit or attempts to commit" an offense under § 1030(a), but makes no mention of aiding and abetting liability).

2.   **Count VI: Conversion against Heidi Criswell**

**Count VIII: Aiding and Abetting Conversion against Heidi Criswell and Dale E. Criswell**

<u>Conversion</u>

There is no genuine dispute as to any material fact as to Count VI, conversion as to Heidi Criswell. The law relating to conversion is well established in the Commonwealth of Pennsylvania. "A conversion is the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification."[246] "Conversion may be committed by [u]nreasonably withholding possession from one who has the right to it."[247]

Heidi Criswell has acknowledged multiple conversions. She took the Mifflinburg Telegraph 720 printer to Wildcat without Mifflinburg Telegraph's consent or knowledge, and without justification.  She took the Mifflinburg Telegraph 401K plan to Wildcat without Mifflinburg Telegraph's consent or knowledge, and without justification. She took the Mifflinburg Telegraph customer business card order to Wildcat without Mifflinburg Telegraph's consent or knowledge, and without justification. She took the Mifflinburg Telegraph customer files and customer lists to Wildcat without Mifflinburg Telegraph's consent or

---

[246] *Stevenson v. Econ. Bank of Ambridge*, 413 Pa. 442, 451 (1964).

[247] *Id*. at 451-2.

knowledge, and without justification. This is a catalog of inappropriate behavior. The motion for summary judgment will therefore be granted on Heidi Criswell as to Count VI.

### Aiding and Abetting Conversion

"The civil tort of aiding and abetting has the following elements: For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with the other or pursuant to a common design with him, or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person."[248]

That said, 'aiding and abetting' a conversion does not appear to be a tort in Pennsylvania; I was unable to find even a single case with a cause of action of 'aiding and abetting' a conversion. Moreover, Mifflinburg Telegraph did not cite to any cases where 'aiding and abetting' a conversion is a cause of action. Accordingly, because I am unconvinced that this is, in fact, a cause of action, and because there has been no legal argument advancing the issue, I find that there is

---

[248] *Bochetto & Lentz, P.C. v. Datz,* 2013 WL 11256829, at *3 (Pa. Super. Ct. 2013) *see also Cummins v. Firestone Tire & Rubber Co.*, 495 A.2d 963, 969 (Pa. Super. Ct. 1985) (*quoting* Restatement (Second) of Torts § 876).

no 'aiding and abetting conversion' tort in Pennsylvania; I have no basis upon which to create torts in this state.  The motion for summary judgment as to Heidi and Dale Criswell as to aiding and abetting conversion will be denied and judgment entered in their favor as to Count VII.

> ### 3. Count IX: Breach of Fiduciary Duty against Heidi Criswell and Dale E. Criswell
>
> ### Count X: Aiding and Abetting Breach of Fiduciary Duty against Heidi Criswell and Dale E. Criswell

Inexplicably, Mifflinburg Telegraph did not move for summary judgment on the breach of fiduciary duty counts.  Pursuant to Federal Rule of Civil Procedure 56(f)(3) "after giving notice and a reasonable time to respond, the court may ... consider summary judgment on its own after identifying for the parties the material facts that may not be genuinely in dispute."  District Courts "possesses the power to enter summary judgment *sua sponte* provided the losing party 'was on notice that [it] had to come forward with all of [its] evidence.'"[249]  "*Sua sponte* grants of

---

[249] *United States v. AseraCare Inc*, 153 F. Supp. 3d 1372, 1385–86 (N.D. Ala. 2015*) citing Burton v. City of Belle Glade*, 178 F.3d 1175, 1203 (11th Cir.1999) (qu*oting Celotex Corp. v. Catret*t, 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)*); see also Lillo ex rel. Estate of Lillo v. Bruhn*, 413 Fed.Appx. 161 (11th Cir.2011) (affirming order granting summary judgment after district court sua sponte raised issue); *Strange v. Travelers Indem. Co*., 915 F.Supp.2d 1243, 1245 (N.D.Ala.2012) ("Rule 56(f)(3) ... allows the court to act on its own initiative" in considering whether summary judgment is appropriate.); *United States v. Ala. Power Co*., 274 F.R.D. 686, 692 (N.D.Ala.2011) (granting summary judgment under Rule 56(f)(3) after informing parties that it "could grant summary judgment as to all claims if there was no admissible evidence" as to a particular point of a claim); *Franks v. Indian Rivers Mental Health Ctr*., No.7:08–cv–1035–SLB, 2014 WL 514130, at *7 (N.D.Ala. Feb. 7, 2014) ("Pursuant to Rule 56(f), the court may grant a sua sponte motion for summary judgment 'after identifying for the parties material facts that may not be genuinely in dispute,' and

summary judgment are only appropriate if the losing party has reasonable notice that the sufficiency of his or her claim will be in issue."[250] "Reasonable notice implies adequate time to develop the facts on which the litigant will depend to oppose summary judgment."[251]

The Honorable Jan E. DuBois of the Eastern District of Pennsylvania has explained that

> To allege a breach of fiduciary duty, a plaintiff must establish that a fiduciary or confidential relationship existed between her and the defendants. *Harold v. McGann*, 406 F.Supp.2d 562, 571 (E.D.Pa.2005). "Although no precise formula has been devised to ascertain the existence of a confidential relationship, it has been said that such a relationship exists whenever one occupies toward another such a position of advisor or counselor as reasonably to inspire confidence that he will act in good faith for the other's interest." *Silver v. Silver*, 421 Pa. 533, 219 A.2d 659, 662 (1966); *see also Basile v. H & R Block, Inc.*, 777 A.2d 95, 101–02 (Pa.Super.2001).
>
> In addition to a confidential relationship, a plaintiff must also allege the elements of a breach of fiduciary duty:
>
>> (1) That the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed;
>> (2) That the plaintiff suffered injury; and

---

giving the opponent at least ten days notice and time to respond."); *accord Norse v. City of Santa Cruz*, 629 F.3d 966, 971 (9th Cir.2010) ("District courts unquestionably possess the power to enter summary judgment sua sponte, even on the eve of trial.").

[250] *Norse v. City of Santa Cruz*, 629 F.3d 966, 971–72 (9th Cir. 2010) *citing United States v. 14.02 Acres of Land More or Less in Fresno Cnty.*, 547 F.3d 943, 955 (9th Cir.2008) (internal quotation marks omitted).

[251] *Portsmouth Square, Inc. v. S'holders Protective Comm.*, 770 F.2d 866, 869 (9th Cir.1985).

(3) The defendant's failure to act solely for the plaintiff's benefit was a real factor bringing about plaintiff's injuries. Pa. S.S.J.I. § 4.16; *see also McDermott v. Party City Corp.*, 11 F.Supp.2d 612, 626 n. 18 (E.D.Pa.1998).[252]

Here, Heidi Criswell owed a fiduciary duty to her employer, and breached it by both taking and deleting data files and customer lists from Mifflinburg Telegraph's computers.[253]  However, there is no evidence of any actionable breach by Dale Criswell in this regard.

"Under Pennsylvania law, the elements that must be proven in order to maintain a claim for aiding and abetting a breach of fiduciary duty are: (1) a breach of a fiduciary duty owed to another; (2) knowledge of the breach by the aider and abettor; and (3) substantial assistance or encouragement by the aider and abettor in effecting that breach."[254] "In other words, "[i]n order to be found liable for aiding and abetting a breach of a fiduciary duty, one must demonstrate that the party knew that the other's conduct constituted a breach of a fiduciary duty and gave substantial assistance or encouragement to the other in committing that breach."[255] "A fiduciary duty may arise from "a

---

[252] *Baker v. Family Credit Counseling Corp.*, 440 F. Supp. 2d 392, 414–15 (E.D. Pa. 2006) (DuBois, J.).

[253] *See id.*

[254] *Synthes, Inc. v. Emerge Med., Inc.*, 25 F. Supp. 3d 617, 674-75 (E.D. Pa. 2014) *citing Reis v. Barley, Snyder, Senft & Cohen*, 667 F.Supp.2d 471, 492 (E.D.Pa.2009).

[255] *Id.  citing Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 174 (3d Cir.2002) (claim for aiding and abetting breach of fiduciary duties

confidential relationship between two parties."[256]  There is no evidence that

Dale Criswell was in any way involved in the Heidi Criswell breach.

Finding both a breach of fiduciary duty and aiding and abetting of that

duty as to Heidi Criswell would be duplicative.  The parties are on notice

pursuant to Fed. R. Civ. P. 56(f)(3) that summary judgment will be entered if

no opposition is filed within thirty (30) days of the date of this Memorandum

Opinion and Order; I intend to enter summary judgment in favor of

Mifflinburg Telegraph as to Count IX as to Heidi Criswell, against

Mifflinburg Telegraph as to Count IX as to Dale Criswell, and against

Mifflinburg Telegraph as to Count X in its entirety.

### 4.    Count XI: Tortious Interference with Business Relations against Heidi Criswell and Dale E. Criswell

Again, Plaintiff did not move for summary judgment on this claim.

Interestingly, it is an exhibit that the Criswells attached that leads me to the

ineluctable conclusion that summary judgment should be entered on Plaintiff's

behalf as to Heidi Criswell.   It is clear from the evidence that Heidi Criswell

interfered with Mifflinburg Telegraph's contract with, at a minimum, its paper

---

under ERISA); *see also* RESTATEMENT (SECOND) TORTS § 876, cmt. to subsection (b) (1979) ("If the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act.").

[256] *PTSI, Inc. v. Haley*, 71 A.3d 304, 311 (Pa. Super. Ct. 2013) (internal citation omitted).

supplier.  However, there is no evidence to support an entry of summary judgment

on this count as to Dale Criswell.

The elements of a cause of action for intentional interference with a

contractual relation, whether existing or prospective, are as follows:

> (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party;
> (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring;
> (3) the absence of privilege or justification on the part of the defendant; and
> (4) the occasioning of actual legal damage as the result of the defendant's conduct.[257]

As to the first element,

> A "prospective contractual relationship" is something less than a contractual right, something more than a mere hope.  Under Pennsylvania law, [Plaintiffs] must present adequate proof of an objectively reasonable probability that a contract will come into existence.   [Plaintiffs] need only demonstrate that it is reasonably probable that it would have obtained a contract, not that it was guaranteed to do so. Stated another way, [Plaintiffs] may recover if, but for [defendant's] wrongful acts, it is reasonably probable that a contract would have been entered.  This reasonable probability may result from an unenforceable express agreement, an offer, or the parties' current dealings, but not merely from prior dealings or an existing business relationship between the parties. [258]

---

[257] *Blackwell v. Eskin*, 2007 PA Super 20, 916 A.2d 1123, 1127-28 (2007) *citing Reading Radio, Inc. v. Fink*, 833 A.2d 199, 211 (Pa.Super.2003), *appeal denied,* 577 Pa. 723, 847 A.2d 1287 (2004) (*quoting Strickland v. University of Scranton*, 700 A.2d 979, 985 (Pa.Super.1997)).

[258] *Baier v. Jersey Shore State Bank*,  2009 WL 2843325, at *17 (M.D. Pa. 2009) (McClure, J.) (internal citations and quotations omitted).

"It is not enough for a plaintiff to show merely that defendant's actions had the incidental consequence of affecting plaintiff's business relationships with third persons."[259] "A plaintiff must show that the defendant acted for the malevolent purpose of interfering with the plaintiff's existing ... business relationships."[260]

"The second element requires proof that the defendant acted for the specific purpose of causing harm to the plaintiff."[261] "The wrong ordinarily requires conduct intended to interrupt negotiations or prevent the consummation of a contract."[262] "[T]he second prong is satisfied if defendant acts improperly and with the knowledge that such interference is substantially certain to occur."[263]

"The third element requires proof that the defendant's actions were improper under the circumstances presented."[264] "The presence of a privilege is not an affirmative defense, rather, the absence of such a privilege is an element of the cause of action which must be pleaded and proven by the plaintiff."[265] "Whether a defendant is privileged or justified in a particular course of conduct is defined by

---

[259] *Devon Robotics v. DeViedma*, 2012 WL 3627419, at *16 (E.D. Pa. Aug. 23, 2012) (Joyner, J.).

[260] *Id. citing Valley Forge Convention & Visitors Bureau v. Visitor's Servs., Inc.*, 28 F.Supp.2d 947, 951 (E.D.Pa.1998).

[261] *Phillips v. Selig*, 2008 PA Super 244, 959 A.2d 420, 429 (2008) (internal citations omitted).

[262] *Orange Stones Co. v. City of Reading*, 87 A.3d 1014, 1025 (Pa. Commw. Ct. 2014) (*citing Glenn v. Point Park College*, 441 Pa. 474, 481, 272 A.2d 895, 899 (1971)).

[263] *Id. citing* Restatement (Second) of Torts § 766 cmt. j; § 766B cmt. d (1979).

[264] *Phillips*, 959 A.2d at 429.

[265] *Synthes, Inc. v. Emerge Med., Inc.*, 2014 WL 2616824, at *19 (E.D. Pa. June 11, 2014) *citing Bahleda v. Hankison Corp.* 323 A.2d 121, 122-123 (Pa.Super.1974).

"the rules of the game," or the "area of socially acceptable conduct which the law regards as privileged."[266]

Pennsylvania has adopted the Restatement Second of Torts proposition that the interference must be improper, i.e., without privilege or justification.[267] To determine impropriety includes consideration of: "(a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the others with which the actor's conduct interferes; (d) the interests sought to be advanced by the actor; (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (f) the proximity or remoteness of the actor's conduct to the interference; and (g) the relations between the parties."[268]

In applying these factors, comment b to section 767 is also instructive:

The issue in each case is whether the interference is improper or not under the circumstances; whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another. The decision therefore depends upon a judgment and choice of values in each situation. This Section states the important factors to be weighed against each other and balanced in arriving at a judgment; but it does not exhaust the list of possible factors.[269]

---

[266] *Orange Stones Co*., 87 A.3d at 1025, *citing Glenn v. Point Park College*, 441 Pa. 474, 482, 272 A.2d 895, 899 (1971).

[267] *See Empire Trucking Co., Inc., v. Reading Anthracite Coal Co*., 71 A.3d 923 (Pa. Super. 2013).

[268] RESTATEMENT (SECOND) OF TORTS § 767, *and see, Phillips, supra* ([The] third element...is determined in accordance with the factors listed in Restatement section 767).

[269] RESTATEMENT (SECOND) OF TORTS § 767 cmt. b (1979).

In making this choice of values in individual cases, the Pennsylvania Supreme Court has advised that when the purpose of the defendant's conduct is, in whole or in part, to protect a legitimate right or interest that conflicts with the interests of the plaintiff, a line must be drawn and the interests evaluated. Although this evaluation of interests is not always susceptible of precise definition, it is clear that the central inquiry is whether the defendant's conduct is sanctioned by the "rules of the game" which society has adopted.

Therefore, the parties are on notice pursuant to Fed. R. Civ. P. 56(f)(3) that summary judgment will be entered if no opposition is filed within thirty (30) days of the date of this Memorandum Opinion and Order; that I intend to enter summary judgment in favor of Mifflinburg Telegraph as to Count XI against Heidi Criswell, and against Mifflinburg Telegraph as to Count XI as to Dale Criswell.

### 5. Count XII: Misappropriation and Misuse of Trade Secrets and Confidential Information in Violation of Pennsylvania Uniform Trade Secrets Act 12 Pa.C.S. § 5301, *et. seq.*, ("PUTSA") against Heidi Criswell and Dale E. Criswell

The policy behind trade secret law is "the maintenance of standards of commercial ethics."[270] "Under PUTSA, a person has misappropriated a trade secret 'when he acquires knowledge of another's trade secret in circumstances giving rise to a duty to maintain its confidentiality and then discloses or uses that

---

[270] *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470 (1974).

trade secret without the other's consent.'"[271] "PUTSA defines a "trade secret" as:

"Information, including a formula, drawing, pattern, compilation including a

customer list, program, device, method, technique or process that: (1) derives

independent economic value, actual or potential, from not being generally known

to, and not being readily ascertainable by proper means by, other persons who can

obtain economic value from its disclosure or use; or (2) is the subject of efforts that

are reasonable under the circumstances to maintain its secrecy.'""[272]

It is clear from the evidence that summary judgment as to Heidi Criswell is

appropriate as to Count XII, as she took Mifflinburg Telegraph's customer lists for

use at Wildcat.  There is simply a paucity of evidence as to Dale Criswell

generally, including any culpability as to this count; summary judgment will

therefore be denied as to him.

###    6.    Count XIV: Procuring Information by Improper Means against Heidi Criswell and Dale E. Criswell

Pennsylvania has adopted RESTATEMENT OF TORTS § 759, Procuring

Information by Improper Means, which provides "one who, for the purpose of

advancing a rival business interest, procures by improper means information about

another's  business is liable to the other for the harm caused by his possession,

---

[271]  *Synthes, Inc. v. Emerge Med., Inc.,* 25 F. Supp. 3d 617, 704–05 (E.D. Pa. 2014) *citing Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 110 (3d Cir.2010) (*citing*  12 Pa. Cons.Stat. § 5302).

[272]  Synthes, Inc., 25 F. Supp. 3d  at 705 *citing* 12 Pa. Cons.Stat. Ann. § 5302

disclosure or use of the information." "Moreover, the comments to § 759 clearly indicate information that is procured under this section need not rise to the level of a trade secret."[273] "It only need be confidential business information."[274]

It is clear that Heidi Criswell took confidential business information, including data files from Mifflinburg Telegraph and used them at Wildcat; summary judgment shall be entered in Plaintiff's favor. However, once again, there is no evidence to support a finding that Dale Criswell acted to appropriate confidential business information; accordingly, summary judgment will be entered in his favor.

### 7. Count XV: Defamation against Heidi Criswell

Mifflinburg Telegraph has not moved for summary judgment on this count. Defamation is codified in Pennsylvania at 42 Pa. C.S.A. § 8343:

(a) Burden of plaintiff.--In an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised:
(1) The defamatory character of the communication.
(2) Its publication by the defendant.
(3) Its application to the plaintiff.
(4) The understanding by the recipient of its defamatory meaning.
(5) The understanding by the recipient of it as intended to be applied to the plaintiff.
(6) Special harm resulting to the plaintiff from its publication.
(7) Abuse of a conditionally privileged occasion.

---

[273] *Pestco, Inc. v. Associated Prod., Inc.*, 880 A.2d 700, 709 (Pa. Super. Ct. 2005) *citing* RESTATEMENT OF TORTS § 759 cmt. b.

[274] *Id.*

(b) Burden of defendant.--In an action for defamation, the defendant has the burden of proving, when the issue is properly raised:
  (1) The truth of the defamatory communication.
  (2) The privileged character of the occasion on which it was published.
  (3) The character of the subject matter of defamatory comment as of public concern.

Under Pennsylvania defamation law, it is for the court to determine whether the statement at issue is capable of a defamatory meaning.[275]  A statement is defamatory if it tends so to harm the reputation of another as to lower him or her in the estimation of the community or to deter third persons from associating or dealing with him or her.[276]  A statement indicating that the plaintiff has engaged in criminal activity constitutes slander per se, obviating need for the Plaintiff to prove 'special harm' as element of defamation claim.[277]

Here, summary judgment should be entered against Heidi Criswell and in favor of Mifflinburg Telegraph. but for Dale Criswell and against Mifflinburg Telegraph.   I again place the parties on notice, pursuant to Fed. R. Civ. P. 56(f)(3), that summary judgment will be entered if no opposition is filed within thirty (30) days of the date of this Order, in favor of Mifflinburg Telegraph as to Count XV

---

[275]  *Keim v. County of Bucks*, 275 F.Supp.2d 628 (E.D.Pa.2003).

[276]  *Id citing U.S. Healthcare v. Blue Cross of Greater Philadelphia,* 898 F.2d 914, 923 (3d Cir.1990), cert. denied, 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990).

[277]  *See Thompson v. Wagner,* 631 F.Supp.2d 664 (W.D.Pa.2008).

against Heidi Criswell, and against Mifflinburg Telegraph on Count XV as to Dale Criswell.

### 8. Count XVI: Civil Conspiracy against Heidi Criswell and Dale E. Criswell

"In Pennsylvania, 'to state a cause of action for civil conspiracy, the following elements are required: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage.'"[278] To prove a civil conspiracy, it must be shown that two or more persons combined or agreed with intent to do an unlawful act or to do an otherwise lawful act by unlawful means.[279]

Additionally, the Pennsylvania Supreme Court stated that proof of malice, an intent to injure, is essential in proof of a conspiracy.[280] This unlawful intent must be absent justification. The test was set forth by that court eighty (80) years ago, as follows.

---

[278] *Gen. Refractories Co. v. Fireman's Fund Ins. Co.,* 337 F.3d 297, 313 (3d Cir. 2003*), citing Strickland v. Univ. of Scranton*, 700 A.2d 979, 987-8 (1997) (citation and internal quotations marks omitted) (*cited in Allegheny General Hosp. v. Philip Morris, Inc*., 228 F.3d 429, 446 (3d Cir.2000)).

[279] *See Landau v. Western Pennsylvania National Bank*, 445 Pa. 217, 282 A.2d 335 (1971); *Fife v. Great Atlantic and Pacific Tea Co*., 356 Pa. 265, 52 A.2d 24 (1947); *Bausbach v. Reiff*, 244 Pa. 559, 91 A. 224 (1914); Baker v. Rangos, 229 Pa.Super. 333, 324 A.2d 498 (1974).

[280] *See Miller v. Post Publishing Co*., 266 Pa. 533, 110 A. 265 (1920); *Miller v. Harvey,* 215 Pa. 103, 64 A.2d 330 (1906); *Irvine v. Elliott*, 206 Pa. 152, 55 A.2d 859 (1903).

Assume that what is done is intentional, and that it is calculated to do harm to others. Then comes the question, Was it done with or without "just cause or excuse"? If it was bona fide done in the use of a man's own property such legal justification would exist not the less because what was done might seem to others to be selfish or unreasonable. But such legal justification would not exist when the act was merely done with the intention of causing temporal harm, without reference to one's own lawful gain, or the lawful enjoyment of one's own rights.[281]

The evidence presented in this matter shows that Heidi Criswell conspired with Margaret Wolfe to take the 720 printer and bill it to Mifflinburg Telegraph. It also shows that Heidi Criswell conspired with Darlene Sharp to convert the Mifflinburg Telegraph 401K trusteeship. Summary judgment will be entered in favor of Mifflinburg Telegraph and against Heidi Criswell as to civil conspiracy.

However, there is no evidence that Dale Criswell conspired with anyone, including his wife. He apparently had no knowledge of any of the torts Heidi Criswell engaged in. The evidence shows that his knowledge of anything regarding the move to Wildcat is minimal. Summary judgment as to this count will therefore be entered in his favor.

### 9. Count XVII: Unjust Enrichment against Heidi Criswell and Dale E. Criswell

Pennsylvania law supports two species of unjust enrichment claims: "(1) a quasi-contract theory of liability, in which case the unjust enrichment claim is

---

[281] *Rosenblum v. Rosenblum,* 320 Pa. 103, 108-09 (1935).

brought as an alternative to a breach of contract claim; or (2) a theory based on unlawful or improper conduct established by an underlying claim, such as fraud, in which case the unjust enrichment claim is a companion to the underlying claim."[282] The case at bar appears to be a claim of the latter, hinging upon other claims in the Plaintiff's complaint.

"Unjust enrichment is essentially an equitable doctrine."[283] "The elements necessary to prove unjust enrichment are: (1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value."[284] "The application of the doctrine depends on the particular factual circumstances of the case at issue."[285] "In determining if the doctrine applies, our focus is not on the intention of the parties, but rather on whether the defendant has been unjustly enriched."[286] In other words, "benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit

---

[282] *Whitaker v. Herr Foods, Inc.*, 198 F. Supp. 3d 476, 492 (E.D. Pa. 2016).

[283] *Mitchell v. Moore*, 729 A.2d 1200, 1203 (Pa. Super. Ct. 1999).

[284] *Id.*

[285] *Id.* at 1203-4.

[286] *Id.* at 1204.

without payment of value."[287]  Employing somewhat circular reasoning, the

Superior Court of Pennsylvania has stated that "the most important factor to be

considered in applying the doctrine is whether the enrichment of the defendant is

unjust."[288]

More helpfully, Pennsylvania has adopted the Restatement of Restitution for

determining whether there is unjust enrichment.[289] The Restatement provides

guidance that unjust enrichment can occur through conversion (§40), interference

with a trade secret (§42), or through a fiduciary or confidential relation (§43).[290]

Further, "an unjust enrichment claim may be pled as a companion… to a claim of

unlawful or improper conduct as defined by law—e.g., a tort claim."[291] When

based on an underlying claim, an unjust enrichment claim shall fall where the

underlying claims are dismissed.[292]

Here, summary judgment should be entered as to Mifflinburg Telegraph and

against Heidi Criswell, as she took what she initially planned to purchase from the

business -- the customer lists, pricing information, contracts and goodwill.

However, there is again insufficient evidence as to Dale Criswell to find liability

---

[287] *Schenck v. K.E. David, Ltd*., 666 A.2d 327, 328 (1995) (internal citations omitted).

[288] *Id.*

[289] *D.A. Hill Co. v. Clevetrust Realty Inv'rs*, 524 Pa. 425, 432, 573 A.2d 1005, 1009 (1990).

[290] RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 40, 42-43 (2011).

[291] *Whitaker v. Herr Foods, Inc.*, 198 F. Supp. 3d 476, 493 (E.D. Pa. 2016).

[292] *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 937 (3d Cir. 1999).

on his part.  Therefore, summary judgment as to this count will be entered in his favor.

**10.  Count XII: Unfair Competition against Heidi Criswell and Dale E. Criswell**

**11.  Count XVII: Violation of Section 43(A) of the Lanham Act, 15 U.S.C. § 1125 against Heidi Criswell and Dale E. Criswell.**

Unfair Competition

Nearly one-hundred years ago, the Pennsylvania Supreme Court defined unfair competition as "anything done by a rival in the same business by imitation or otherwise designed or calculated to mislead the public in the belief that, in buying the product offered by him for sale, they were buying the product of another manufacturer."[293]  The spirit of the law can be expressed as "the deception practiced in 'passing off' the goods of one for that of another."[294]  "The law of unfair competition also requires that a company, entering a field already occupied by a rival of established reputation, 'must do nothing which will unnecessarily

---

[293] *B.V.D. Co. v. Kaufmann & Baer Co.*, 272 Pa. 240, 116 A. 508, 508-09 (Pa.1922).

[294] *Volunteer Firemen's Ins. Servs., Inc. v. Fuller*, No. 1:12-CV-2016, 2012 WL 6681802, at *11 (M.D. Pa. Dec. 21, 2012) (citing *Pa. State Univ. v. Univ. Orthopedics, Ltd.*, 706 A.2d 863, 870 (Pa.Super.Ct.1998)).

create or increase confusion between his goods or business and the goods or business of the rival.'"[295]

Unfair competition may not be construed as "a virtual catch-all for any form of wrongful business conduct."[296] In fact, comment g to § 1 of the Third Restatement of Unfair Competition itself explains that a "primary purpose" of that section is "the identification and redress of business practices that hinder rather than promote the efficient operation of the market."

"Pennsylvania common law [of unfair competition] is identical to the Lanham Act, 15 U.S.C. § 1125, except that the Lanham Act requires interstate commerce."[297] Accordingly, I will address the two counts together.

---

[295] *Pennsylvania State Univ. v. Univ. Orthopedics, Ltd.*, 706 A.2d 863, 870–71 (Pa. Super. Ct. 1998) (internal citations omitted).

[296] *USX Corp. v. Adriatic Ins. Co.*, 99 F. Supp. 2d 593, 619–20 (W.D. Pa. 2000) (Diamond, J.) (explaining that unfair competition "contextually is limited to claims designed to protect a business from another's misappropriation of its business organization or its expenditure of labor, skill or money, *i.e.,* injury to reputation, product, manner of doing business, identification and so forth"), *aff'd,* 345 F.3d 190 (3d Cir. 2003). Indeed, our Court of Appeals, albeit in the context of interpreting commercial insurance policies, has reemphasized that unfair competition may require something more than suggested by the post-*Synthes* jurisprudence. For example, in *Frog, Switch & Mfg. Co. v. Travelers Ins. Co.*, 193 F.3d 742, 748 (3d Cir. 1999), the court anchored its reasoning as to the potency of an unfair competition on whether the offending company "misappropriated methods of gaining customers" or "misappropriated information about the manufacture of . . . the resulting product"—the former iteration being the more clearly actionable one.

[297] *Moore Push-Pin Co. v. Moore Bus. Forms, Inc.*, 678 F. Supp. 113, 116 (E.D. Pa. 1987)

Lanham Act

The Lanham Act makes actionable the use of deceptive and misleading marks. However, "it is not a panacea for every type of commercially tortious conduct."[298]

The Act provides, in relevant part, that a civil action exists when:

> any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>>
>> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.[299]

The Third Circuit has stated, "to prevail on its claim of unfair competition under Section 43(a), we have said a plaintiff must prove by a preponderance of the evidence: 1) that the defendant has made false or misleading statements as to his

---

[298] § 2:2.Injuries and complaints not redressable under Section 43(a), 1 Federal Unfair Competition: Lanham Act 43(a) § 2:2

[299] 15 U.S.C. § 1125(a).

own product [or another's]; 2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) that the deception is material in that it is likely to influence purchasing decisions; 4) that the advertised goods travelled in interstate commerce; and 5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of goodwill, etc."[300] However, "the act of making a false representation 'for a purpose other than competition' has also been determined to be beyond the scope of the Lanham Act since, in one court's words, the Act would "have create[d] a federal tort of misrepresentation.'"[301]

"Federal courts have long held that § 43(a) of the Lanham Act extends protection to unregistered trademarks."[302] A designation may only receive protection, however, if the public recognizes it as identifying the claimant's "goods or services and distinguishing them from those of others."[303]

"Section 43(a) of the Lanham Act prohibits actions like trademark infringement that deceive consumers and impair a producer's goodwill."[304] "It

---

[300] *Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm., Inc.*, 19 F.3d 125, 129 (3d Cir. 1994) *citing U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 922–23 (3d Cir.1990), *cert. denied*, 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990) (*quoting Max Daetwyler Corp. v. Input Graphics, Inc.*, 545 F.Supp. 165, 171 (E.D.Pa.1982)).

[301] § 2:9.Injuries and complaints not redressable under Section 43(a)—Miscellaneous, 1 Federal Unfair Competition: Lanham Act 43(a) § 2:9

[302] *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 296 (3d Cir. 1986).

[303] 1 J. McCarthy, Trademarks and Unfair Competition § 15:1 at 657 (2d ed. 1984).

[304] *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 32 (2003).

forbids, for example, the Coca–Cola Company's passing off its product as Pepsi–Cola or reverse passing off Pepsi–Cola as its product.[305]

This is precisely what Heidi Criswell did. She began the Wildcat business by leading other to believe that she was the proprietor of Mifflinburg Telegraph. Heidi Criswell was misleading customers to believe that she was the owner of a new Mifflinburg Telegraph business by marketing Wildcat (after she resigned) as Mifflinburg Telegraph under "new management" and placing miseleading reorder cards in Mifflinburg Telegraph customer orders leading customers to reorder with Wildcat. The United States Supreme Court has held "that a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff."[306]

In Paragraph 29 of Mifflinburg Telegraph's statement of facts they indicate that it communicated outside of Pennsylvania with both Ricoh and Continental Benefits Group. Ricoh provides financing for its products through its State of Georgia office; Continental Benefits operates through its State of New Jersey office.

---

[305] *Id.*

[306] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1391 (2014).

However, for the federal Lanham act to apply, it is insufficient for Mifflinbrug Telegraph to do business in interstate commerce. "Plaintiffs must show that the statements were introduced into interstate commerce."[307] "The interstate commerce jurisdictional predicate for the Lanham Act merely requires a party to show that the **defendant's** conduct affects interstate commerce, such as through diminishing the plaintiff's ability to control use of the mark, thereby affecting the mark and its relationship to interstate commerce."[308] "Purely intrastate disputes do not fall under the Lanham Act."[309]

Although Mifflinburg Telegraph attempts to bring this dispute under the purview of the Lanham Act by indicating that it has contracts in other states, those contracts, and the work of Wildcat, are not for the goods at issue here. "'In commerce' means all commerce which may be regulated by Congress."[310] While it is clear that Congress may regulate Contintental's administration of Mifflinburg Telegraph's 401K plan, Congress has no authority to regulate Wildcat and Mifflinburg Telegraph's printing products for local Mifflinburg customers. Mifflinburg Telegraph's argument here is untenable.

---

[307] *Grubbs v. Sheakley Grp., Inc*., 807 F.3d 785, 802 (6th Cir. 2015).

[308] *Browne v. McCain*, 611 F. Supp. 2d 1073, 1079 (C.D. Cal. 2009) (emphasis added).

[309] *Mother Waddles Perpetual Mission, Inc. v. Frazier*, 904 F. Supp. 603, 611 (E.D. Mich. 1995).

[310] *Id.*

Consequently, summary judgment will be denied as to Count XVII, the Lanham Act claim against Heidi Criswell.  However, summary judgment will be granted on Count XII as to the state tort of unfair competition as to Heidi Criswell. It is evident that she made several attempts to pass off her work as that of Mifflinburg Telegraph.

There is no evidence in the record as to liability as to Dale Criswell as to either count.  Accordingly, summary judgment will be granted in his favor here and against Mifflinburg Telegraph.

### 12.  Compensatory Damages Award

I made a compensatory damages finding in my September 7, 2017 Order of Default Judgment against Wildcat.[311]  For the same reasoning employed in that Order, I find that an award totaling $172,162.57, comprising of $157,500.00 in damages to goodwill, $5,358.00 for the printer, and $9,304.57 for the forensic computer recovery services, in compensatory damages is rationally related to the amount demanded in the complaint.  Heidi Criswell is jointly and severally liable with Wildcat for this amount.

### 13.  Punitive Damages Demand

I decline to award punitive damages.  Under Pennsylvania law, punitive damages are only available to compensate "for conduct that is outrageous, because

---

[311]  ECF Nos. 146 and 147.

of the defendant's evil motive or his reckless indifference to the rights of others."[312] Fundamentally, punitive damages are penal in nature; the objective is to punish a tortfeasor for his outrageous conduct and to deter him from similar conduct in the future.[313] Pennsylvania has adopted Section 908(2) of the Restatement (Second) of Torts, which permits punitive damages only for conduct that is "outrageous because of the defendant's evil motive or his reckless indifference to the rights of others."[314] Accordingly, a punitive damages claim must be supported by sufficient evidence to establish: (1) that the defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed; and (2) that he acted or failed to act in conscious disregard of that risk.[315]

"Although ordinary negligence will not support an award of punitive damages, 'punitive damages are appropriate for torts sounding in negligence when the conduct goes beyond mere negligence and into the realm of behavior which is willful, malicious, or so careless as to indicate wanton disregard for the rights of the parties injured.'"[316] To establish a punitive damages claim, "the state of mind

---

[312] *Hutchison v. Luddy,* 870 A.2d 766, 770 (Pa. 2005) (*citing Feld v. Merriam*, 485 A.2d 742, 747 (Pa. 1984)).

[313] *See id.; see also SHV Coal, Inc. v. Continental Grain Co*., 587 A.2d 702, 704 (Pa. 1991).

[314] *Feld,* 485 A.2d at 747 (1984) (quoting Chambers v. Montgomery, 411 Pa. 339, 192 A.2d 355 (1963); RESTATEMENT (SECOND) OF TORTS, § 908(2)).

[315] *See Feld*, 485 A.2d at 1097-98.

[316] *Young v. Westfall,* No. 4:06-CV-2325, 2007 WL 675182, at *2 (M.D.Pa. Mar. 1, 2007) (McClure, J.) (*citing Hutchison*, 870 A.2d at 770).

of the actor is vital. The act, or the failure to act, must be intentional, reckless or malicious."[317] A plaintiff must allege facts sufficient to support a plausible claim demonstrating this intentional, wanton, reckless or malicious conduct.[318] A showing of mere negligence, or even gross negligence, will not suffice to establish that punitive damages should be imposed.[319]

"The standard under which punitive damages are measured in Pennsylvania requires analysis of the following factors: (1) the character of the act; (2) the nature and extent of the harm; and (3) the wealth of the defendant."[320] The United States Supreme Court has reiterated that the "most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct."[321] That Court continued, "we have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or

---

[317] *Hutchison*, 870 A.2d at 770 (*quoting Feld*, 485 A.2d at 748).

[318] *See Twombly*, 550 U.S. at 556.

[319] *Phillips v. Cricket Lighters*, 883 A.2d 439, 445 (Pa. 2005).

[320] *Grossi v. Travelers Pers. Ins. Co.*, 79 A.3d 1141, 1157 (2013)

[321] *State Farm v. Campbell,* 538 U.S. 408 (2003) (Kennedy, J.).

was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. "[322]

Although Heidi Criswell's conduct was intentional and repeated, the harm was only economic as opposed to physical, and it did not disregard the health or safety of others. Moreover, evaluating the 'wealth' of Criswell would be to use the term 'wealth' loosely. She was making between $10.75 and $11.75 during her more than a decade term of employment with Mifflinburg Telegraph. She has almost fully mortgaged Wildcat to finance the business. That is not to ignore the wholly inappropriate nature of her actions. But to award punitive damages here would be an overreach of my judicial responsibility to do justice.

### 14. Attorney's Fees

"The "American Rule" [is] that each party in a lawsuit ordinarily shall bear its own attorney's fees unless there is express statutory authorization to the contrary."[323] Attorney's fees and expenses may be awarded to a prevailing party in a federal litigation where authorized by statute, court rule, or contract.[324] In this matter, Mifflinburg Telegraph seeks an award of attorney's fees pursuant to both the Pennsylvania Uniform Trade Secrets Act and the Lanham Act. However, as described above, Plaintiff has not succeeded on the Lanham Act claim.

---

[322] *Id.*

[323] *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983).

[324] *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 257, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).

Under the PUTSA "a court may award reasonable attorney fees, expenses and costs to the prevailing party if… willful and malicious misappropriation exists."[325]   Plaintiff argues "willful and malicious misappropriation" on the part of Wildcat.[326]  'Willful and malicious' is defined as such intentional acts or gross neglect of duty as to evince a reckless indifference of the rights of others on the part of the wrongdoer and an entire want of care so as to raise the presumption that the person at fault is conscious of the consequences of his carelessness."[327]

I find here that the actions of Defendant were 'willful and malicious.'[328]  In a similar case, arising out of our sister court in the Western District of Pennsylvania, the Honorable Donetta W. Ambrose found that "where the employee spent months letting the employer believe that he was working in its best interest; used the employer's name, reputation, contacts, and resources to develop an automated system; and then resigned, taking with him the system knowing full well that not only was he misappropriating a trade secret but that he would also simultaneously be depriving the employer of the ability to use that trade secret."[329]

The factual scenario here is similar to that in Judge Ambrose's case.   Heidi Criswell spent months negotiating a buyout of Mifflinburg Telegraph while

---

[325]   12 Pa. C.S. § 5305.

[326]   ECF No. 106 at 12.

[327]   18A SUMM. PA. JUR. 2D COMMERCIAL LAW § 19:45 (2d ed.).

[328]   However, I award only attorney's fees, as Plaintiff did not request exemplary damages.

[329]   *Id. see also B & B Microscopes v. Armogida,* 532 F. Supp. 2d 744 (W.D. Pa. 2007).

simultaneously, and surreptitiously, organizing the Wildcat business.  She stole the customer list; she misappropriated re-order forms; she intentionally deleted Mifflinburg Telegraph's computer files, hindering its ability to operate.

I turn now to the "sham affidavit rule" addressed above.

Federal Rule of Civil Procedure 56(h) Affidavit or Declaration Submitted in Bad Faith. If satisfied that an affidavit or declaration under this rule is submitted in bad faith or solely for delay, the court-- after notice and a reasonable time to respond--may order the submitting party to pay the other party the reasonable expenses, including attorney's fees, it incurred as a result. An offending party or attorney may also be held in contempt or subjected to other appropriate sanctions.

In its post-hearing brief, Mifflinburg Telegraph requests $178,679.29 in legal fees and costs.   An award of the entirety of fees and costs requested is appropriate here.  Heidi Criswell's affidavit falls squarely in the "sham affidavit" category.  As described above, her affidavit is not in accordance with the other evidence of record, including emails, contracts, billing statements, her resignation letter, and even her own deposition testimony. She has been, as the English would say, somewhat economical with the truth.  As a sanction, I will not reduce the requested attorney's fees amount as I did for Wildcat, and I will instead award the entire amount requested.

Heidi Criswell will also have thirty (30) days to respond, should she so choose to do so, to the fees and costs I am ordering, pursuant to Rule 56.

### 15. Joint & Several Liability

Heidi Criswell is jointly and severally liable with the liability previously directed against Wildcat.[330] "A liability is joint and several when 'the creditor may sue one or more of the parties to such liability separately, or all of them together, at his [or her] option.'"[331] "Accordingly, 'an assertion of joint and several liability is an assertion that each defendant is liable for the entire amount, although the plaintiff only recovers the entire amount once.'"[332]

## III. CONCLUSION

Dostoyevsky's insight as to the accused's own mental state is " perhaps why no other novelist's work has been so widely drawn upon by fields and disciplines that do not normally draw on fiction for their sources."[333] It was not the quality or lack of lawyering here, that lead to the instant results. It was Heidi Criswell's own statements, oral and written, that resulted in the finding of liability without the need to resort to a jury trial.

This case should serve as a warning to other picaresque employees that it is never wise to spread the net while the bird you want to catch is watching. For the

---

[330] September 7, 2017, ECF Nos. 146 and 147.

[331] *S.E.C. v. J.W. Barclay & Co.*, 442 F.3d 834, 843 (3d Cir. 2006) *citing United States v. Gregg*, 226 F.3d 253, 260 (3d Cir.2000).

[332] *S.E.C. v. J.W. Barclay & Co., Inc.* 442 F.3d 834, 843 (3dCir. 2006) *citing Golden v. Golden*, 382 F.3d 348, 355 n. 5 (3d Cir. 2004).

[333] PROSECUTING RASKOLNIKOV, *supra*, at 64.

forgoing reasons the motion will be granted as to Heidi Criswell, denied as to Dale Criswell, and for those counts enumerated above on which I have deferred ruling pursuant to Federal Rule of Civil Procedure 56(f), final judgment will be deferred for thirty (30) days.

Damages, attorney's fees, and post judgment interest will be Ordered in accordance with this Memorandum Opinion.

The amount, totaling, $350,841.86,  is comprised of:

Computer forensic recovery:          $9,304.57

Rental payments on 720 printer:       $5,358.00

Damages to the business value:        $157,500.00

Attorney's Fees:                      $178,679.29

An appropriate Order follows.


                                    BY THE COURT:


                                    *s/ Matthew W. Brann*
                                    Matthew W. Brann
                                    United States District Judge